IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KELLY GOLDWIRE** | : | |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **CITY OF PHILADELPHIA** | : | |
| **and** | : | |
| **CITY OF PHILADELPHIA** | : | **No. 2:15-cv-2856** |
| **POLICE OFFICER  TODD** | : | |
| **LANDHERR (BADGE # 8753)** | : | |
| **Individually and as a Police Officer** | : | |
| **for the City of Philadelphia** | : | |
| **and** | : | |
| **CITY OF PHILADELPHIA** | : | |
| **POLICE OFFICER ROSA RICARDO** | : | |
| **(BADGE # 3945)** | : | |
| **Individually and as a Police Officer** | : | |
| **for the City of Philadelphia** | : | |
| **and** | : | |
| **CITY OF PHILADELPHIA** | : | |
| **POLICE OFFICER** | : | |
| **DANIEL MURAWASKI** | : | |
| **(BADGE # 8144)** | : | |
| **Individually and as a Police Officer** | : | |
| **for the City of Philadelphia** | : | |
| **and** | : | |
| **JOHN DOE CITY OF PHILADELPHIA** | : | |
| **POLICE OFFICERS I-III** | : | |
| **Individually and as Police Officers** | : | |
| **for the City of Philadelphia** | : | |

<u>**AMENDED COMPLAINT**</u>

Plaintiff, Kelly Goldwire ("Mr. Goldwire"), by and through his attorneys, Gay Chacker &

Mittin, P.C., hereby asserts the following Amended Complaint against defendants, Police Officer

Todd Landherr ("defendant Landherr"), Police Officer Rosa Ricardo ("defendant Ricardo"),

Police Officer Daniel Murawski ("defendant Murawski"), the City of Philadelphia ("City"), and

John Doe City of Philadelphia Police Officers I-III ("defendant John Doe officers")(collectively

"defendants").

## Parties

1.      Plaintiff, Kelly Goldwire is and was at all material times a resident of Philadelphia, Pennsylvania.

2.      Defendant City of Philadelphia is a Municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the City of Philadelphia Police Department, which employed the defendant police officers.

3.      Defendant Landherr was at all times relevant to this action an officer of the City of Philadelphia Police Department.  He is being sued in his individual capacity as a police officer for the City of Philadelphia.

4.      Defendant Ricardo was at all times relevant to this action an officer of the City of Philadelphia Police Department.  She is being sued in her individual capacity as a police officer for the City of Philadelphia.

5.      Defendant Murawski was at all times relevant to this action an officer of the City of Philadelphia Police Department.  He is being sued in his individual capacity as a police officer for the City of Philadelphia

6.      Defendant John Doe officers I-III were at all times relevant to this action, officers of the City of Philadelphia Police Department.  They are being sued in their individual capacities as police officers for the City of Philadelphia.

## Jurisdiction

7.      This action is brought pursuant to 42 United States Code Section 1983. Jurisdiction is based upon 28 United States Code 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction under 28 United States Code Section 1376(a) to hear and decide claims under state law.

2

## Facts

8.      Mr. Goldwire is a self-employed, certified Fugitive Recovery Agent (Certification No. PA 0111).

9.      As such an agent, Mr. Goldwire pursues individuals with open bench warrants and is licensed to carry a firearm.

10.     On or about March 24, 2014 at or about 1:30 A.M., Mr. Goldwire was in his vehicle driving in the area of 11th and Cambria Streets, Philadelphia, Pennsylvania while investigating the whereabouts of a fugitive he was pursuing.

11.     As Mr. Goldwire was driving in/or around Indiana Street, Philadelphia, Pennsylvania, he noticed a police vehicle start to follow him.

12.     Mr. Goldwire was travelling on Glenwood Avenue when he turned on Germantown Avenue.

13.     After Mr. Goldwire turned onto Germantown Avenue, the police vehicle driven by defendant Landherr engaged its emergency lights indicating to Mr. Goldwire to pull over.

14.     Mr. Goldwire complied with the traffic stop.

15.     After Mr. Goldwire pulled over, defendant Ricardo, defendant Murawski, and defendant John Doe officers arrived as back-up for the stop.

16.     The defendants, led by defendant Ledbetter, all approached Mr. Goldwire's vehicle.

17.     Defendant Landherr then informed Mr. Goldwire that one of his taillights was out.

18.     While requesting Mr. Goldwire's driver's license and insurance information, defendant Landherr, who knew Mr. Goldwire and knew his vehicle, asked whether Mr. Goldwire was armed and where his firearm was located.

19.     Mr. Goldwire informed defendant Landherr that his firearm was behind him on the floor of his vehicle.

20.     After Mr. Goldwire told the defendant Landherr the location of his firearm, defendant Landherr instructed Mr. Goldwire to get out of the car and immediately and, without basis in law, arrested him.

21.     Mr. Goldwire reminded defendant police officers that he was licensed to carry a firearm.

22.     Mr. Goldwire also offered to produce his all of his licensing paperwork, which was in his wallet and included his Act 235 license.

23.     None of the defendant police officers would look at or review Mr. Goldwire's Act 235 license.

24.     Despite knowing that Mr. Goldwire was properly licensed to carry a firearm, defendant police officers proceeded to detain and arrest Mr. Goldwire without any legal basis to do so.

25.     Despite having an opportunity to intervene and prevent Mr. Goldwire's unlawful arrest and detainment, none of the other defendant police officers made any effort to prevent what they knew to be an improper arrest.

