### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELLY GOLDWIRE, | : | |
| Plaintiff, | : | No. 2:15-cv-2856 |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| CITY OF PHILADELPHIA, et al. | : | |
| Defendants. | : | |

### ORDER

AND NOW, this _____ day of _____, 2016, upon consideration of the

Motion for Summary Judgment of Defendants' and Plaintiff's opposition thereto, it is hereby

ORDERED that said Motion is DENIED.


BY THE COURT:


_____
                                                    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KELLY GOLDWIRE,               :
               Plaintiff,        :        No. 2:15-cv-2856
      v.                       :
                         :        JURY TRIAL DEMANDED
CITY OF PHILADELPHIA, et al.   :
             Defendants.       :

## PLAINTIFF'S RESPONSE TO DFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Kelly Goldwire, by and through his attorneys, Gay Chacker & Mittin, P.C., hereby files the within response to Defendants' Motion for Summary Judgment. Mr. Goldwire incorporates by reference his opposing memorandum of law as if the same were set forth in full herein.

WHEREFORE, plaintiff, Kelly Goldwire, respectfully requests that this Court enter an order denying the Motion for Summary Judgment of defendants.

                             /S/ BSC5184
                        Brian S. Chacker, Esquire
                        Steven A. Medina, Esquire
                        Gay Chacker & Mittin, P.C.
                        1731 Spring Garden Street
                        Philadelphia, PA 19130
                        Tel: (215) 567-7955
                        Fax: (215) 567-6809
                        bchacker@gaychackermittin.net
                        smedina@gaychackermittin.net
                        *Attorneys for Plaintiff*

Date:  April 6, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KELLY GOLDWIRE,                          :
                   Plaintiff,          :          No. 2:15-cv-2856
    v.                                   :
                             :          JURY TRIAL DEMANDED
CITY OF PHILADELPHIA, et al.              :
             Defendants.              :

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This is a false arrest civil rights action arising from the injuries sustained by plaintiff, Kelly Goldwire ("Mr. Goldwire" or "plaintiff"), as a result of defendants' the City of Philadelphia ("the City") and Philadelphia Police Officer Landherr ("defendant Landherr"), violation of Mr. Goldwire's constitutional rights on March 24, 2014.[1]

On March 24, 2014, Mr. Goldwire was Act 235 certified and lawfully working as fugitive recovery agent. Defendant Landherr had been working in a patrol car and observed that one of the Mr. Goldwire's brake lights was out as he drove on 11th Street in Philadelphia. As a result, defendant Landherr turned on his lights and Mr. Goldwire pulled over.

Upon approaching Mr. Goldwire's vehicle, defendant Landherr asked Mr. Goldwire for his license and registration. As Mr. Goldwire complied with defendant Landherr's order, defendant Landherr observed that Mr. Goldwire was wearing a badge around his neck. *Mr. Goldwire was wearing his fugitive recovery agent badge around his neck.* Defendant Landherr

---

[1] Plaintiff also named two additional officers as defendants in this action; defendants Rosa and Murawski. Defendants have moved for summary judgment on their behalf and plaintiff does not oppose their dismissal from this action. Therefore, plaintiff will only address wrongdoing on the part of defendant Landherr and the City of Philadelphia in his opposition to defendants' motion for summary judgment.

asked if Mr. Goldwire was armed and Mr. Goldwire replied that he was. Mr. Goldwire advised defendant Landherr that his firearm was on the floor in the rear of the vehicle. Mr. Goldwire also produced his Act 235 certificate, which authorized him to carry the weapon as part of his work as a fugitive recovery agent.

Despite having ample evidence in front of him suggesting that Mr. Goldwire was within his right to carry his firearm (the fugitive recovery agent badge that spurred his suspicion that Mr. Goldwire was in possession of a firearm), defendant Landherr failed to conduct any investigation into why Mr. Goldwire was carrying his firearm, the nature of Mr. Goldwire's employment, or whether Mr. Goldwire's possession of his firearm was in compliance of Act 235. Instead, defendant Landherr asked whether Mr. Goldwire was coming from the vicinity of 11th and Cambria Streets and nothing more.

Based upon that information, defendant Landherr made the ill-informed _assumption_ that Mr. Goldwire had been working for an illegal establishment and, thus, was not permitted to carry his firearm. Indeed, defendant Landherr's decision to arrest Mr. Goldwire was entirely based upon defendant Landherr's own ill-informed assumption and suspicion that a crime had been committed. Mere suspicion is never the basis for a lawful arrest. That assumption and suspicion would have been addressed if defendant Landherr had taken even a moment to actually investigate as he is required to do before improperly subjecting Mr. Goldwire to a false arrest.

The premise of defendant Landherr's motion for summary judgment is two-fold. First, it is his contention that probable cause existed for the arrest. The facts and defendant Landherr's blatant failure to conduct any investigation prior to the arrest establish otherwise. At a minimum, the utter failure to conduct any investigation in the face of evidence that suggested that Mr. Goldwire was working as a fugitive recovery agent creates a disputed issue of material

fact regarding what was known or should have been known to defendant Landherr at the time of Mr. Goldwire's arrest. As a result, there remain disputed issues of material fact regarding the existence of probable cause that properly should be left for a jury to decide at the time of trial.

Second, defendant Landherr contends that he is entitled to Qualified Immunity because of some alleged confusion regarding the interpretation of Act 235.  A police officer asserting entitlement to qualified immunity must claim that his conduct did not violate a clearly established constitutional right of which a reasonable officer would have known.  See Behrens v. Pelletier, 516 U.S. 299, 305 (1996); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  When evaluating whether an officer is entitled to qualified immunity it must be asked, in no particular order: (1) whether the facts, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001).

Here, throughout the motion, defendants misstate facts and ignore basic tenets of law in an effort to confuse the issues applicable to defense based upon Qualified Immunity and thus shirk responsibility.  They claim that defendant Landherr simply misinterpreted Act 235, but this case is not about an interpretation of Act 235.  The clearly established right at issue here is the right to be free from false arrest.  That is a long-standing and clearly established constitutional right.  Taking the facts of this case in a light most favorable to Mr. Goldwire, defendant Landherr's interpretation of Act 235 is irrelevant to his failure to conduct any investigation into Mr. Goldwire's employment and the reason he was carrying his firearm.

This case is about defendant Landherr's complete and total failure to investigate. Because defendant Landherr failed to investigate, defendant Landherr could not have known whether Mr. Goldwire was compliant with Act 235.  His "suspicion" that Mr. Goldwire had been

working at an illegal establishment is irrelevant as the facts available to him suggested that he was working as a fugitive recovery agent. Thus, viewing the facts in the light most favorable to Mr. Goldwire, there is a genuine issue of material fact as to whether defendant Landherr reasonably believed there was probable cause to arrest Mr. Goldwire. Furthermore, defendant Landherr's decision to falsely arrest Mr. Goldwire without probable cause either was intentional, because he knew Mr. Goldwire was working as a fugitive recovery agent, or he simply did not care to find out. Under both circumstances, there remains a question of defendant Landherr's motive. The law on this point is clear: questions of motive are properly are left for the jury to resolve at trial.