26.     Subsequent to the unlawful detention and arrest of Mr. Goldwire, defendant police officers prepared and caused to be prepared police paperwork intentionally misrepresenting the events that led to the arrest of Mr. Goldwire.  These misrepresentations were intentional, malicious, in bad faith, deliberately indifferent and recklessly indifferent to Mr. Goldwire's rights.

4

27.     At no time during the incident described in this complaint did Mr. Goldwire violate the laws of Pennsylvania or any other jurisdiction as described in the bogus paperwork prepared by defendant Landherr.

28.     Subsequent to the unlawful arrest, Mr. Goldwire unlawfully was charged with, Firearms Not To Be Carried Without License and Carry Firearms Public In Philadelphia.

29.     Mr. Goldwire was unable to afford bail initially despite his false arrest, imprisonment and malicious prosecution.

30.     As a result, he remained incarcerated for a period of at least five (5) days until he was able to gather sufficient bail funds.

31.     At the time that the defendant police officers improperly arrested and charged Mr. Goldwire, he advised defendants that he was receiving chemotherapy and could not afford to miss his medical treatment appointment, which was scheduled for later that morning.

32.     As a result of his incarceration, Mr. Goldwire missed one of his chemotherapy appointments.

33.     On December 30, 2014, Mr. Goldwire was found not guilty on all charges.

34.     Mr. Goldwire continues to suffer from, *inter alia,* anxiety, fear, and mental harm.

35.     Mr. Goldwire was without his license to carry a firearm for approximately five (5) months as a result of the defendant police officers' improper and illegal actions.

36.     To date, Mr. Goldwire still does not have possession of his firearm.

37.     As a result of the defendant police officers' actions, Mr. Goldwire has been unable to work as a Fugitive Recovery Agent.

38.     As a direct and proximate result of the defendants' actions, Mr. Goldwire was deprived of rights, privileges and immunities under the Fourth and Fourteenth Amendments to the United States Constitution and in particular the right to be free from malicious prosecution, the right to be free from false arrest and false imprisonment, and the right to due process of law.

39.     The actions and/or inactions of the defendants violated the clearly established federal constitutional rights of Mr. Goldwire to freedom from malicious prosecution, the right to be free from false arrest and false imprisonment and the right to due process of law.

40.     Moreover, there have been numerous media reports and cases similar to the instant matter demonstrating that the violation of Mr. Goldwire's federal constitutional rights was attributable to the policies and/or customs of the City of Philadelphia. See August 31, 2010 Philly.com Article; March 19, 2012 Pennsylvania Record Article; May 17, 2011 Blog Post by Jonathon Turley, true and correct copies of which are attached hereto as Exhibits "A" through "C"; see also, Sharper v. City of Philadelphia et al., 2:14-cv-05299-BMS; Fiorino v. City of Philadelphia et al., 2:12-cv-00769-TON.

41.     In particular, the website Philly.com reported that the City had confiscated the guns of at least nine security guards who possessed valid Act 235 licenses to carry a concealed weapon. See Exhibit "A".

42.     Like Mr. Goldwire, these men were working at the time their weapons were confiscated. See id.

43.     For example, one man identified by the article simply as "Oliver, 42, of Northeast Philadelphia" was traveling home from his security guard job when he was pulled over by police for allegedly running a stop sign.  Police did not honor any of his valid carry permits, forced him to stand outside in the cold for four (4) hours, held him in custody for eighteen (18) hours, denied

6

him his diabetes medicine throughout the ordeal, and thereafter booked him on firearm charges. Id.

44.     The case was withdrawn by the District Attorney's office within a month.  Id.

45.     At the time of publication, the City confirmed that it was handling eight such cases. Id.

46.     Thus, with respect to Mr. Goldwire, the actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of inadequately training police officers, including defendant officers, with respect to Act 235 and similar concealed and open carry gun laws in effect at the time of the alleged incident.

47.     Furthermore, the actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of engaging in a widespread assault on citizens' Second Amendment rights, specifically by unlawfully arresting people who are legally carrying firearms with a valid Act 235 license.

48.     The actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of the City of inadequately training its officers regarding Act 235 and how to investigate whether a citizen with an Act 235 certificate may properly carry a firearm.  In addition, the City of Philadelphia failed to supervise its officers with respect to the enforcement of Act 235.

49.     The actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of circumventing the gun laws of the Commonwealth of Pennsylvania and covering-up and avoiding detection of acts of police abuse or improper use of authority by charging victims of police abuse with criminal offenses thereby attempting to prevent the victim's access to the courts and to due process.

50.     The actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of inadequately supervising and training their police officers, including the defendant officers, thereby failing to adequately discourage further constitutional violations on the part of their police officers.  The City of Philadelphia did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct.

51.     The actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of inadequately supervising and training their police officers, including the defendant officers, against a code of silence or "blue code" of officers refusing to intervene against or provide truthful information against constitutional violations and misconduct committed by their fellow officers.

52.     It is believed and therefore averred that the City of Philadelphia and their Police Departments have adopted and maintained for many years a recognized policy, custom and practice, which allows for falsely arresting, falsely imprisoning and maliciously prosecuting suspects by Police Officers, the same type of treatment to which Mr. Goldwire was subjected, and which violates the Fourth and Fourteenth Amendments of the Constitution of the United States, the laws of the United States and is in violation of 42 U.S.C. Section 1983.

53.     It is believed and therefore averred that further evidence of these policies and/or customs is within the control of the City of Philadelphia.

**COUNT ONE**
**42 U.S.C. § 1983 Against Individual Defendant**
**City of Philadelphia Police Officer Landherr**

54.     Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 53, inclusive, of his Complaint as if the same were set forth at length herein.