With respect to the City, the evidence in this case shows an utter failure to provide adequate training to police officers regarding Act 235, how to investigate Act 235 compliance, and how to resolve any confusion or uncertainty that officers may have when faced with someone presenting an Act 235 license while on patrol. Indeed, there have been numerous media reports and similar cases evidencing the City's failure with respect to Act 235 training which have resulted in numerous unlawful arrests.

Here, the City's failure manifested through the complete lack of proper investigation by defendant Landherr. Due to the City's failure to properly train its officers prior to March 24, 2014, defendant Landherr believed his actions with respect to Mr. Goldwire were acceptable. It was because of the City's developed and maintained policies and customs that defendant Landherr violated Mr. Goldwire's constitutional rights by acting in such an egregious manner. Ultimately, that failure leads officers such as defendant Landherr to act with deliberate indifference toward the rights of the persons such as Mr. Goldwire to be free from false arrest for purported, but unsupported violations of the Uniform Fire Arms Act and Act 235. Thus, there

4

exists a genuine issue of material fact as to whether a custom and practice has developed that properly should be left for the jury at the time of trial.  Accordingly, defendants' motion for summary judgment should be denied.

## II.   COUNTER STATEMENT OF MATERIAL FACTS

On March 23, 2014, Mr. Goldwire was working as certified Fugitive Recovery Agent, which required him to pursue individuals who have open bench warrants.  See Deposition Transcript of Kelly Goldwire, at p. 16-17, a true and correct copy of the relevant portion of which is attached hereto and marked as Exhibit "A."   On that day, Mr. Goldwire received information that a fugitive he was pursuing was in the area of 11th and Cambria Streets in Philadelphia, Pennsylvania.  Id.  At approximately 3:00 p.m., Mr. Goldwire spoke with his employer, Tom Nixon ("Mr. Nixon"), and agreed that he and his partner, Kenneth Sharper, would attempt to apprehend the fugitive promptly.  Id.

Mr. Goldwire rendezvoused with his partner at approximately 7:00 p.m., the pair began their search by driving their respective vehicles in and around the area of 11th and Cambria Streets in Philadelphia.  Id.  They visited the fugitive's last known address and knocked on the front door, but no one answered.  Id.  They then continued to search by canvasing the neighborhood in their vehicles until approximately 10:00 p.m.  Id.

At 10:00 p.m., Mr. Goldwire and his partner met Mr. Nixon at a Dunkin Donuts on Champlost Avenue in Philadelphia to discuss how best to proceed.  Id. at 19-20.  It was believed that the fugitive was most active in the late night and early morning hours, so they resolved to continue the search throughout the night.  Id. at 17-18, 23-24.

At approximately midnight, on March 24, 2014, Mr. Goldwire and Mr. Sharper set up a stakeout by parking their vehicles near a dance club located at 2840 North 11th Street

(hereinafter "the club" or "the establishment"). Id. at 23:19-24:15. After about an hour of surveillance at the establishment, Mr. Goldwire did not see any unusual activity, so he and Mr. Sharper agreed that Mr. Goldwire would take a break and get dinner. Id. at 25. At or about 1:00 a.m., Mr. Goldwire pulled out of his parking space in front of 2840 North 11th Street to head home for his break. Id. at 25-26.

According to defendant Landherr, he was in his police vehicle and had just turned the corner onto the 2800 block of 11th Street when he noticed Mr. Goldwire's vehicle pulling out from the parking spot. See Deposition Transcript of defendant Landherr at 35, a true and correct copy of the relevant portion of which is attached hereto and marked as Exhibit "B." Importantly, this was the first time he had seen Mr. Goldwire's vehicle on the night in question, and he had not seen what its occupant, Mr. Goldwire, had been doing before he encountered it. Id.

At the corner of 11th and Cambria Streets, defendant Landherr noticed that the brake light on the vehicle's spoiler was not working; he followed the vehicle to the 3100 block of Germantown Avenue and decided to initiate a traffic stop. Id. at 42. Defendant Landherr engaged his police vehicle's lights and Mr. Goldwire pulled over to the side of the road in compliance with the traffic stop. Id. at 42-43. Defendant Landherr approached the vehicle, saw Mr. Goldwire gathering his paperwork, and observed that Mr. Goldwire was wearing a badge around his neck. Id. at 43; see also plaintiff's Fugitive Recovery Agent Badge, a true and correct copy of which is attached hereto as Exhibit "C."

Defendant Landherr informed Mr. Goldwire that one of his brake lights was out and requested his information. See defendant Landherr deposition transcript at 44 (Exhibit "B" hereto). Having observed the badge around Mr. Goldwire's neck, defendant Landherr asked whether Mr. Goldwire was armed. Id. at 45. Mr. Goldwire stated that he was armed; produced

his Act 235 license; and stated that his firearm was in the back of his vehicle.  Id.; Goldwire

deposition transcript at 28 (Exhibit "A" hereto).

Defendant Landherr instructed Mr. Goldwire to exit his vehicle and Mr. Goldwire

complied.  See Goldwire deposition transcript at 28-29 (Exhibit "A" hereto).  Defendant

Landherr immediately informed Mr. Goldwire that he was being placed under arrest.  Id.  Mr.

Goldwire asked why he was being arrested; he also informed defendant Landherr that he was

receiving chemotherapy and had treatment later in the morning that he could not miss.  Id. at 29.

In response, and without investigation, defendant Landherr informed Mr. Goldwire that he was

being arrested for a violation of the Firearm Act.  Id.   Defendant Landherr never conducted any

investigation into why Mr. Goldwire was carrying his firearm or the nature of Mr. Goldwire's

employment, and he never gave Mr. Goldwire the opportunity to explain that he had been

lawfully working as a fugitive recovery agent in the area and that he had been conducting a

stakeout.  Id. at 29.

By defendant Landherr's own testimony he was duty bound to investigate to make sure

he had probable cause prior to arresting Mr. Goldwire:

> Q:  And the directives, you're aware – are you familiar with the police
> department directives regarding the obligations of the arresting
> officer prior to making the arrest?
>
> A:  As far as what?
>
> Q:  Just generally. Do you have an obligation to investigate before
> making an arrest?
>
> A:  Yes.
>
> Q:  An obligation to make sure you have probable cause, sufficient
> evidence to make an arrest?
>
> A:  Yes.

Defendant Landherr deposition transcript at 66-67 (Exhibit "B" hereto).

Indeed, the full extent of defendant Landherr's "investigation" concerned his

whereabouts and not what he had been doing.  Id. at 47.  Specifically, defendant Landherr

testified to the following:

> Q:    Okay. Then tell me about what happened next.
>
> A:    Since he told me he's 235, you know, just from my general
>       experience, I know 235 meant he had his Act 235 certification,
>       armed security guard. I asked him, you know, where he was
>       coming from and he said that he was coming from 11th and
>       Cambria. I asked him more specifically if he was coming from
>       2840 North 11th Street, and he told me that, yes, he was.