55.     Plaintiff claims damages for the injuries set forth above under 42 U.S.C. Section 1983 against defendant Landherr for violation of Mr. Goldwire's constitutional rights under color of law.

56.     As aforesaid, defendant Landherr, individually and acting within the course and scope of the City of Philadelphia employment, under color of state law, and pursuant to the customs, policies and practices of the City of Philadelphia Police Department intentionally and maliciously deprived Mr. Goldwire of his rights, privileges and immunities under the Constitution of the United States and the laws of the United States; in particular, the right to be free from false arrest, false imprisonment and malicious prosecution; which violated Mr. Goldwire's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, the laws of the United States, and were in violation of 42 U.S.C. Section 1983.

57.     The defendant Landherr has been deliberately indifferent to the rights of citizens of the Commonwealth of Pennsylvania and, in particular, City of Philadelphia to be free from false arrest, false imprisonment and malicious prosecution, which deliberate indifference violated Mr. Goldwire's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, the laws of the United States, and were in violation of 42 U.S.C. Section 1983.

58.     The defendant Landherr invaded the privacy and/or cast Mr. Goldwire in a false light by making it appear to others that Mr. Goldwire had violated or was violating the laws of the Commonwealth of Pennsylvania or of another jurisdiction.

59.     As a result of the above actions, Mr. Goldwire suffered the damages as aforesaid.

WHEREFORE, plaintiff, Kelly Goldwire, demands judgment in his favor and against defendant Landherr for compensatory damages, reasonable attorney fees and costs, interest; and such other and further relief as appears reasonable and just.

## COUNT TWO
### Bystander Liability
### 42 U.S.C. § 1983 Against Individual Defendant Ricardo, Defendant Murawski, and Defendant John Doe Police Officers I through III

60.     Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 59, inclusive, of his Complaint as if the same were set forth at length herein.

61.     Plaintiff believes and therefore avers that defendant police officers encouraged and stood idly by while Mr. Goldwire was subjected to malicious prosecution, false arrest and false imprisonment, despite the fact that Mr. Goldwire had done nothing wrong and had offered proof that he licensed to carry a firearm.

62.     Defendant police officers failed to fulfill their obligation to intervene when they had an independent and affirmative duty to prevent the malicious prosecution, false arrest and false imprisonment of Mr. Goldwire.

63.     By encouraging and failing to intervene, the defendant police officers effectively assisted each other in depriving Mr. Goldwire of his Constitutional rights and privileges under the Fourth and Fourteenth Amendments to the Constitution of the United States.

64.     As a result of the above actions, Mr. Goldwire suffered the damages as aforesaid.

65.     The defendant police officers made statements among themselves and others in order to conceal their unlawful and unconstitutional conduct and in an attempt to deny plaintiff's access to the courts and to due process and to cover-up the malicious prosecution, false arrest and false imprisonment of Mr. Goldwire.

WHEREFORE, plaintiff, Kelly Goldwire, demands judgment in his favor and against Defendant Ricardo, Defendant Murawski, and Defendant John Doe Police Officers I-III for compensatory damages, reasonable attorney fees and costs, interest; and such other and further relief as appears reasonable and just.

## COUNT THREE
### 42 U.S.C. Section 1983 Against City of Philadelphia

66.     Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 65, inclusive, of his Complaint as if the same were set forth at length herein.

67.     Prior to March 24, 2014, the City of Philadelphia developed and maintained policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons, which caused the violation of Mr. Goldwire's rights.

68.     In particular, and as evidenced by numerous media reports and similar lawsuits, it was the policy and/or custom of the City of Philadelphia to inadequately train their police officers, including defendant officers, with respect to Act 235 and similar concealed and open carry gun laws in effect at the time of the alleged incident.  See Exhibits "A" through "C"; see also, Sharper v. City of Philadelphia et al., 2:14-cv-05299-BMS; Fiorino v. City of Philadelphia et al., 2:12-cv-00769-TON.

69.     It was the policy and/or custom of the City of Philadelphia to engage in a widespread assault on citizens' Second Amendment rights, specifically by unlawfully arresting people who are legally carrying firearms using gun licenses from reciprocal states and those in possession of a valid Act 235 license.

70.     It was the policy and/or custom of the City of Philadelphia to inadequately train its officers regarding Act 235 and how to investigate whether a citizen with an Act 235 certificate may properly carry a firearm.  In addition, the City of Philadelphia failed to supervise its officers with respect to the enforcement of Act 235.

71.     It was the policy and/or custom of the City of Philadelphia to circumvent the gun laws of the Commonwealth of Pennsylvania and to cover-up and avoid detection of acts of police abuse or improper use of authority by charging victims of police abuse with criminal offenses

11

thereby attempting to prevent the victim's access to the courts and to due process.

72.     It was the policy and/or custom of the City of Philadelphia to inadequately supervise and train their police officers, including the defendant officers, thereby failing to adequately discourage further constitutional violations on the part of their police officers.  The City of Philadelphia did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct.

73.     It was the policy and/or custom of the City of Philadelphia to inadequately supervise and train their police officers, including the defendant officers, against a code of silence or "blue code" of officers refusing to intervene against or provide truthful information against constitutional violations and misconduct committed by their fellow officers.

74.     It is believed and therefore averred that the City of Philadelphia and their Police Departments have adopted and maintained for many years a recognized policy, custom and practice, which allows for falsely arresting, falsely imprisoning and maliciously prosecuting suspects by Police Officers, the same type of treatment to which Mr. Goldwire was subjected, and which violates the Fourth and Fourteenth Amendments of the Constitution of the United States, the laws of the United States and is in violation of 42 U.S.C. Section 1983.