Id.

By all accounts, defendant Landherr _never_ inquired as to what Mr. Goldwire was doing at

2840 North 11th Street:

> Q:    Did you ask him what he was doing at -- like other than him saying
>       he was coming from work, did you ask him what he was doing
>       there?
>
> A:    No.
>
> Q:    Is that important?
>
> A:    If it were another location, it would have been.
>
> Q:    Why –
>
> A:    If he would have given me any other address in the city and county
>       of Philadelphia, yes, it would have been important.
>
> Q:    But because it was that address?
>
> A:    Correct. It was not.
>
> Q:    Why not?
>
> A:    As I previously stated, the 2840 North 11th Street was not to be
>       opened as a business.

8

Q:      Right. But you didn't ask him what he was doing there?

A:      It's not really relevant at that point, if the business isn't even supposed to be open.

Q:      Let me ask you something. If he is just --

A:      Armed security.

Q:      If he's armed security -- if I hire him to be my bodyguard, is that considered valid employment, my personal bodyguard, my personal security?

A:      I don't know.

Q:      *If he is working as a fugitive recovery agent and he is staking out the bar because he heard someone might be there, is that important to know?*

A:      *Fugitive recovery agent staking out the bar? Yeah, that would be important I guess.*

* * * *

Q:      If he was doing proper work, did you have probable cause to arrest him?

A:      If he was doing proper work, no.

Q:      What investigation did you do to determine whether he was doing proper work or not?

A:      I asked him where he was coming from.

* * * *

Q:      *If he was wearing a badge that said fugitive recovery, if his badge, in fact, did say fugitive recovery, you should have asked him about that.*

A:      *Yes.*

Id. at 49-51, 56, 61 (emphasis added); see also, Goldwire deposition transcript at 29-30 (Exhibit "A" hereto).

9

In fact, defendant Landherr specifically testified that, if he had asked Mr. Goldwire about his Fugitive Recovery Agent Badge, it would have "influenced" his decision to arrest Mr. Goldwire:

> Q.   If he had told you I was working – if you had asked him about the fugitive recovery and he says, yeah, I'm working on a warrant right now, and I heard the lady was going to be at that location, that's why I was there, would that have changed your decision to arrest him?
>
> A.   It would have influenced it. I would have had a series of follow-up questions.

Id. at 67.

Unfortunately for Mr. Goldwire, defendant Landherr had met him approximately four days before the unlawful arrest at the establishment. See Goldwire deposition transcript at 10 (Exhibit "A" hereto). At the time, Mr. Goldwire was providing armed bodyguard services for the owner of the establishment. Id.

During the encounter, defendant Landherr informed Mr. Goldwire that the establishment was operating as an illegal speakeasy, and Mr. Goldwire risked arrest or forfeiture of his Act 235 license if he continued to work there. Id. at 14-15. Upon being so informed, it is undisputed that Mr. Goldwire immediately said, "say no more," got in his vehicle, and left the establishment. Id. at 14; defendant Landherr deposition transcript at 34-37 (Exhibit "B" hereto). After that encounter, Mr. Goldwire ceased working for the establishment. Goldwire deposition transcript at 14.

Rather than actually conduct an actual investigation, defendant Landherr assumed that Mr. Goldwire was working at the establishment again and, as a result, was in violation of the Pennsylvania Uniform Firearms Act. Id. at 47-48, 54, 69. However, contrary to defendant Landherr's mistaken belief, after their previous encounter Mr. Goldwire had no further

involvement with the establishment.  See Goldwire deposition transcript at 15 (Exhibit "A"

hereto).  He was not working for the club or anyone located there during the course of his work

as a fugitive recovery agent.  Id.  In fact, on the night in question, he never even exited his

vehicle.  Id. at 24-25.

Subsequent to the unlawful arrest, Mr. Goldwire remained incarcerated for

approximately three days, until his fiancée, Annette Figueroa, was able to post bail.  Id. at 36.

As a result of his incarceration, Mr. Goldwire missed his chemotherapy appointment.  Id. at 35.

On December 30, 2014, Mr. Goldwire was found not guilty on all charges.  See Criminal Court

Disposition, a true and correct copy of which is attached hereto and marked as Exhibit "D".

With respect to the City, Mr. Goldwire's arrest was the result of the actions and/or

inactions of the City of Philadelphia which were part of a policy and/or custom of inadequately

training police officers, including defendant Landherr, with respect to Act 235 and similar

concealed and open carry gun laws in effect at the time of the alleged incident.  This is evidenced

by the fact a that defendant Landherr testified to a near complete lack of training provided by the

Philadelphia Police Department with respect to Act 235 and its enforcement:

> Q:  Tell me about the training that you received, whether it be at the
> academy or since, regarding Act 235 and how to deal with those
> people carrying Act 235 licenses?
>
> A:  Act 235, I had some minimal training at the academy. None since
> then. They basically just went over some of the general guidelines
> and reasons that people have the Act 235. You know, they're
> typically security officers. They're not police officers. They have
> no arrest powers. Some are armed, and they are permitted to be
> armed while at work. And in addition to that, they're allowed to be
> armed while traveling to and from their place of work.

Defendant Landherr deposition transcript at 19 (Exhibit "B" hereto).  In addition, defendant

Rosa's testimony supports Mr. Goldwire's allegations regarding the City's lack of training when

he states that he could not remember any training updates with respect to Act 235.  <u>See</u>

Deposition Transcript of Officer Rosa at 15, a true and correct copy of the relevant portion of

which is attached hereto and marked as Exhibit "E".

Moreover, there have been numerous media reports and cases similar to the instant

matter, which demonstrates that the violation of Mr. Goldwire's federal constitutional rights was

attributable to the policies and/or customs of the City of Philadelphia.  <u>See</u> Plaintiff's Amended

Complaint at ¶¶ 40-45, and multiple media reports, true and correct copies of which are attached

hereto and marked as Exhibits "F", "G", "H" and "I", respectively.  Indeed, this Court recently

heard a similar case involving Mr. Goldwire's partner, Mr. Sharper, whose constitutional rights

were violated when he was working as a certified fugitive recovery agent and armed pursuant to

Act 235.  That case was captioned as  <u>Sharper v. City of Philadelphia et al.</u>, 2:14-cv-05299-BMS.

In that case, Philadelphia Police Officer Robert McCarthy testified to the lack of training

regarding Act 235 and its enforcement:

> Q:   Had you received at any point in time any training on how to deal
>       with someone who hands you an Act 235 license?
>
> A:   I don't remember training on it.  You know, you have
>       conversations with, you know, other officers that, you know, know
>       what the Act 235 means.  That is, you know, they are allowed to
>       carry, to go to and from work, and basically, like security club, like
>       the guys out front, you know, with -- all the swat officers, like
>       them guys are Act 235.
>
> Q:   Right.  But my question is a little different.
>
> A:   Okay.
>
> Q:   Did you receive any training that you can recall from the
>       Philadelphia Police Department at the Academy or through your
>       updates regarding how to deal with someone who presents an Act
>       235 license to you?
>
> A:   I don't recall.