75.     It is believed and therefore averred that at the time that Mr. Goldwire was falsely arrested, falsely imprisoned and maliciously prosecuted, the City of Philadelphia knew or should have known of the previously described policy, custom and practice of their Police Departments, and it deliberately, knowingly, and negligently failed to take measures to stop or limit the policy, custom and practice, *inter alia*, providing proper training, supervision, and control of the officers, agents, and/or employees of the City of Philadelphia.

76.     As a result of the above described policies and customs, police officers of the City of Philadelphia and the City of Philadelphia, including the defendant police officers, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated and condoned.

77.     As a result of the above actions, Mr. Goldwire suffered the damages as aforesaid.

78.     The actions of the City of Philadelphia were so malicious, intentional and reckless, and displayed such a reckless indifference to Mr. Goldwire's rights and well-being that the imposition of punitive damages is warranted.

WHEREFORE, plaintiff, Kelly Goldwire, demands judgment in his favor and against defendant, City of Philadelphia for compensatory damages, reasonable attorney fees and costs, interest; and such other and further relief as appears reasonable and just.


/BSC5184
BRIAN S. CHACKER, ESQUIRE
GAY CHACKER & MITTIN, P.C.
1731 Spring Garden Street
Philadelphia, PA  19130
bchacker@gaychackermittin.net
Tel: (215) 567-7955
Fax: (215) 567-6809
**Attorneys for Plaintiff**
**Kelly Goldwire**

Dated: September 18, 2015

13



# philly●com

🏠 | News | Sports | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

BREAKING   NEWS VIDEO   BLOGS   PHILADELPHIA   NEW JERSEY   POLITICS   EDUCATION   OPINION   OBITUARIES   NATION/WORLD   WEATHER   TRAFFIC   LOTTERY

Collections

## Guns of Contention: If Philly says no, Florida can say yes

| 10 | 1 | 0 | @ |
| Like | Tweet | G+1 | |



From left, Kenneth Sharper, John Solomon, Richard Oliver and Jamell Gaines. All had guns taken by police and have not gotten them back. (Sarah J. Glover/Staff) (Lissa Atkins)

**By Stephanie Farr, farrs@phillynews.com 215-854-4225**
POSTED: August 31, 2010

In the last two years, Philadelphia police have confiscated guns from at least nine men - including four security guards - who were carrying them legally, and only one of the guns has been returned, according to interviews with the men.

Eight of the men said that they were detained by police - two for 18 hours each. Two were hospitalized for diabetic issues while in custody, one of whom was handcuffed to a bed. Charges were filed against three of the men, only to be withdrawn by the District Attorney's Office.

The civil-rights unit of the City Solicitor's Office confirmed that it is handling eight such cases. Two of the men interviewed by the *Daily News* said that they rejected settlement offers from the city ranging from $3,500 to $7,500. One accepted a $5,000 offer.

Most of the cases hinge on what local authorities call the "Florida loophole," under which a Pennsylvania resident can obtain a nonresident permit to carry a concealed weapon through the mail from another state, even without a permit in Pennsylvania.

The "loophole" is unpopular with Philadelphia cops, who say that it allows those denied a permit here or whose permits were revoked to circumvent Philadelphia authorities and obtain it elsewhere.

But proponents say that it's necessary because Philadelphia has unusually strict criteria for obtaining a concealed-carry permit. Philadelphia, according to police and gun owners, relies heavily on a clause that allows denial of a permit based on "character and reputation" alone.

The men interviewed by the *Daily News* had varying reasons for seeking nonresident permits from Florida or other states, including having been denied a Philadelphia permit because of unpaid parking tickets. Some said that they carry a Florida permit because it is recognized by more states than a Pennsylvania one.

Two of the security guards said that they were on the job when their guns were taken, and that they were holding licenses issued by the state police to security officers under Pennsylvania Act 235, the Lethal Weapons Training Act.



We specialize in answers.

[See why ▶]

🔵 Rowan University #AskRowanU

**We Recommend**

City Howl Help Desk: IN NEED OF A
COP? MAYBE YOU COULD RENT ONE
*December 7, 2011*



We specialize in answers.

[See why ▶]

🔵 Rowan University #AskRowanU



EXHIBIT

A

Despite following the law, all of the men said that they were treated like criminals by city cops who either ignored their rights or didn't know the laws.

Lt. Fran Healy, special adviser to the police commissioner, acknowledged that some city cops apparently are unfamiliar with some concealed-carry permits. But he said that it's better for cops to "err on the side of caution."

"Officers' safety comes first, and not infringing on people's rights comes second," Healy said.

Both Healy and Craig Straw, chief deputy city solicitor with the civil-rights unit, said that they could not speak to individual cases because of pending litigation, but said that the main issue with Florida permits is that officers on the street are not able to check the validity of a permit 24 hours a day.

"There's a lot of bad guys out there," Healy said. "I want to use my time on them and not waste it on this nonsense."

**9 SEPARATE INCIDENTS**

The nine men learned about each other because one of them, Richard Oliver, teaches safety courses required for nonresident permits from other states but not required by Pennsylvania.

In interviews with the *Daily News*, each said that Philadelphia police had confiscated guns that they had been legally carrying.

**-- Oliver, 42, of Northeast Philadelphia:** Last year, Oliver, who had nonresident permits from three states and an Act 235 license, was driving to his job as a security guard when police pulled over his car for allegedly running a stop sign in West Philadelphia. He said that police did not honor any of his permits and held him in custody for 18 hours, forcing him to stand outside for four hours in winter and denying him his diabetes medication.