Q:    You don't recall ever receiving any?

A:    I don't recall.  No.

Q:    Have you had your updates yet for this year?

A:    Yes.

Q:    Those updates, were you presented with any training on how to
      deal with someone who presents and Act 235 license?

A:    No.

Q:    Do you remember your training in the past -- let's say in the past
      three years for your updates, do you remember ever receiving any
      training relating to Act 235?

A:    I don't.

See Deposition Transcript of Officer Robert McCarthy at 20-21, a true and correct copy of the

relevant portion of which is attached hereto and marked as Exhibit "J".  Thus, there is clear

evidence in this case, similar cases, and numerous media reports demonstrating a clear failure on

the part of the City of Philadelphia to train its police officers with respect to Act 235 and its

enforcement.

    Simply put, when viewing the facts in the light most favorable to the nonmoving party,

defendant Landherr falsely arrested Mr. Goldwire because the City of Philadelphia failed to

properly train him.  As a result, Mr. Goldwire's constitutional rights under the Fourth

Amendment were violated.  Accordingly, defendants' motion for summary judgment should be

denied.

13

### III.   QUESTIONS PRESENTED

1.     Whether defendants' motion for summary judgment should be denied where the facts, viewed in the light most favorable to plaintiff, demonstrate there was no probable cause to arrest Mr. Goldwire or, at a minimum, that there remains disputed issues of material fact whether probable cause to arrest Mr. Goldwire existed?

**Suggested Answer: Yes.**

2.     Whether defendants' motion for summary judgment should be denied where defendants have failed to establish the required elements of a defense based upon qualified immunity and there remain factual issues regarding defendant Landherr's motive in arresting Mr. Goldwire?

**Suggested Answer: Yes.**

3.     Whether defendants' motion for summary judgment should be denied where the record evidence supports Mr. Goldwire's claim based upon Monell v. City of New York, as the City allowed a custom and practice of violating the public's constitutional rights to develop through its lack of training and supervision regarding Act 235 and the enforcement of the Uniform Firearms Act?

**Suggested Answer: Yes.**

### IV.   ARGUMENT

#### A.   Legal Standard For Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is available to a party if "there is no genuine issue as to any material fact" such that the moving party is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988). The Supreme Court has described the summary judgment procedure as an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy

14

and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327

(1986) (internal quotation marks omitted).

      The court may grant summary judgment only in circumstances where "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show that there is no genuine issue as to any material fact." Fed. R. C. P. 56(c); Celotex, 477

U.S. at 322. Under this standard, "[s]ummary judgment will not lie if the dispute about a

material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A fact is considered "material" if a dispute about it might affect the outcome of the suit in light

of the controlling substantive law. Id. In applying this standard to determine whether a genuine

issue of material fact exists, the court must view the facts in the light most favorable to the non-

moving party and extend all reasonable inferences to that party. See Matsushita Electric

Industries Co. v. Zenith RadioCorp., 475 U.S. 574, 587 (1986). Furthermore, as the Supreme

Court has cautioned, summary judgment should not be granted unless the evidence "is so one-

sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 248.

      The Court also has recognized that "[c]redibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

judges." Liberty Lobby, 477 U.S. at 255; see also, Williams v. Borough of Chester, 891 F.2d

458, 460 (3d Cir. 1989). Likewise, in the context of a false arrest under the Fourth Amendment,

the issue of whether there was probable cause is almost always a question of fact for the jury and

therefore cannot be resolved on a motion for summary judgment. See Wilson v. Russo, 212 F.3d

781, 796 (3d Cir. 2000); Montgomery v. DeSimone, 159 F.3d 120, 124 (3d Cir. 1998).

      In addition, if there are any material facts in dispute, in applying the facts to the law, the

court must adopt and apply the non-moving party's version of the facts as true.  See Couden v. Duffy, 446 F.3d 483, 489 (3d Cir. 2006) ("In considering whether qualified immunity applies, a court must first decide whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation"); Harvey v. Plains Township Police Department, 421 F.3d 185, 194 n. 12 (3d Cir. 2005) ( "At this stage, however, the summary judgment standard requires the Court to resolve all factual disputes in Harvey's favor and grant her all reasonable inferences, obviating any need to look to a jury."); Sharrar v. Felsing, 128 F.3d 810, 814 (3d Cir. 1997) ("As to those portions of this case that were decided by summary judgment, we set forth the undisputed facts revealed by the record, which is comprised almost entirely of deposition testimony, and the plaintiffs' version of the facts when there are disparities").

Where, as here, the evidence clearly establishes that Mr. Goldwire's claims against defendants are supported by the record evidence, defendants cannot demonstrate they are entitled to judgment as a matter of law.  Accordingly, defendants' motion for summary judgment should be denied.

**B.    Defendants' Motion For Summary Judgment Should Be Denied As Defendant Landherr Did Not Have Probable Cause To Arrest Mr. Goldwire**

Contrary to defendant Landherr's contention, there was absolutely no probable cause to arrest Mr. Goldwire on March 24, 2014. The very premise of defendants' motion that defendant Landherr had probable cause to arrest Mr. Goldwire for violation of the Pennsylvania Uniform Firearm Act by having his firearm in his vehicle on the morning of his arrest ignores the applicable law and the record facts viewed in a light most favorable to plaintiff.

The Pennsylvania Uniform Firearms Act makes it a crime to "carr[y] a firearm in any vehicle . . . without a valid and lawfully issued license." 18 Pa. Cons. Stat. § 6106(a)(2). 22 Pa. Cons. Stat. §§ 41, 42, 48(a) specifically allows someone with a valid Act 235 Certificate to carry

16

a firearm while at work and while travelling to and from a bona fide place of employment.  See

22 Pa. Cons. Stat. §§ 41, 42, 48(a).  Here, as Mr. Goldwire was traveling from work to his home,

he was authorized by applicable statute to carry his firearm.  Thus, his arrest was improper and

without probable cause.

There is no dispute in this case that defendant Landherr arrested and confined Mr.

Goldwire without a warrant.  The Third Circuit has indicated that in Section 1983 cases the

burden is on the defendant to establish probable cause.  See Patzig v. O'Neil, 577 F.2d 841, 849

n. 9 (3d Cir. 1978) ("the burden of proof as to the existence of probable cause may well fall upon

the defendant once the plaintiff has shown an arrest and confinement without a warrant").

Moreover, the Third Circuit has consistently held that "[i]n a § 1983 action the issue of whether

there was probable cause to make an arrest is usually a question for the jury."  Sharrar v. Felsing,

128 F.3d 810, 818 (3d Cir. 1997).

"'Probable cause to arrest exists when the facts and circumstances within the arresting

officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an

offense has been or is being committed by the person to be arrested.'"  Wilson v. Russo, 212

F.3d 781, 789 (3d Cir. 2000) (quoting Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d

Cir.1995)).  To be "sufficient," these "facts and circumstances" must be "reasonably

trustworthy."  Hunter v. Bryant, 502 U.S. 224, 228 (1991). Plaintiff is entitled to civil damages

for an arrest if "'no reasonable competent officer' would conclude that probable cause exists."