His ordeal eventually landed him in Mercy Philadelphia Hospital, at 54th Street and Larchwood Avenue, in West Philadelphia, before he was booked on firearms charges and held on $15,000 bail, according to court records. In less than a month, his case was withdrawn by the District Attorney's Office, and a week later his gun was returned on a judge's order.

Later, Oliver obtained a Philadelphia permit to carry. As owner of the Parapet Group, a protection-and-security company, Oliver continues to teach the safety courses.

Although the charges were withdrawn, they're still visible on Oliver's online court record. He said that the city offered him a $7,500 settlement, which he rejected.

"If ignorance of the law is not an excuse for a citizen," said Oliver, "it cannot be an excuse for law enforcement who are sworn to enforce the law."

**-- Randy Huggins, 39, of West Philadelphia:** On Election Day in November 2008, Huggins, who had just finished clerking at the polls at 64th and Callowhill streets, went to his mother's house to get his gun after the polls closed. He was stopped with the gun and questioned by police who overheard him on his phone trying to quell a family member's fears that he'd been the victim of a murder, he said.

Huggins said that police did not honor either of his nonresident permits and that he subsequently spent 14 hours in custody. Huggins, a diabetic, said that he was handcuffed to a bed at Thomas Jefferson University Hospital, in Center City, after his blood pressure skyrocketed. He said that he then was interrogated by homicide detectives for hours before he was released without being charged with a crime. Despite numerous attempts, Huggins said, he was unable to retrieve either his gun or his permits.

He said that the city offered him a $3,500 settlement, which he rejected.

**-- Jameel Gaines, 32, of Oxford Circle:** In April, Gaines, who has a permit to carry a concealed weapon in Philadelphia, and is an Act 235 agent, was working security at the Comfort Zone Lounge, in West Philadelphia, when cops raided the bar.

Gaines, who was in uniform, said that police took his handgun from his holster and took a shotgun he'd hidden behind the bar. After the raid, Gaines said, cops returned his handgun but told him that they were keeping his shotgun. He was never arrested or charged with a gun crime. He still has both his Philadelphia permit and his Act 235 license, but the shotgun has not been returned.

"This is the first time I had negative issues with the Philadelphia Police Department," said Gaines, adding that as a security guard he has turned over numerous illegal weapons to police.

**-- Samuel Tiru, 28, of North Philadelphia:** During a car stop in 2008 in North Philadelphia, Tiru said, an officer referred to his Florida gun permit as "baloney." He said that he subsequently was taken into custody, held for 18 hours and booked on firearms charges.

The case later was withdrawn by the District Attorney's Office, according to court records, but Tiru said that he has been unable to get his gun back and that police told him that they couldn't find his property receipt.

"It's not fun to sit in jail for something you didn't do wrong," Tiru said. "It wasn't a good experience knowing that you got booked for having a gun permit."

**-- John Solomon, 24, of Germantown:** Solomon, who has both a Florida gun permit and an Act 235 license, said that cops did not honor either document during a car stop in 2008. He said that he was taken into custody for six hours but was never charged with a crime. Solomon said that he was unable to get his gun back and was not given a property receipt.

**-- Frank Walker, 37, of West Philadelphia:** Walker said that police did not honor his Virginia nonresident gun permit when they stopped his car in July in West Philadelphia. He said that he was held in custody for four hours, then was let go without being charged with a crime. Walker said that although a supervisor apologized to him, he was told that his weapon wouldn't be returned because the police "already went through the paperwork of writing it up."

"I feel as though I've been robbed, because if I go out there and I take something from somebody, I'm going to jail," he said. "But I want to know why they can just take my gun for no reason."

**-- Ron Frierson, 57, of Wynnefield:** In 2009, Frierson, who was carrying a concealed weapon using a Florida permit, was pulled over for driving under the influence in West Philadelphia. He later was charged and opted into a first-time-offenders program for possession of marijuana and DUI, according to court records. He was not charged with a gun crime.

Frierson said that he was not able to get his weapon back or get a property receipt. He said that he signed off on a $5,000 settlement from the city, but has not received the money.

**-- Ras-Tesfa Ferguson, 27, of Wyncote, Montgomery County:** Ferguson, who has a Montgomery County gun permit and permits from Florida and New Hampshire, said that in 2008 he was outside a house in the Lawncrest section of Northeast

Philadelphia when police descended on the block. He said that cops did not honor any of his permits and charged him with possessing firearms not to be carried without a license and related gun crimes. Online court records show that Ferguson also was charged with burglary and simple assault in the case, but that all charges later were withdrawn.

Ferguson said that his gun and permits were confiscated. He said that he never got his gun back, although he was able to get his Montgomery County permit renewed. "Montgomery County is used to gun permits," he said. "Philadelphia acts like you broke the law."

-- Kenneth Sharper, 29, of North Philadelphia: Sharper, who has an Act 235 license and a Philadelphia gun permit, said that he was working security in 2008 at the Players Club, in Northeast Philadelphia, when he and a police officer "had words, like two grown men."

After closing time, Sharper said, police arrested him for disorderly conduct and public intoxication and took him into custody. Sharper said that he never drinks at work and that cops refused to give him a sobriety or blood test. He said that he was held for eight hours and that police took his gun and his Philadelphia permit and have not returned them.

He now carries a Florida nonresident permit and still has a valid Act 235 license.