Wilson, 212 F.3d at 789-90 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Probable cause, as determined by the Pennsylvania Municipal Police Officers' Education

and Training Commission ("MPOETC"), is comprised of "facts and circumstances which

support a reasonable belief that a crime has been committed and the person to be arrested

17

committed the crime." See MPOETC Basic Recruit Curriculum, Section IV, a true and correct copy of the relevant portion of which is attached hereto and marked as Exhibit "K." The MPOETC develops the lesson plans for the recruit and in-service training of all Pennsylvania municipal police officers. The MPOETC instructs that in establishing probable cause, officers should consider *reliable* information received from others. Id. MPOETC describes three broad sources of facts and circumstances which can be used to establish probable cause for an arrest. Those are observations made by the officer (such as seeing Mr. Goldwire's Fugitive Recovery Agent Badge), reliable information that the officer receives from others such as witnesses or victims (not applicable here) and information that the officer receives through investigation (such as defendant Landherr would have learned had an investigation been conducted). Id. at 12. Importantly, MPOETC instructs that probable cause *cannot* be based on mere suspicion. Id. at 10.

Here, all of the evidence that was available to defendant Landherr, when viewed in a light most favorable to plaintiff, points to the utter lack of probable cause to arrest Mr. Goldwire. In addition to the MPOETC training, defendant Landherr admits that he has a duty to investigate before making an arrest. See defendant Landherr deposition transcript at 66-67 (Exhibit "B" hereto). Nevertheless, by his own account, the only question he asked Mr. Goldwire was where he was coming from. Id. at 69. Furthermore, Mr. Goldwire testified that defendant Landherr never gave him the opportunity to explain anything before he was arrested. See Goldwire deposition transcript at 29 (Exhibit "A" hereto). Defendant Landherr's knowing decision not to investigate occurred despite the fact that Mr. Goldwire was wearing a fugitive recovery badge and produced his Act 235 certificate.

18

When questioned about those facts, defendant Landherr admitted that he should have asked questions regarding the nature of Mr. Goldwire's work. <u>See</u> defendant Landherr deposition transcript at 43, 61 (Exhibit "B" hereto). Indeed, even accepting defendant Landherr's version of the events as true, the fact that he chose to elicit so little information before making an arrest demonstrates that the arrest was based on little more than *a mere suspicion* of wrongdoing. At minimum, the evidence establishes that defendant Landherr's investigation fell so far short of MPOETC training that there is no way that a reasonable officer could believe that probable cause existed without more; particularly in the face of a Fugitive Recovery Agent Badge.

Defendant Landherr's ignoring the evidence right in front of him and his failure to investigate establish that he not only violated applicable police procedures, but also that he could not have reasonably believed that Mr. Goldwire committed any offense. Instead, defendant Landherr's suspicions were raised because of Mr. Goldwire's location and his prior encounter, which occurred four nights prior. Based solely on these suspicions, he wrongly concluded that Mr. Goldwire could not legally carry a firearm. It is undisputed that defendant Landherr never inquired as to what Mr. Goldwire was doing at 2840 North 11th Street. <u>Id.</u> at 49-51. When defendant Landherr was questioned about that failure during his deposition, he admits that it would have been important to know whether Mr. Goldwire was working as a fugitive recovery agent before he arrested him. <u>Id.</u>

There can be no excuse for this failure to investigate the nature of Mr. Goldwire's work in the area given that it is undisputed that plaintiff was wearing a badge around his neck at the time of his arrest that clearly identified him as a fugitive recovery agent. <u>Id.</u> at 44; <u>see also</u> Plaintiff's Fugitive Recovery Agent Badge (Exhibit "C" hereto). Defendant Landherr even

19

provided sworn deposition testimony that Mr. Goldwire's visible badge meant that he should have asked more questions before making an arrest. See defendant Landherr deposition transcript at 61.

The fact is that there are a number of possible explanations for why Mr. Goldwire was travelling home with his firearm in his vehicle. First, there is the truth; that he was working as a fugitive recovery agent. Second, he may have been serving as a body guard for someone who wanted to go to the club at 2840 N. 11th Street and left after dropping that person off. Further, he could have been working at another establishment and simply stopped at 2840 N. 11th St within the travel time provided in order to drop something off to a friend. Indeed, there are many other possible reasons for Mr. Goldwire being in the area of 2840 N. 11th St. and being within his right to carry his firearm. Because defendant Landherr failed in his obligation to obtain any information, the facts available to him were insufficient to establish probable cause for a violation of the Uniform Firearms Act without more. Consequently, viewing the facts in a light most favorable to Mr. Goldwire, no probable cause existed for his arrest. At a minimum, factual disputes remain regarding what information defendant Landherr had in his possession at the that time that he made the improper decision to deny Mr. Goldwire of his freedom. Accordingly, defendants' motion for summary judgment should be denied.

In a last ditch effort to sway the Court, defendants argue that the fact that Mr. Goldwire's charges were held for trial at his preliminary hearing buttresses their argument that probable cause to arrest existed. See defendants' memorandum of law at p 3. In making this argument, defendants rely on Wheeler v. Wheeler, No. 15-1981, 2016 WL 231581 (3d Cir. Jan. 20, 2016), and Snell v. Duffy, No. 02-3660, 2004 WL 62711 (E.D. Pa. Jan. 6, 2004), which not only do not stand for the proposition that a court should dismiss a claim based upon the outcome of a

preliminary hearing, but also are highly distinguishable from the facts of this case.

In Wheeler, the decision to dismiss plaintiff's claims was made upon motion to dismiss, where plaintiff had failed to properly plead facts that established the absence of probable cause. 2016 WL 231581 at *3. Specifically, in Wheeler, the matter was not dismissed based upon the outcome of the preliminary hearing, but rather the fact that the plaintiff lacked the ability to properly state a claim. Here, not only has Mr. Goldwire properly stated a claim and survived a motion to dismiss, but he has adduced substantial record facts that support the conclusion that no probable cause for his arrest existed.

In Snell, summary judgment was granted in a Section 1983 case stemming from the arrest of a man who pointed a gun at children while hunting. See 2004 WL 62711 at *2, 4-5. To rule upon the issue of probable cause, the Court viewed the totality of the circumstances surrounding the defendant officer's investigation. Id. at 4-5. The investigation by the officer involved obtaining statements from alleged victims and from the alleged criminal, which led to the determination that no reasonable jury could conclude probable cause to arrest was absent. Id. at *4-5. At the preliminary hearing, one of the victims testified. Id. at *5. In granting summary judgment, the Court recognized that the outcome preliminary hearing served only to buttress their finding, but was careful to observe that the outcome of a preliminary hearing is not conclusive evidence of the existence of probable cause. Id. Further, the Court reinforced the accepted rule that the existence of probable cause in a Section 1983 action is generally a question for the trier of fact. Id. at *4.