'THESE GUYS AREN'T THUGS'

Many of the men whose guns were taken said that they were told to write a letter to the police commissioner to seek the return of their firearm. Two of the men wrote letters but said that they received no response.

Guy Sciolla, a defense lawyer whose firm is handling at least 10 such civil suits, said that the men should not have been "separated from their legally possessed firearms."

Sciolla said that even though some officers may not like the "loophole," their disdain for the law should not allow them to circumvent it.

"These guys aren't thugs, they're going about their business, going to work, and they've complied with the law," he said of the men whose guns were confiscated.

"If the bottom line is the police are upset because they are going around them, it's OK if they want to take it personally, but you can't use arrest powers because you're upset on a personal level."

Mary Catherine Roper, a staff attorney at the American Civil Liberties Union of Pennsylvania's Philadelphia office, said that the cases seem "pretty outrageous."

"This idea of taking people's guns who are carrying them legally and arresting them is absurd," she said. "The police don't get to decide what is a crime - they only get to enforce what is a crime.

"They are simply acting as vigilantes here and deciding they know better than the law."

Straw, of the City Solicitor's Office civil-rights unit, said that his department is handling about eight such cases of "constitutional claims that civil rights were violated by us taking their property and by them being falsely arrested."

Healy, the special adviser to the police commissioner, said that he is working on uniform guidelines for officers on the street on how to handle nonresident gun permits.

Meanwhile, Roper said that citizens should remain wary of police who arrest people complying with the law and take their property, even if it is a gun.

"The public may be saying, 'You're getting guns off the street,' " Roper said.

"But there's got to come a point where you want your police, of all people, to respect the law.

"This isn't technical, it's fundamental."

**You May Like**                                                                 Sponsored Links by Taboola

**An Accepted Method To Pay Off A Credit Card**
NextAdvisor

**This Hoodie Is So Insanely Popular You Have To Wait Months To Get It**
American Giant Hoodie

**Why Aren't Homeowners Taking Advantage of HARP?**
LowerMyBills

**Warren Buffett Just Gave Americans a Big Warning**
The Motley Fool

**2 New Recipes that Turbocharge Weight Loss!**
RandomHouse | Zero Belly Cookbook

**3 Reasons to Say Goodbye to Spreadsheets in Accounting**
Intacct

**More From The Web**

- **The method used to pay down credit card debt at a furious pace** (NextAdvisor)
- **This Hoodie Is So Insanely Popular You Have To Wait Months To Get It** (American Giant Hoodie)
- **Why Aren't Homeowners Taking Advantage of HARP?** (LowerMyBills)
- **Warren Buffett Just Gave Americans a Big Warning** (The Motley Fool)
- **2 New Recipes that Turbocharge Weight Loss!** (RandomHouse | Zero Belly Cookbook)
- **Boy, 2, Dies; Police Suspect Abuse, Hold Father For Assault Head Injuries Killed Shaeer Bailey. Wesley Wise, His Father, May Face Murder Charges. Dhs Has A Case File.**
- **Sources: Philly cops probing sergeant over surrendered guns**
- **Cops: Intruder takes girl from house, beats her**
- **North Philly Horror story**
- **Haverford School's Kevin Carter, Wood's Anthony Russo players of week**

**More From Philly.com**

Promoted Links by Taboola

Comments for this thread are now closed.   ✕

**0 Comments**    Philly.com      ● Login ▾

♥ Recommend    ☐ Share      Sort by Best ▾

This discussion has been closed.

⚡ SPONSORED



- 1. Your Cable Company Doesn't Want You To Know This 2 months ago fool.com The Motley Fool Fool.com (sponsored)



✉ Subscribe    ⊕ Add Disqus to your site    🔒 Privacy

comments powered by Disqus

**Commenting policy | Comments FAQ**

# FLIR® Infrared Cameras

flir.com/Thermal-Simulator

## Take An IR Camera For A Virtual Test Drive. See What You're Missing

### FEATURED ARTICLES



City: New road closings, fencing for pope visit; help for businesses



D.A. to probe prison death of 'Fat Mike'



They'll never forget: Attacks changed their lives forever

#### More:

In Bulk Trucking, Chemical Leaman Is Rolling Toward The Top

Frank Nofer, 71, famed graphic artist

George Mattson, 88, Olympian, Crew Coach

De Mazia Art Brings $2.38 Million

Leader Of Jbm Sentenced To Life Aaron Jones Was Convicted Of Conspiring To Distribute $100 Million In Cocaine. He Plans To Appeal.

Jbm 8 Believed Founders

Index by Keyword | Index by Date | About Philly.com | Contact Us | Terms of Use & Privacy Statement | Copyright 2015

PennRecord.com

# Lawsuit claims harassment of lawful gun owners is turning Phila. into a 'police state'

Pennsylvania Record Report Mar. 19, 2012, 6:59am



A federal civil rights lawsuit filed by a Philadelphia man on March 15 alleges that the City of Philadelphia and its police department have been engaging in a widespread assault on citizens' Second Amendment rights, specifically by unlawfully arresting people who are legally carrying firearms using gun licenses from reciprocal states.

In a 43-page lawsuit filed at the U.S. District Court for the Eastern District of Pennsylvania by Philadelphia attorney James E. Lee, of the firm Brooker, Richardson, Dickerson, Lee & Associates, on behalf of city resident Jeff Lavalliere slams the City of Philadelphia, the Philadelphia Police Department and various law enforcement higher-ups for a slew of constitutional rights violations, asserting that the city's constant and longstanding assault on the Second Amendment is turning Philadelphia into a "police state."