Here, defendant Landherr's "investigation" was the single question of where Mr. Goldwire was coming from and a decision to ignore exculpatory evidence right in front of him. The nature of investigation conducted by defendant Landherr is very different from the

investigation that occurred in Snell. Here, there was no victim to a crime, defendant Landherr did not ask questions to determine whether a crime had been committed, and he did not witness the commission of a crime. A common sense view of the evidence suggests that the outcome of the preliminary hearing in the instant case is intrinsically less valuable than the outcome of the hearing in Snell. Moreover, the totality of the circumstances surrounding defendant Landherr's investigation, or lack thereof, clearly negate whatever scintilla of value the outcome of the hearing does have in determining probable cause at the summary judgment stage of this lawsuit. Moreover, equally important is the fact that all charges were dismissed at trial when all of the evidence was presented.

Here, the complete lack of an investigation into the alleged firearm violation means that no reasonable police officer could have believed probable cause existed to arrest plaintiff for a violation of the Uniform Firearms Act. Thus, defendant Landherr's arrest was unlawful because it was done without probable cause. At minimum, viewing the facts in Mr. Goldwire's favor, the determination of whether probable cause existed is a matter that should be left for the jury to decide at the time of trial. Accordingly, defendants' motion for summary judgment should be denied.

### C.    Defendants' Motion For Summary Judgment Should Be Denied As Defendant Landherr Is Not Entitled To Qualified Immunity

While defendant Landherr does his best to twist the facts and ignore basic tenets of law in an effort to confuse the issues applicable to defense based upon qualified immunity, defendant simply cannot meet his burden and, as such, is not entitled to a defense of qualified immunity. At a minimum, there are numerous factual issues that properly should be left for the jury at trial. As such, defendants' motion for summary judgment should be denied.

The premise of defendant Landherr's claim of qualified immunity is that he simply misinterpreted Act 235 and that liability cannot be imposed upon defendant Lanherr based on the Sergeant's interpretation of a statute.  Importantly however, this case is not about defendant Landherr's interpretation of Act 235.  The alleged interpretation issue on which defendant Landherr bases his qualified immunity defense is whether an illegal establishment qualifies as a *bona fide* work-place within the ambit of Act 235.  Had defendant Landherr actually asked questions and performed an investigation based upon the evidence in front of him, he would have learned that Mr. Goldwire was working as a fugitive recovery agent and was legally entitled to be in possession of his firearm.  Thus, contrary to defendant Landherr's attempt to redefine the clearly established right at issue in this case, the clearly established right at issue here is the right to be free from false arrest.  That is a long-standing and clearly established constitutional right.

At the time of Mr. Goldwire's arrest, defendant Landherr knew or should have known that he was arresting Mr. Goldwire without probable cause, and therefore, in violation of his Fourth Amendment right to be free from false arrest.  The Fourth Amendment prohibits a police officer from arresting a citizen without probable cause.  Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995) (citing Papachristou v. City of Jacksonville, 405 U.S. 156, 169 (1972)).  If a police officer arrests a person without probable cause, then he may be liable in a civil rights suit for damages.  Id. at 483.

A police officer asserting entitlement to qualified immunity must claim that his conduct did not violate a clearly established constitutional right of which a reasonable officer would have known.  Behrens v. Pelletier, 516 U.S. 299, 305 (1996); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Officers bear the burden of demonstrating their entitlement to that affirmative defense.  Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d Cir. 2014).  When evaluating whether an officer is

23

entitled to qualified immunity it must be asked, in no particular order: (1) whether the facts, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001) (explaining the two steps in the context of a mandatory sequence); Pearson v. Callahan, 555 U.S. 223, 227, 236 (2009) (holding the sequence of the two steps to be optional).

A right is clearly established if its contours, in light of pre-existing law, are sufficiently clear that any reasonable officer would understand that his conduct violates that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987); George v. Rehiel, 738 F.3d 562, 572 (3d Cir. 2013). Qualified immunity offers no protection to an officer when existing precedent places the statutory or constitutional question beyond debate. Ashcroft v. al-Kidd, -- U.S. --, 131 S. Ct. 2074, 2083 (2011). The ultimate question is whether an officer had fair warning that his conduct deprived a plaintiff of a constitutional right. Schneyder v. Smith, 653 F.3d 313, 329 (3d Cir. 2011).

Moreover, the law may be clearly established and an officer may be found to have had fair warning even if no court has previously held the specific conduct in question to be unlawful. Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 377 (2009); Wilson v. Layne, 526 U.S. 603, 615 (1999). Sometimes, the very action in question will not have been previously held unlawful because some outrageous conduct is so obviously unconstitutional that the "easiest cases don't even arise." Safford, 557 U.S. at 377 (quoting K.H. v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990)). But even when an officer's conduct is "less than an outrage," he should still be on notice that his conduct could violate established law. Id. at 377-78 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Thus, the mere fact that no court has yet had occasion to declare

certain conduct obviously or outrageously unconstitutional does not make the conduct in question less obvious or outrageous.

Contrary to defendants' suggestion, plaintiff does not argue that defendant Landherr misinterpreted Act 235 in arresting Mr. Goldwire.  Instead, as explained above, his actions speak to an arrest without probable cause that was based on a complete failure to investigate and a conscious decision to ignore exculpatory evidence right in front of him.  Any reasonable officer would have known in March of 2014 that he had violated a citizen's constitutional rights when he arrested that citizen without probable cause.  Thus, defendant Landherr knew or should have known that he was violating Mr. Goldwire's constitutional rights.  This is true because the facts of this case show that no reasonable officer could have believed probable cause to arrest was present.

Indeed, even defendant Landherr admitted that he should have asked Mr. Goldwire why he was near 2840 North 11th Street in light of the facts that Mr. Goldwire was wearing a fugitive recovery badge at the time of his arrest and the defendant never saw him working at the establishment on the night in question.  See defendant Landherr deposition transcript at 35, 61 (Exhibit "B" hereto).

Mr. Goldwire was never given an opportunity to explain himself to the defendant officers on scene.  See Goldwire deposition transcript at 29 (Exhibit "A").  Instead, he was arrested based on the mere suspicion that a crime had been committed.  Plaintiff does not suggest that defendant Landherr's investigation needed to be exhaustive.  Rather, if had he simply taken the time to pose the questions that he agreed, under oath, he should have asked, then the truth of what Mr. Goldwire was doing in the area and why he was armed would likely have been discovered and the arrest never would have occurred.  That defendant Landherr chose not to ask those questions

is inexcusable and serves only as evidence that defendant Landherr had little to no interest in establishing probable cause in order to effectuate a proper arrest.  As a result, Mr. Goldwire suffered three days of incarceration, missed a chemotherapy appointment for his cancer, endured public and private embarrassment in the form of a criminal trial, and suffered lost wages and lost future earnings.