Despite the fact that Philadelphia cannot legally enact its own gun laws due to the state's preemption



statute, the city "has a long and unsuccessful history of attempting to regulate lawful gun ownership," the lawsuit claims.

The suit goes on to label Mayor Michael Nutter as a "malicious and vocal advocate of abolishing the Second Amendment rights of citizens like Mr. Lavalliere."

"Highly prone to rhetorical hyperbole, Mayor Nutter often misstates facts and claims that lawful gun owners are violating the civil rights of other citizens," the lawsuit states. "Mayor Nutter wrongfully and maliciously claims that the formal reciprocity agreements with other states … is a 'loophole' that allows firearms to be unlawfully possessed in the City of Philadelphia."

The lawsuit outlines three separate incidents in which Lavalliere was unlawfully detained, accosted by police and had his firearm and Florida gun license seized without provocation.

(Florida and Pennsylvania have a reciprocity agreement by which each state recognizes the others' gun licenses. Philadelphia, however, passed an ordinance banning the practice. The local law is believed by many to be illegal).

Lavalliere makes his living as an armed security agent, and his lawsuit alleges that the constant police harassment, and the fact that officers seized, and have yet to return, his property, has made it so he has been unable to make a living in his chosen field.

The lawsuit states that following a third incident in May 2011, during which he was arrested and charged with three felonies – he was later found not guilty of all criminal charges – Lavalliere lost his job as an armed security agent and he has been unable to find work since.

"Even though Mr. Lavalliere was completely exonerated by a state court judge, [the defendants]

have refused to return Mr. Lavalliere's firearm, ammunition, concealed weapons license and Act 235 Permit," the lawsuit states.

Act 235 relates to armed guard certification in Pennsylvania.

The lawsuit claims that the defendants' actions unlawfully interfere with Lavalliere's right to bear arms, his rights to contract for lawful employment, and his rights to lawful travel.

The complaint also alleges that because the City of Philadelphia and its police department allow city officers to work as armed security agents while off-duty, the defendants can personally benefit from denying Lavalliere his ability to carry firearms, which he does for his job.

The lawsuit contains numerous allegations of constitutional violations. It also lodges a claim of failure to supervise against Police Commissioner Charles Ramsey and Deputy Police Commissioner Stephen Johnson, as well as claims of failure to intervene and stop a violation of civil rights against the two department higher-ups.

The suit also contains counts of denial of due process, retaliation, taking property rights, invasion of privacy – false light, assault and battery, false arrest and false imprisonment, malicious prosecution and abuse of process, intentional infliction of emotional distress and conspiracy under the color of state law.

Lavalliere demands punitive damages in the amount of $150,000 on all claims for relief, as well as attorney's fees and other litigation costs. He is also demanding a jury trial.

Additional defendants named in the lawsuit are Lisa King, the lieutenant in charge of the police department's Gun Permits Unit, Detective Vincent Guarna, and Officers Velez, Cartagena, Johnson,

Monahan and Rivera. None of the officers' first names are given.

*The federal case ID number is 2:12-cv-01357-BMS.*

# JONATHAN TURLEY

**Res ipsa loquitur ("The thing itself speaks")**

# Menu

Skip to content

- Home
- Bio
- Civility Rule
- Columns
- Corrections
- Weekend Bloggers

HomePhiladelphia Police Wrongly Accuse Man of Gun Violation in Abuse Confrontation And Then Charge Him Instead With Disorderly Conduct

# Philadelphia Police Wrongly Accuse Man of Gun Violation in Abuse Confrontation And Then Charge Him Instead With Disorderly Conduct

1, May 17, 2011 jonathanturley Bizarre, Criminal law, Politics, Society



There is an interesting audio recording (below) from a man, Mark Fiorino, 25, who was confronted by a Philadelphia police officer about carrying a



gun in public. Fiorino is allowed to open carry in the city, but the officers appeared completely ignorant of their own directives and became increasingly hostile to Fiorino's effort to show them that he was lawfully carrying the weapon. After concluding that he was right, he was released . . . only to be charged later with disorderly conduct based on his effort to show the officers that they were wrong about the law.

Fiorino carries a .40-caliber Glock on his hip in plain view. Sgt. Michael Dougherty spotted the gun and pulled his own weapon — shouting "Yo, Junior, what are you doing?"

What follows is an audio tape of the confrontation. The officers become increasingly profane and insulting — particularly after learning that they have been taped. Dougherty asked, incorrectly, "Do you know you can't openly carry here in Philadelphia?: Fiorino responds by saying, correctly, "Yes, you can, if you have a license to carry firearms. It's Directive 137. It's your own internal directive." He is right. You can carry if you have a concealed weapons permit (a slightly higher standard than the rest of the state).

I will not hide my unease about open carry laws and I am sympathetic with the difficulty that it poses for officers who have to determine if someone is a danger to themselves and others. However, the conduct of these officers in this case should be a matter of internal discipline. Instead, as is often the case with taped police encounters, the prosecutors are now seeking to convict Fiorino on a different charge after confirming that he was right. He is now being charged despite the fact that he never raises his voice and remains calm throughout the encounter.

Here is the directive that Fiorino referenced:

Police directive sent to all districts regarding open carry in Philadelphia, PA Sept 22, 2010

GENERAL: 1272 09/22/10 12:53:20

TO : ALL COMMANDING OFFICERS / DEPARTMENT HEADS
SUBJECT : FIREARM OPEN CARRY LAW IN PHILADELPHIA

1. DIRECTIVE 137, ENTITLED "FIREARMS" IS BEING UPDATED CONCERNING THE PENNSYLVANIA OPEN CARRY LAWS REGARDING THE CITY OF PHILADELPHIA. THIS TELETYPE REFLECTS THE NEW POLICY AS IT WILL APPEAR IN THE DIRECTIVE.