Defendant Landherr relies on five purportedly undisputed facts that he contends support a finding that probable cause existed for arrest.  However, a review of those facts shows substantial holes in his rationale and suggests at best, mere suspicion, rather than any evidence that a violation of the Uniform Firearms Act had occurred.  Specifically, those facts are that: (i) Sergeant Landherr saw Mr. Goldwire working at an illegal speakeasy a few days before the arrest; (ii) the Sergeant told Plaintiff that the speakeasy was an illegal establishment and that Mr. Goldwire's Act 235 card did not permit him to carry a firearm while working there; (iii) defendant Landherr saw Mr. Goldwire's car pulling out from a parking spot in front of the speakeasy on the night of the arrest; (iv) defendant Landherr pulled Mr. Goldwire over a few minutes later and learned that Mr. Goldwire was carrying a firearm; and (v) Mr. Goldwire's only legal authorization to transport a firearm was his Act 235 card.  See defendants' memorandum of law at 5.

Not only does this recitation of facts omit the fact that defendant Landherr admitted to specifically looking at Mr. Goldwire's badge, which says "Fugitive Recovery" on it (see defendant Landherr deposition transcript at 44-45 (Exhibit "B" hereto); see also, plaintiff's Fugitive Recovery Badge (Exhibit "C" hereto)), but they also scream of the need for additional information.  While Mr. Goldwire had been working at the speakeasy as security four days earlier, was he actually working at the speakeasy on that night?  Instead of asking a direct

question, defendant Landherr could have asked Mr. Goldwire why he disregarded the prior

instruction not to work at the speakeasy. If he had done so and given Mr. Goldwire an

opportunity to speak, he would have learned that Mr. Goldwire was not working at the speakeasy

and, instead was working as a fugitive recovery agent. None of the facts listed in defendants'

motion provide evidence of a crime being committed by Mr. Goldwire. At best, without an

investigation, they provided mere suspicion, which is not sufficient to establish probable cause.

Indeed, defendant Landherr admitted that without an investigation, he did not have probable

cause:

> Q:   Okay. Fine. So let's assume that you have to make -- is it your job
>       as the arresting officer to do an investigation at the scene to
>       determine whether he was working as -- at -- doing work that fell
>       within the definition of Act 235?
>
> A:   Yes.
>
> Q:   And if you don't do that investigation, do you agree that you would
>       not have probable cause to arrest someone?
>
> A:   Yeah, I agree.
>
> Q:   And in this case, other than asking him the location of his work,
>       did you ask him what he was doing there?
>
> A:   I did not.
>
> Q:   Did you ask him who he was there with?
>
> A:   I didn't see him with anyone.
>
> Q:   Did you ask him if he was working with anyone?
>
> A:   I did not.
>
> Q:   So other than the location, did you do any investigation to
>       determine whether Mr. Goldwire was performing work within the
>       definition of Act 235?
>
> A:   No.

Q:     Do you believe that you had an obligation to do so?

A:     I felt like I asked him, you know, enough information to determine why he was there, you know, or, I'm sorry, that -- where he was coming from. What he was doing at that address to me, that night, wasn't going to fall within his Act 235 security that I'd seen him out there three days prior.

Q:     So you didn't ask because you figured there would be no legitimate explanation?

A:     Yes, because the property wasn't supposed to be occupied by him or anyone.

Q:     I understand that. I understand that. But you assumed that he was doing something wrong because of the location, right?

A:     Yes.

Q:     You didn't have evidence that he was doing something wrong. You're basing it on your assumption; is that fair?

A:     No. He admitted he was at 2840 North 11th Street. So off of his admission, I made my determination.

Q:     And again, I know that part. I know that part. My question is a little different. You took the location, and you made an assumption, right?

A:     No, it was a fact. It wasn't an assumption.

Q:     The location was a fact. You took the fact that he was at a location, and you made an assumption about what he was doing there, right?

A:     Okay.

Q:     Is that a yes?

A:     Yes.

Q:     You didn't do an investigation to determine what exactly he was doing there?

A:     Yes.

> Q:     If he was wearing a badge that said fugitive recovery, if his badge,
>        in fact, did say fugitive recovery, should you have asked him about
>        that?
>
> A:     Yes.

Id. at 58-61.

This lack of investigation and the decision to ignore exculpatory evidence hanging around Mr. Goldwire's neck despite the ease with which an adequate inquiry could have been accomplished establishes that there was no probable cause to arrest Mr. Goldwire on the night in questions. Further, it raises genuine issues about defendant Landherr's motive on the night in question. The Third Circuit has held, "Motive is a question of fact that must be decided by the jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor." Monteiro v. City of Elizabeth, 436 F.3d 397, 405 (3d Cir.2006); see also, Mitchell v. Forsyth, 472 U.S. 511, 529 (1985) (improper intent is a pure question of fact); Johnson v. Jones, 515 U.S. 304, 313, (1995) (qualified immunity may turn on disputed issues of fact).

Given the total lack of an investigation and the conscious decision not to ask Mr. Goldwire about his Fugitive Recovery Agent Badge which was the very reason defendant Landherr suspected the presence of a firearm, a reasonable conclusion supported by the record is that defendant Landherr knew he had no probable cause when he arrested Mr. Goldwire. Defendant Landherr's motive is a fact question that properly should be left for a jury and is inappropriate for disposition on summary judgment. Accordingly, there exist genuine issues of material fact regarding defendant Landherr's entitlement to qualified immunity such that defendants' motion for summary judgment should be denied.

**D.    Defendants' Motion For Summary Judgment Should Be Denied Because Mr. Goldwire Has Shown An Underlying Cause of Action Against Defendant Landherr And Adduced Evidence Supporting A Failure To Train Theory Based Upon *Monell v. New York City***

The premise of defendants' motion for summary judgment on behalf of the City is two-fold.  First, the City contends that, because there is no underlying liability on the part of the named individual defendants, there can be no liability against the City.  Rather than restate the arguments made <u>supra</u>, Mr. Goldwire hereby incorporates those arguments herein.  For the reasons set forth above, there is a valid claim against defendant Landherr.  As such, defendants' motion for summary judgment should be denied.

Second, defendant erroneously contends that Mr. Goldwire has somehow failed to present evidence that a "policy or custom of [the City of Philadelphia] was the 'moving force' behind a violation of his [constitutional] rights."  <u>Clark v. Regional Medical First Correctional</u>, 360 F. App'x 268, 269 (3d Cir. 2010).  Based upon the facts as set forth in the Factual Background, <u>supra</u>, and as described more fully here, there is ample evidence of a custom and practice that has developed as a result of the City's failure to train its officers regarding Act 235 and how to investigate persons who present Act 235 Certifications to patrol officers.

A claim of municipal liability under <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658 (1978) is available to Mr. Goldwire because the evidenced adduced allows a reasonable trier of fact to find municipal liability.  A municipality is liable when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation.  <u>See</u> <u>Monell</u>, 436 U.S. at 691–95, 98.  Liability will be imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the "moving force" behind the constitutional tort of one its employees.  <u>See</u> <u>Polk County v. Dodson</u>, 454 U.S. 312 (1981).