2. ALL OFFICERS SHOULD BE AWARE THAT PENNSYLVANIA IS CONSIDERED AN "OPEN CARRY STATE" WITH THE EXCEPTION OF PHILADELPHIA. IT IS IMPORTANT TO DEFINE A FEW TERMS USED, WHICH ARE AS FOLLOWS:

"OPEN CARRY" REFERS TO THE ACT OF OPENLY AND VISIBLY CARRYING A FIREARM ON ONE'S PERSON.

"OPEN CARRY STATE" REFERS TO A STATE THAT ALLOWS PEOPLE TO OPENLY AND VISIBLY CARRY A FIREARM ON ONE'S PERSON WITHOUT A SPECIAL LICENSE OR PERMIT.

"CONCEALED CARRY FIREARMS LICENSE" REFERS TO A SPECIFIC LICENSE ISSUED TO AN INDIVIDUAL AUTHORIZING THE PERSON TO CARRY A FIREARM CONCEALED ON HIS OR HER PERSON OR VEHICLE.

3. IN PHILADELPHIA, UNLIKE ANY OTHER PART OF THE STATE, FOR ANY PERSON TO LAWFULLY, OPENLY AND VISIBLY CARRY A FIREARM, THAT PERSON MUST HAVE A CONCEALED CARRY FIREARMS LICENSE. SO, IN PHILADELPHIA, IF A PERSON HAS A VALID CONCEALED CARRY FIREARMS LICENSE, HE OR SHE CAN LEGALLY CARRY A FIREARM EITHER OPEN AND VISIBLE OR CONCEALED.

4. AN OFFICER ENCOUNTERING A PERSON CARRYING A FIREARM
OPENLY IN PHILADELPHIA SHOULD FOR THE SAFTEY OF PUBLIC
INVESTIGATE AS A POSSIBLE VUFA VIOLATION.

A. SINCE A SEPARATE LICENSE IS REQUIRED IN PHILADELPHIA
AND IT IS IMPOSSIBLE FOR ANY OFFICER TO KNOW WHO DOES
AND DOES NOT HAVE A VALID CONCEALED CARRY LICENSE, IT
IS ENTIRELY REASONALBE FOR OFFICERS TO TEMPORARILY
DETAIN AND INVESTIGATE ANY INDIVIDUAL CARRYING A
FIREARM EXPOSED TO DETERMINE IF THE PERSON IS
OPERATING WITH THE LAW.

B. IMMEDIATLEY SEIZE ANY FIREARMS FOR OFFICER SAFETY
DURING THE STOP AND UNLOAD THE FIREARMS IF POSSIBLE,
BUT ONLY IF IT CAN BE DONE SAFELY.

C. A 75-48A MUST BE COMPLETED AND THE BASIS FOR THE STOP
WOULD BE A "POSSIBLE VUFA VIOLATION"

D. ONCE THE OFFICER RECEIVES CONFIRMATION THAT THE
CONCEALED CARRY LICENSE IS VALID, AND THERE ARE NO
OTHER OFFENSE OR VIOLATIONS BEING INVESTIGATED,
OFFICERS SHOULD RETURN THE FIREARM AND AMMUNITION
BACK TO THE INDIVIDUAL AT THE END OF THE STOP.

E. HOWEVER, IF THE INDIVIDUAL CANNOT PRODUCE A VALID
CONCEALED CARRY LICENSE OR THE LICENSE IS NOT VALID
(I.E. EXPIRED OR REVOKED), PROBABLE CAUSE THEN EXISTS
TO ARREST THE INDIVIDUAL FOR THE VUFAVIOLATION AND
TRANSPORT THE INDIVIDUAL TO THE DIVISIONAL DETECTIVES
FOR PROCESSING. THE FIREARM AND AMMUNITION SHOULD
BE PLACED ON A PROPERTY RECEIPT (75-3) AND MARKED AS

" EVIDENCE". A 75-48A FOR THE INITIAL STOP MUST BE
PREPARD ALONG WITH A 75-48 FOR THE VUFA ARREST.

The District Attorney's Office is pressing charges with reckless endangerment and disorderly
conduct. I believe those charges are wildly excessive and retaliatory.

While he should have followed the directions of the officers in dropping to his knees, it is hardly
the conduct to support a criminal charge. For gun owners, the prospect of being constantly told to
drop to their knees while staring down a gun barrel may seem like retaliation by the police
department, which is clearly hostile to the right created by law. There are ample reasons to
oppose open carry laws, but the government has affirmed this right for citizens like Fiorino.
There is an obvious need for better training of officers on the existence of the right. Moreover,
regardless of the legitimate need to investigate, these officers were plainly unprofessional in their
language and treatment of Fiorino.

Source: Philly

Jonathan Turley

**Share this:**

- Twitter6
- Reddit
- Facebook32

## CERTIFICATE OF SERVICE

I, Brian S. Chacker, Esquire, hereby certify that a true and correct copy of the foregoing

Plaintiff's Amended Complaint  was served this 18th day of September, 2015, by the ECF

electronic filing system, upon the following:

Michael R. Miller, Esquire
Assistant City Solicitor
City of Philadelphia Law Department
1514 Arch Street, 14th Floor
Philadelphia, PA 19102
Michael.r.miller@phila.gov

/s BSC5184
Brian S. Chacker, Esquire