30

Pursuant to <u>Monell</u>, a municipality can be held liable under section 1983 when it turns a "blind eye" to improper behavior by its employees. <u>See</u> <u>Whichard v. Cheltenham Township</u>, 1996 WL 502281, at *5 (E.D. Pa. Aug. 29, 1996); <u>see also</u>, <u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 584 (3d Cir. 2003). The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury. <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 (1989).

Additionally, contrary to the suggestion of the City, there is no issue with the fact that a specific individual was not identified as the policymaker. The Supreme Court has held that the unconstitutional acts of municipal employees can create municipal liability *even where the acts have "not been formally approved by an appropriate decisionmaker."* <u>Bd. of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404 (1997) (emphasis added); <u>see also</u>, <u>Natale</u>, 318 F.3d at 583-84. Courts have recognized that "custom can be established by other means, such as proof of knowledge and acquiescence." <u>Cortlessa v. County of Chester</u>, 2006 WL 1490145 at *7-8 (E.D. Pa. May 24, 2006).

In <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378 (1989), the plaintiff claimed that her constitutional rights had been violated when she was denied medical care while detained in a municipal jail. The Court noted that the relevant city policy did not itself violate the <u>Harris</u> plaintiff's constitutional rights, but explained that this did not resolve her failure to train claim:

> There can be little doubt that on its face the city's policy regarding medical treatment for detainees is constitutional. The policy states that the city jailer "shall ... have [a person needing medical care] taken to a hospital for medical treatment, with permission of his supervisor...." App. 33. It is difficult to see what constitutional guarantees are violated by such a policy.

> Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior*. The claim in this case, however, is that if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train....

Id. With respect to the Harris plaintiff's failure to train claim, the Supreme Court held that municipal liability can be predicated upon a failure to train only where that failure amounts to "deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." Id. at 389. The Court also explained why deliberate indifference is required and the nature of the relationship between liability for failure to train and the rule that a municipality is accountable only for its own custom or policy:

> Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.
>
> . . .
>
> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need....

Id.
The facts of this case allow a jury to reasonably conclude that the City failed to adequately and properly train and supervise its police officers with respect to Act 235 and its enforcement. That failure resulted in the denial of Mr. Goldwire's constitutional rights. The evidence shows there was a lack of training regarding Act 235, how to investigate Act 235 compliance, and how

to resolve any confusion or uncertainty on the part of an officer as to what constitutes a *bona fide* place of employment.

Defendant Landherr testified that he only received minimal training at the police academy and no training updates since his time as a recruit.  See defendant Landherr deposition transcript at 19-20 (Exhibit "B" hereto).  This lack of training speaks to both the total inadequacy of his investigation and the liability that should be imposed upon the City.  There can be little doubt that where there is absolutely no training or attention to the constitutional rights of individuals lawfully working under the auspices of Act 235, police officers are more likely to act with deliberate indifference to those rights.  In this case, such deliberate indifference manifested itself in the form of a conclusory and woefully inadequate investigation that ended with Mr. Goldwire's false arrest.

In addition, the fact that there are numerous media reports and similar cases serves only to strengthen plaintiff's claim against the City.  See Plaintiff's Amended Complaint at ¶¶ 40-45 (Exhibit F); articles from multiple media sources (Exhibits "G", "H" and "I", hereto).  Indeed, Mr. Goldwire's partner, Mr. Sharper, was recently before this Court as a plaintiff because he alleged that his constitutional right to be free from false arrest was violated when officers failed to properly investigate his purported violation of the Uniform Firearms Act.  Sharper v. City of Philadelphia et al., 2:14-cv-05299-BMS.  In that case too, the evidence on record demonstrated a lack of police officer training by the City with respect to Act 235:

> Q:      Had you received at any point in time any training on how to deal
>           with someone who hands you an Act 235 license?
>
> A:      I don't remember training on it.  You know, you have
>           conversations with, you know, other officers that, you know, know
>           what the Act 235 means.  That is, you know, they are allowed to
>           carry, to go to and from work, and basically, like security club, like
>           the guys out front, you know, with -- all the swat officers, like

33

them guys are Act 235.

Q:    Right.  But my question is a little different.

A:    Okay.

Q:    Did you receive any training that you can recall from the Philadelphia Police Department at the Academy or through your updates regarding how to deal with someone who presents an Act 235 license to you?

A:    I don't recall.

Q:    You don't recall ever receiving any?

A:    I don't recall.  No.

Q:    Have you had your updates yet for this year?

A:    Yes.

Q:    Those updates, were you presented with any training on how to deal with someone who presents and Act 235 license?

A:    No.

Q:    Do you remember your training in the past -- let's say in the past three years for your updates, do you remember ever receiving any training relating to Act 235?

A:    I don't.

See Deposition Transcript of Officer Robert McCarthy at 20-21 (Exhibit "J" hereto).

Here, because of the policies, practices and customs of the City prior to March 24, 2014, defendant Landherr believed his actions with respect to Mr. Goldwire were acceptable.  It was because of the City's developed and maintained policies and customs that defendant Landherr violated Mr. Goldwire's constitutional rights in such an egregious manner.

For its part, particularly in light of the numerous media articles and other lawsuits, the City knew or should have known of its failure to adequately train its police officers with respect

34

to Act 235 and its enforcement, but it deliberately, knowingly, and negligently failed to take measures to provide proper training, supervision, and control of City police officers, agents, and employees. As a result, defendant Landherr believed that his actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated and condoned. Here, the record demonstrates that the City did not emphasize Act 235 or the constitutional rights of individuals working pursuant to a valid Act 235 license. There exists a genuine issue of material fact as to whether defendant Landherr violated Mr. Goldwire's constitutional right to be free from false arrest because he believed the City would not impose consequences or take corrective action.

Viewing the facts a light most favorable to Mr. Goldwire, the specific actions and/or inactions of the City to develop policies, procedures and customs for the supervision and training of their officers and employees clearly amount to a constitutional violation. At minimum, this is a disputed issue of material fact that should be left for a jury to decide.

Defendant Landherr abused the power entrusted to him as a police officer and the City knowingly turned a blind eye. Throughout the course of these events the City, implicitly, through its customs, practices, policies, and procedures, trained the officers that their actions were acceptable. Thus, it is reasonable to infer that, if there was rampant disregard for the policies and procedures of the City, it is because the City turned a blind eye to the egregious behavior of its officers. This is the basis of Mr. Goldwire's <u>Monell</u> claim, and accordingly, defendants' motion for summary judgment should be denied.

35

## V.     **CONCLUSION**

For all of the foregoing reasons, plaintiff Kelly Goldwire, respectfully requests that this

Court enter an Order, in the form proposed, denying defendants' motion for summary judgment.

Respectfully submitted,


_____/s BSC5184_____
Brian S. Chacker, Esquire
Steven A. Medina, Esquire
Gay Chacker & Mittin, P.C.
1731 Spring Garden Street
Philadelphia, PA  19130
Tel: (215) 567-7955
Fax: (215) 567-6809
bchacker@gaychackermittin.net
smedina@gaychackermittin.net

Date:  April 6, 2016                    *Attorneys for Plaintiff*