# Exhibit A

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELLY GOLDWIRE, | : | CIVIL ACTION |
| Plaintiff(s), | : | |
| vs. | : | |
| CITY OF PHILADELPHIA, | : | |
| ET AL., | : | |
| Defendant(s). | : | NO. 15-2856 |

- - -

WITNESS:  KELLY GOLDWIRE

- - -

JANUARY 6, 2016

- - -

Oral deposition taken pursuant to notice,
held at the offices of Gay, Chacker & Mittin,
P.C., 1731 Spring Garden Street, Philadelphia,
Pennsylvania, beginning at approximately 11:07
a.m., before Donna M. Bittner, Court
Reporter-Notary Public, there being present:

- - -

Philadelphia Office:
The Bourse, Suite 1030
Philadelphia, Pennsylvania 19106

New Jersey Office:
89 North Haddon Avenue, Suite D
Haddonfield, New Jersey 08033

KELLY   GOLDWIRE

```
 1                      APPEARANCES:

 2

         GAY, CHACKER & MITTIN, P.C.
 3       BY: BRIAN S. CHACKER, ESQUIRE
         1731 SPRING GARDEN STREET
 4       PHILADELPHIA, PA 19130-3915
         (215)567-7955
 5       BCHACKER@GAYCHACKERMITTEN.NET

 6       COUNSEL FOR THE PLAINTIFF

 7


 8       CITY OF PHILADELPHIA LAW DEPARTMENT
         BY: MICHAEL R. MILLER, ESQUIRE
 9       ONE PARKWAY BUILDING
         1515 ARCH STREET, 14TH FLOOR
10       PHILADELPHIA, PA 19102
         (215)683-5433
11       MICHAEL.R.MILLER@PHILA.GOV

12       COUNSEL FOR THE DEFENDANT

13

14

15

16

17

18

19

20

21

22

23

24
```

KELLY   GOLDWIRE

Page 9

```
 1    traveling home from work, is that your

 2    understanding?

 3    A.          Correct.

 4    Q.          Have you ever been to 2840 North 11th

 5    Street?

 6    A.          Yes.

 7    Q.          When was the first time you ever went to

 8    that location?

 9    A.          I don't recall.

10    Q.          Could you give an estimate?

11               MR. CHACKER:  Don't guess.

12               THE WITNESS:  I don't recall, no

13    knowledge of it.  I don't know.

14    BY MR. MILLER:

15    Q.          Had you ever been there before the day

16    you were arrested?

17    A.          Yes.

18    Q.          Approximately how many times?

19    A.          I'd say about ten.

20    Q.          And why were you going there?

21    A.          Employment.

22    Q.          So what kind of employment?

23    A.          Security.

24    Q.          And could you just unpack for me a
```

KELLY   GOLDWIRE

Page 10

```
 1    little -- could you expand on what that means?

 2                  MR. CHACKER:  Object to the form.

 3    BY MR. MILLER:

 4    Q.          What kind of work were you doing at 2840

 5    North 11th Street?

 6    A.          Security, armed security.

 7    Q.          Were you guarding the establishment?

 8    A.          The owner of the building.

 9    Q.          Were you guarding the owner?

10    A.          Correct.

11    Q.          I know -- well, strike that.  Did you

12    know what kind of business was being run out of

13    the building?

14    A.          Yes.  Yes.

15    Q.          What kind?

16    A.          It was a club, a dance club.

17    Q.          Okay.  Was it serving any alcohol?

18    A.          See, I can't say because my job, my

19    duties was outside.  I can't say right offhand.

20    Q.          So you were working outside the

21    building?

22    A.          Right.

23    Q.          Where outside the building?

24    A.          In front of the building.
```

KELLY   GOLDWIRE

1    Q.           At the entrance?

2    A.           At the entrance.

3    Q.           Now, what was the owner of the

4    building's name?

5    A.           I can't remember his name, his Muslim

6    name.

7    Q.           Do you remember the first time you met

8    him?

9    A.           Yes.

10   Q.           Do you remember when that was?

11   A.           It was probably -- scratch that.  I do

12   remember his name.

13   Q.           What's that?

14   A.           I only remember his first name.  Ahmad.

15   Q.           Could you spell that for the court

16   reporter?  You don't know how?

17   A.           Your guess is as good as mine.

18   Q.           Do you remember how you met him?

19   A.           I was at another bar and a friend of

20   ours had told him about me and he came by to see

21   me and offered me employment.

22   Q.           And what did he want to employ you as?

23   A.           As a security guard.

24   Q.           Now, this Ahmad, do you remember when

KELLY   GOLDWIRE

Page 12

```
 1    you first met him approximately?

 2    A.          No.

 3    Q.          Approximately how many days did you

 4    serve as a security guard for Mr. Ahmad?

 5    A.          Five days.   Five days.

 6    Q.          Did you ever guard him at a different

 7    location than 2840 North 11th Street?

 8    A.          No.

 9    Q.          So it sounds like you only worked as a

10    guard for him at this establishment?

11    A.          Correct.

12    Q.          The dance club at 2840 North 11th

13    Street?

14    A.          Correct.

15    Q.          How many entrances were there to the

16    club?

17    A.          One to my knowledge.

18    Q.          Would you screen who was able to get in

19    and out of the entrance?

20    A.          That's correct.

21    Q.          And what kind of criteria would you use

22    when you were doing that?

23    A.          I need their identification and then I

24    will take my flashlight and physically check them
```

KELLY   GOLDWIRE

1    for weapons.

2    Q.          And if they were over 21 and they had no

3    weapons, would you let them in?

4    A.          Correct.

5               MR. CHACKER:  Object to the form.

6    BY MR. MILLER:

7    Q.          You can answer.

8               MR. CHACKER:  You can answer.

9               THE WITNESS:  Correct.

10   BY MR. MILLER:

11   Q.          It sounds like you've worked security at

12   other bars too; is that right?

13   A.          Yes.

14   Q.          Was there any difference between what

15   you would do at 2840 North 11th Street and what

16   you would do at another bar?

17   A.          No.

18   Q.          Do you know before you were arrested,

19   did the dance club at 2840 North 11th Street have

20   any issues with police?

21   A.          Before I was arrested they did come

22   there.

23   Q.          And do you remember when that was?

24   A.          Approximately probably four days before

KELLY   GOLDWIRE

Page 14

1    I got arrested.

2    Q.        And what happened when they came?

3    A.        They came in there and basically just

4    shut the building down for that night.

5    Q.        Do you know why?

6    A.        No, I didn't ask questions why.

7    Q.        Did anybody -- strike that.  Did you

8    have a conversation with any of the police

9    officers that came there four days before you're

10   arrested?

11   A.        Yes.

12   Q.        Who did you talk to?

13   A.        Sergeant Landherr.

14   Q.        What did he say to you?

15   A.        He said to me this is an illegal

16   establishment.  Your 235 could be taken away from

17   you and you could be arrested.

18   Q.        And did you say anything in reply?

19   A.        Yes.

20   Q.        What did you say?

21   A.        I said, say no more.  I'm going home.

22   Q.        So -- strike that.  Did you have

23   conversations with any other officers that

24   evening?

KELLY   GOLDWIRE

Page 15

1    A.          No.

2    Q.          Did you ever have a conversation with

3    this person named Ahmad about why the business

4    was shut down?

5    A.          No.

6    Q.          So after Sergeant Landherr told you

7    that, you went home?

8    A.          Correct.

9    Q.          When was the next time you worked at

10   2840 North 11th Street?

11               MR. CHACKER:   Objection to the form.

12   Do you mean worked for Ahmad or worked at that

13   location.

14               MR. MILLER:   Well it's kind of

15   synonymous because I never worked at any other

16   location.

17   BY MR. MILLER:

18   Q.          When was the next time you worked for

19   Ahmad?

20   A.          That was it.

21   Q.          So on the day of your arrest you weren't

22   working for Ahmad?

23   A.          No, I wasn't.

24   Q.          And did you stop working for Ahmad

KELLY   GOLDWIRE

1    because you now realized it was a speakeasy?

2              MR. CHACKER:   Objection to the form.

3    You can answer.

4              MR. MILLER:   Or I'll strike that.

5    BY MR. MILLER:

6    Q.          Why did you stop working for Ahmad?

7    A.          At that time I had a bounty arrest that

8    we was trying to make.   So I was concentrating on

9    my bounty duties at that time.

10   Q.          Now the day of your arrest, why don't

11   you just take me through what you did that day as

12   best you can remember.

13   A.          From what time?

14   Q.          From when you woke up.

15   A.          Wow.   Well, I guess I woke up around

16   normal time, probably 2:30, 3 o'clock.   I got a

17   call from my partner saying that we had a citing

18   on the fugitive that we was chasing.   At that

19   time I did get a call from my boss, which is Tom

20   Nixon that we need to hurry up and try to get

21   this female caught as soon as possible.   So I

22   then called my partner and told him I'll be there

23   in probably about 20 minutes.   In the process of

24   that he received a call from one of our friends

KELLY   GOLDWIRE

Page 17

1    that live in that area.

2    Q.        What area?

3    A.        11th and Cambria.

4    Q.        Okay.

5    A.        The fugitive was out there.  So he said

6    he gave us the identification of what she was

7    wearing and the location that he did see her at.

8    At that time me and my partner proceeded going to

9    ride around to see if we can locate her and

10   arrest her.  At that time I said it had to be

11   around I want to say 6 o'clock, 7 o'clock we did

12   a couple of drive-bys.  Went to her place of

13   registry.  Knocked on her door to see if she was

14   there.  There was no reply.  We did then

15   proceeded to go around the neighborhood again in

16   different directions to see if one of us run into

17   her.  At the same time, while we are doing this,

18   we're relaying our message back to our boss

19   letting him know what was going on.  Once we got

20   through with that we -- what time did we leave

21   at?  I think we left to go meet up with Tom

22   approximately around 9:30, 10 o'clock to tell him

23   that we couldn't locate her at that time and that

24   we are definitely going to get up on it.  Because

KELLY  GOLDWIRE

1    that wasn't the first time that we heard that she

2    was back in the area.  She was basically doing a

3    lot of early morning and late night movements.

4    So we advised our strategy to go out and settle

5    on an area and see if we can catch her on one of

6    her late night runs so we can get her off the

7    streets.

8    Q.        So I'm going to unpack it a little.  If

9    I get something wrong, just let me know.  It

10   sounds like you went to the vicinity of 2840

11   North 11th Street around 6 p.m.?

12                  MR. CHACKER:  Objection to the form.

13                  THE WITNESS: No, not 2840.

14   BY MR. MILLER:

15   Q.        The vicinity of 11th and Cambria around

16   6 p.m.

17   A.        11th and Cambria.

18   Q.        And 11th and Cambria is very close to

19   2840 North 11th Street, correct?

20   A.        Correct.

21   Q.        So you start looking for this fugitive

22   around 6 p.m., right?

23   A.        Correct.

24   Q.        Do you remember her name?

KELLY   GOLDWIRE

Page 19

1   A.              I don't remember her right offhand.

It's on the warrant though.

3   Q.              And you were working with a partner; is

4   that correct?

5   A.              Correct.

6   Q.              And was he in the same car as you?

7   A.              No, he was in a different vehicle.

8   Q.              Were you guys driving together or were

9   you separate?

10  A.              We was together.  One behind each other.

11  Q.              So you were kind of following each other

12  around the neighborhood?

13  A.              Correct.

14  Q.              What was his name?

15  A.              Kenneth Sharper.

16  Q.              And I know who that is but could you

17  spell that for the record?

18  A.              K-E-N-N-E-T-H, Kenneth Sharper,

19  S-H-A-R-P-E-R.

20  Q.              So you and Mr. Sharper were looking for

21  this fugitive from around 6 p.m. until around

22  8:30 p.m. approximately?

23  A.              Approximately 9:30, 10 o'clock, correct.

24  Q.              After 10 o'clock what did you do?

KELLY   GOLDWIRE

Page 20

```
 1    A.              We left and went to meet up with Tom and
 2    talk with him about how we was going to proceed
 3    to catch this fugitive.
 4    Q.              And who is Tom?
 5    A.              Tom is our boss.
 6    Q.              Does he have a last name?
 7    A.              Nixon.
 8    Q.              So where did you meet with Tom?
 9    A.              I think it was at Dunkin' Donuts on
10    Germantown and Champlost I think, if I'm correct.
11    Q.              I'm sorry, Germantown and what?
12    A.              Champlost.
13    Q.              Do you know how to spell that?
14                    MR. CHACKER:  C-H-A-M-P-L-O-S-T.
15    BY MR. MILLER:
16    Q.              So you met with him around 10 o'clock
17    approximately?
18    A.              Yeah.
19    Q.              And what did you talk about?
20    A.              About how hard it was to catch this
21    female basically and what we need to do to try to
22    hurry up and get this matter over and done with.
23    Q.              And just -- I know nothing about this.
24    How do you come to get assigned a fugitive to try
```

KELLY   GOLDWIRE

1    to catch?

2    A.          Excuse me?

3    Q.          How do you -- how does Tom -- what's the

4    process like for apprehending a fugitive?

5    A.          A warrant is issued for the fugitive's

6    arrest.  It is then sent to him from another

7    office.  He gets the warrant.  Gives us a copy of

8    the warrant and lets us know who the person we

9    are looking for, the area they are, the home

10   address, and the people who signed or may have

11   signed for him or her to be bonded out.

12   Q.          And does Tom own a business that

13   specializes in this?

14   A.          I think he does, yes.

15   Q.          Do you know the name of that business?

16   A.          Not offhand.  I have it on my e-mail.

17   Q.          Were you an employee of the business?

18   A.          Yes.

19   Q.          So you meet with Tom and Kenneth around

20   10 p.m., right?

21   A.          Me and Kenneth.

22              MR. CHACKER:  9:30, 10:00 he said.

23              THE WITNESS:  Me and Kenneth was

24   together and we go meet Tom around 9:30, 10

KELLY   GOLDWIRE

1    o'clock.

2    BY MR. MILLER:

3    Q.        At a Dunkin' Donuts on Germantown,

4    correct?

5    A.        No, Broad and Champlost.

6    Q.        Oh, Broad and Champlost.  I'm sorry.  I

7    thought you said Germantown.

8              MR. CHACKER:  Yeah, I think you

9    actually did say Germantown.  It doesn't matter.

10   Broad and Champlost.

11   BY MR. MILLER:

12   Q.        So on Broad Street you and Kenneth --

13   A.        Broad Street; me, Kenneth, and Tom met

14   at Dunkin' Donuts at Broad and Champlost.

15   Q.        And you're talking about how to catch

16   this fugitive, correct?

17   A.        Correct.

18   Q.        How long were you talking at that

19   Dunkin' Donuts?

20   A.        I have no idea.

21            MR. CHACKER:  Don't guess.

22            THE WITNESS:  I have no idea.

23   BY MR. MILLER:

24   Q.        Do you know if it was more than 30

KELLY   GOLDWIRE

Page 23

1   minutes or less than 30 minutes?

2   A.          It was more than 30 minutes.

3   Q.          More than an hour, less than an hour?

4   A.          Yeah, more than an hour.

5   Q.          So you're there at least an hour.  What

6   happens after that?

7   A.          From there I think we went our ways for

8   a minute.  Actually I went home, took a shower,

9   changed clothes, and came back out.

10  Q.          Where did you live at the time?

11  A.          5843 North Hope Street.

12  Q.          How far is that from that Dunkin'

13  Donuts?

14  A.          Let's see, Front and --

15              MR. CHACKER:  How long does it take

16  you?  You don't have to give --

17              THE WITNESS:  About 20 minutes.

18  BY MR. MILLER:

19  Q.          So you drive 20 minutes.  You take a

20  shower and then you said you went back out?

21  A.          Yes.

22  Q.          What did you go back out to do?

23  A.          Arrest the fugitive.

24  Q.          At that point did you think about going

1   to bed?

2   A.          Job first, sleep when you're dead.

3   Q.          So you go back out to arrest the

4   fugitive.  Is Mr. Sharper also going back out at

5   that time?

6   A.          Right.

7   Q.          Did you meet up with him?

8   A.          Correct.

9   Q.          Where did you meet up?

10  A.          11th and Cambria.

11  Q.          Okay.  Do you know approximately what

12  time that was?

13  A.          No.

14  Q.          Could you give an estimate?

15  A.          11:30, midnight.

16  Q.          What happens after --

17              MR. CHACKER:  Is that an estimate?

18              THE WITNESS:  That's an estimate.

19              MR. CHACKER:  Okay.

20  BY MR. MILLER:

21  Q.          What happens after you meet up with Mr.

22  Sharper?

23  A.          We are waiting to catch the fugitive.

24  We're sitting.  He's in the truck.  I'm in the

KELLY   GOLDWIRE

1    truck.  And we're talking back to each other on

2    the phone about how she looks, what she may have

3    on, and where she was last sighted.

4    Q.          And why were you -- strike that.  Why

5    did you think she was around 11th and Cambria?

6    A.          To be honest, we caught a fugitive from

7    Connecticut in that same vicinity at the same

8    exact address.

9    Q.          What address?

10    A.          2840 or 2830, whatever it is.

11    Q.          The dance club?

12    A.          Yes.

13    Q.          You caught a fugitive at the dance club

14    before?

15    A.          Inside the club.

16    Q.          Okay.  So you're waiting in the truck

17    and what happens after that?

18    A.          Well, we seen that nothing is going on.

19    I decided I was going to go get something to eat.

20    Q.          Okay.

21    A.          Pull off.  As I'm pulling off, I look in

22    my rearview mirror and I see two red and blue

23    lights.  Didn't think much of it.  Pulled off.

24    Proceeded up Cambria to Glenwood.  As I get by

KELLY   GOLDWIRE

Page 26

1   Glenwood I can see the cop speeding up at a high

2   rate of speed to get right behind me.  Makes a

3   right on Glenwood.  I'm now at Germantown and

4   Glenwood.  I make say left on Germantown.  As I

5   proceed down Germantown, that's when he puts his

6   lights on and stops me.

7   Q.          Were you parked in front of 2840 North

8   11th Street when you pulled out?

9   A.          Correct.

10  Q.          And you had a gun in your vehicle at the

11  time?

12  A.          Correct.

13  Q.          And you had your Act 235?

14  A.          Correct.

15  Q.          Did you have any other licenses to

16  carry, other than an Act 235?

17  A.          I had my 235 certification, I had my

18  license to be a certified bail bondsman on me as

19  well as my identification.

20  Q.          But at this time your license to carry a

21  firearm, that is expired, correct?

22              MR. CHACKER:  The Pennsylvania

23  license you mean?

24              MR. MILLER:  Yes.

KELLY   GOLDWIRE

Page 27

```
 1                  THE WITNESS:   Which license?

 2                  MR. CHACKER:   The Pennsylvania

 3      license.

 4                  THE WITNESS:   Correct.

 5      BY MR. MILLER:

 6      Q.          And at this time how many -- I know you

 7      had one gun in the car; is that correct?

 8      A.          Correct.

 9      Q.          How many guns did you own at this time?

10      A.          Two.

11      Q.          What kind of gun was the second one?

12      A.          Mossberg shotgun.

13      Q.          Now you said you were leaving to go get

14      something to eat?

15      A.          Correct.

16      Q.          And you got pulled over on the way

17      obviously?

18      A.          Correct.

19      Q.          Now when -- strike that.  Do you know

20      whether your brake light was out when you got

21      pulled over?

22      A.          No, I didn't know.  I didn't know.

23      Q.          So sitting here today do you know

24      whether it was out or not?
```

KELLY   GOLDWIRE

Page 28

1    A.            Yeah, I know now because I went back and

2    looked at it.

3    Q.            Was it out?

4    A.            Yes.

5    Q.            Now when Sergeant Landherr pulled you

6    over, do you recall anything he said to you?

7    A.            As far as what, sir?

8    Q.            Well, it sounds like you do recall, so

9    what do you recall him saying to you?

10   A.            When he pulled me over he said I'm

11   pulling you over because your brake light is out

12   on the spoiler.  The third brake light is out.

13   Then he proceeded to ask me where is your

14   firearm.  I told him my firearm is on the floor

15   behind me.  He then proceeded to tell me to get

16   out of the vehicle -- strike that.  I'm sorry,

17   I'm getting ahead of myself.  I said, well,

18   here's my 235 and my driver's license, which I

19   handed to him.  He then tells me to get out of

20   the vehicle.  As I'm getting out of the vehicle

21   he walks me to the back of the car while they get

22   my duty rig out with my weapon in it.  And he

23   basically tells me I'm under arrest.

24   Q.            Did you say anything to Sergeant

KELLY   GOLDWIRE

1    Landherr before you were arrested?

2    A.          I asked him why am I being arrested?

3    What am I being arrested for?  And I also let him

4    know at the time I was going through chemotherapy

5    and I had a chemo appointment in a few hours.

6    Q.          So the next day you had a chemo

7    appointment?

8    A.          No, in a few hours after.

9              MR. CHACKER:  This happened at 1

10   a.m.

11             THE WITNESS:  This happened at 1

12   a.m., my chemo appointment was at 6:25 in the

13   morning.

14   BY MR. MILLER:

15   Q.          So you asked him why you're being

16   arrested, correct?

17   A.          Correct.

18   Q.          What does he say?

19   A.          You violated -- violation of the Firearm

20   Act.

21   Q.          Did you ever explain to him that you

22   were hunting for a fugitive?

23   A.          He never gave me a chance to.

24   Q.          So he didn't ask you, correct?

KELLY   GOLDWIRE

Page 30

1    A.          Correct.

2    Q.          And you didn't say that, correct?

3    A.          I had no chance to.

4    Q.          So you are processed and I think you

5    post bail for this on March 26th?

6    A.          Correct.

7    Q.          When you get released from jail, do you

8    get your Act 235 card back?

9    A.          Yes.

10   Q.          And do you still have that card today?

11   A.          Yes.

12   Q.          Give me a second.  I just have a couple

13   of documents I want to show you.

14               MR. MILLER:  Can we mark this as

15   Goldwire-1?

16         (Whereupon, Goldwire-1, one-page document,

17   was marked for identification.)

18               MR. MILLER:  Off the record.

19               (Whereupon, a discussion was held.)

20   BY MR. MILLER:

21   Q.          Is that your signature at the bottom of

22   this?

23   A.          Yes.

24   Q.          Now I think what this means, but you can

KELLY   GOLDWIRE

Page 31

```
 1    tell me if I'm wrong, is that when you were

 2    released from jail in addition to giving your Act

 3    235 card back, they gave you approximately $250?

 4    A.          No, they didn't give me my Act back.

 5    That was sent to me from the state police.

 6    Q.          That was sent to you from the state

 7    police?

 8    A.          Yes.  That's how I received my --

 9    Q.          Do you know when you got that?

10    A.          I don't have -- I don't remember.

11    Q.          Can you give an estimate of how long

12    after your arrest you got it back from the state

13    police?

14    A.          I can't remember offhand.  I think it

15    was -- I don't want to say a date and be caught

16    up on a date.

17              MR. CHACKER:  How about approximate

18    time frame.  Understanding that it's an estimate

19    and we'll look for the letter.  You can search at

20    home for that letter?

21              THE WITNESS:  Yes, I have her doing

22    that right now.

23    BY MR. MILLER:

24    Q.          Let's do it that way then.  If you don't
```

KELLY   GOLDWIRE

1   know you don't know.  But it looks like when you

2   were released from jail you got about 428.91

3   back?

4   A.        Correct.

5   Q.        Okay.  Now --

6            MR. MILLER:  I'm just going to show

7   you a couple more.  Can we mark this as

8   Goldwire-2?

9        (Whereupon, Goldwire-2, property receipt,

10  was marked for identification.)

11  BY MR. MILLER:

12  Q.        I just want -- that's your signature at

13  the bottom of this document, correct?  It says

14  inmates signature.  No?

15  A.        That's not my signature.

16           MR. CHACKER:  No, there's an X above

17  for the inmate's signature.

18           MR. MILLER:  Oh, I see it.

19  BY MR. MILLER:

20  Q.        Well, I'll just ask it this way.  It

21  says here when you were let out of CFCF they gave

22  you back three credit cards, is that a fair

23  statement?

24  A.        Correct.

1              MR. MILLER:  Can you mark this

2    Goldwire-3?

3         (Whereupon, Goldwire-3, bail receipt, was

4    marked for identification.)

5    BY MR. MILLER:

6    Q.        So it looks like this is a bail receipt?

7    A.        Yes.

8    Q.        Who is Annette Figueroa?

9    A.        My fiancee.

10   Q.        Are you guys still engaged?

11   A.        Yes.

12   Q.        And was she your fiancee at the time

13   that you were arrested?

14   A.        Yes.

15   Q.        Now did she post your bail?

16   A.        Yes.

17   Q.        So she put up the 2,500?

18   A.        Yes.

19              MR. CHACKER:  Off the record for a

20   second.

21              (Whereupon, a discussion was held.)

22   BY MR. MILLER:

23   Q.        When was the first time, and I don't

24   want to know what you said, but that you met with

KELLY   GOLDWIRE

Page 34

1    an attorney or someone who works for an attorney

2    about filing this lawsuit?

3                    MR. CHACKER:  Objection.  Don't

4    answer.  It's not -- there's no rule of evidence

5    that allows for that discovery.

6                    MR. MILLER:  I'll figure out if I

7    want to take it up with the Judge.

8    BY MR. MILLER:

9    Q.          When was the last time you talked to Mr.

10   Sharper?

11   A.          Last month.

12   Q.          And I'm sorry, was it Mr. Nixon that ran

13   this company that you were working for?

14   A.          Yes.

15   Q.          When was the last time you talked to

16   him?

17   A.          About two months ago.

18   Q.          Now did being arrested cause you any

19   mental health problems?

20                    MR. CHACKER:  Objection to the form.

21   What do you mean by mental health problems?

22   BY MR. MILLER:

23   Q.          Any emotional distress, any depression,

24   anything like that?

KELLY   GOLDWIRE

Page 35

1    A.          Yes.   Because you've got to think about

2    it at the time I'm fighting for my life.   I got

3    chemo.   I needed that life treatment.   And to

4    have that taken from me made what I was going

5    through that much more harder because I could not

6    receive chemo treatment while I'm in jail.   And

7    on the secondhand of that, I had just recently

8    lost my aunt, young, to cancer.   So all of this

9    was playing in my mind as I'm in jail and can't

10   receive this.   What is going to happen to me, how

11   long am I going to be in here, you know.   There

12   was a whole bunch of stuff that went on.   It just

13   drove me almost insane while I was up in there.

14   Q.          I'm sorry to ask you this, but when did

15   your aunt die?

16   A.          My aunt died September 2013.

17   Q.          Okay.

18   A.          Forty-six years old.

19   Q.          Now, have you ever received treatment

20   for any sort of emotional distress or mental

21   health problems?

22   A.          No.

23   Q.          Why not?

24   A.          I'm basically a loner.   I've been a

KELLY   GOLDWIRE

1    loner all my life.  And I deal with a lot of

2    emotions on my own time and on my own concerns.

3    Q.         I'm just going to show you one more

4    document.

5              MR. MILLER:  I think we're up to

6    Goldwire-4.

7        (Whereupon, Goldwire-4, multi-page

8    document, was marked for identification.)

9              MR. MILLER:  Actually I don't think

10   this is the one that I wanted to show you.  You

11   can stop looking at that.

12   BY MR. MILLER:

13   Q.         So you were in jail for I guess

14   approximately three days and then Ms. Figueroa

15   posted your bail, correct?

16   A.         Correct.

17   Q.         Apart from those three days, did you

18   miss any time from work as a result of this

19   incident?

20   A.         Yes.

21   Q.         Were you able to keep working for Mr.

22   Nixon after you got out of jail?

23   A.         No.

24   Q.         And why not?

# Exhibit B

SERGEANT TODD LANDHERR

ORIGINAL

Page 1

```
        IN THE UNITED STATES DISTRICT COURT

    FOR THE EASTERN DISTRICT OF PENNSYVLANIA

                  - - -

KELLY GOLDWIRE,           :   CIVIL ACTION NO.:

        Plaintiff    :   2:15-cv-02856-JPH

    vs.

                          :

CITY OF PHILADELPHIA
    and                   :
CITY OF PHILADELHPIA
POLICE OFFICER TODD       :
LANDHERR (BADGE #8753)
Individually and as a     :
Police Officer for the
City of Philadelphia      :
    and
CITY OF PHILADELPHIA      :
POLICE OFFICER RICARDO
ROSA (BADGE #3945)        :
Individually and as a
Police Officer for the    :
City of Philadelphia
    and                   :
CITY OF PHILADLEPHIA
POLICE OFFICER DANIEL     :
MURAWASKI (BADGE #8144)
Individually and as a     :
Police Officer for the
City of Philadelphia      :
    and
JOHN DOE CITY OF PHILA.:
POLICE OFFICERS I-III
Individually and as       :
Police Officers for the
City of Philadelphia,     :

        Defendants.:
---------------------
```

SERGEANT TODD LANDHERR

Page 2

1                           - - -

2              Oral deposition of SERGEANT TODD

3     LANDHERR, taken at the CITY OF PHILADELPHIA

4     LAW DEPARTMENT, One Parkway Building, 1515

5     Arch Street, 14th Floor, Philadelphia,

6     Pennsylvania 19102 on Thursday, February 18,

7     2016, commencing at approximately 11:38 a.m.,

8     before Kori DiMattia, Professional Court

9     Reporter - Notary Public, there being present:

10

11

12

13

14

15

16

17

18

19

20

21                         - - -

22              ACE REPORTERS, INC.
              The Bourse, Suite 1030
23         Philadelphia, Pennsylvania 19106
                          - - -

24         89 North Haddon Avenue, Suite D
           Haddonfield, New Jersey 08033

SERGEANT TODD LANDHERR

```
 1    A P P E A R A N C E S:

 2

 3

 4    GAY CHACKER & MITTIN, P.C.
      BY:  BRIAN S. CHACKER, ESQUIRE
 5    1731 Spring Garden Street
      Philadelphia, Pennsylvania 19130
 6    Counsel for the Plaintiff
      bchacker@gaychackermittin.net
 7    (215) 567-7955

 8

 9

10    CITY OF PHILADELPHIA LAW DEPARTMENT
      BY:  MICHAEL R. MILLER, ESQUIRE
11    Civil Rights Unit
      One Parkway Building
12    14th Floor
      Philadelphia, Pennsylvania 19102
13    Counsel for the Defendants
      michael.r.miller@phila.gov
14    (215) 683-5433

15

16

17

18

19

20

21

22

23

24
```

SERGEANT TODD LANDHERR

1    then when I was permanently assigned, I was

2    assigned to the 14th district from November of

3    2009 until I was promoted at the beginning of

4    2014.

5    Q    And that's when you got moved to the

6    25th?

7    A    Correct.

8    Q    So you were -- in the 14th, at the end,

9    you were working the midnight shift?

10   A    No.  My -- as soon as I graduated the

11   academy and I was permanently assigned to the

12   14th, I did -- that November of 2009 until

13   January of 2011, I was on the midnight shift.

14   From January of 2011 until the end of December

15   of 2011, I was on one squad.  We rotated two

16   weeks of night work, two weeks of daywork,

17   8:00 to 4:00, 4:00 to 12:00.  Then from

18   January of 2012 until I was promoted, I was in

19   five squad tactical, and I worked Tuesday

20   through Saturday, 6:00 p.m. to 2:00 a.m. for

21   two weeks, and then one week of daywork, 8:00

22   to 4:00.

23   Q    Were you with Officer Rosa in five squad?

24   A    No, I was not.  He was in five squad in

SERGEANT TODD LANDHERR

Page 19

1    the 25th district.  I was in five squad in the

2    14th district.

3    Q    As soon as you got back to the 25th, you

4    went to the midnight shift?

5    A    I was never at the 25th prior to being

6    promoted.

7    Q    That's what I am saying.

8    A    Oh, okay.

9    Q    Once you got to the 25th, you had

10    returned to --

11    A    To the last night --

12    Q    -- midnight shift?

13    A    Yeah.  Yeah.  Midnight, yes.  And I've

14    been there ever since.

15    Q    Tell me about the training that you

16    received, whether it be at the academy or

17    since, regarding Act 235 and how to deal with

18    those people carrying Act 235 licenses?

19    A    Act 235, I had some minimal training at

20    the academy.  None since then.  They basically

21    just went over some of the general guidelines

22    and reasons that people have the Act 235.  You

23    know, they're typically security officers.

24    They're not police officers.  They have no

SERGEANT TODD LANDHERR

Page 20

1    arrest powers.  Some are armed, and they are

2    permitted to be armed while at work.  And in

3    addition to that, they're allowed to be armed

4    while traveling to and from their place of

5    work.

6    Q    Okay.  Were you given any training on how

7    to investigate when you stop someone who says

8    they're carrying an Act 235?

9    A    Just like any other pedestrian

10   investigation.  You know, you would verify the

11   information on the card, make sure it's

12   current.  And if you really wanted to, this

13   wasn't at the training, you could verify it

14   with the state police.  They do have a website

15   that you can input their name, Social Security

16   Number, and their certification number, and it

17   will tell you if it's an active certification.

18   Q    How do you verify -- if you make this

19   stop and you're in the field, how do you

20   verify the information on the card?

21   A    Well, by looking at it first, and then if

22   you want to take it that next step, you know,

23   I have an iPhone, I can go online to the state

24   police website, and I can verify it then.

SERGEANT TODD LANDHERR

Page 21

1    Q    Are you trained, though, to do any of

2    that stuff?

3    A    I was not trained for the portion online.

4    Q    Any of it?

5    A    Yeah, yeah.  Just to physically look at

6    the card.

7    Q    Okay.  Were you given any training on

8    what kind of investigation to perform?

9    A    A 75-48a.

10   Q    Right.  But an Act 235, you know they're

11   allowed to carry it to and from work and while

12   they're at work?

13   A    Correct.

14   Q    Did anyone from the police department

15   ever train you on how to perform that

16   investigation?

17   A    No.

18   Q    Do you know whether an Internal Affairs

19   investigation was performed to this case?

20   A    I do not know.

21   Q    You're not saying -- well, let me ask you

22   this:  Do you contend that Mr. Goldwire did

23   not have a valid Act 235 on his person when

24   you stopped him on March 21st, 2014?

SERGEANT TODD LANDHERR

Page 33

1    A     Myself; Officer Rosa; Officer Edward

2    Taylor; Gregory Kravitz, another officer that

3    works for me; Officer Albert Ortiz; Officer

4    Joseph Sanchez.  I think there was six of us

5    total.  I think that's all --

6    Q     Did you take everyone or did everyone

7    kind of --

8    A     Everyone drove down, we met down there.

9    Q     But for the tickets, who paid for them?

10   A     The individual officers.

11   Q     Okay.  So it was --

12   A     I had a friend who had six seats in a

13   row.  I bought them up front, and everyone

14   reimbursed me.

15   Q     Gotcha.  So you were like, hey guys, why

16   don't we all go to the game?

17   A     Right.

18   Q     I mean, if you weren't friends with them,

19   you wouldn't invite him to the game, right?

20   I'm not saying that you're best friends.

21   A     We're not best friends.  It was more of

22   like a team building, like, you know -- yeah,

23   that's how I'm going to describe it.

24   Q     Okay.  So let's talk about your interview

SERGEANT TODD LANDHERR

Page 34

1    here.  You said, on 3/24/14, while working the

2    10:30 p.m. to 7:15 a.m. tour of duty, assigned

3    as RPC, radio patrol car 25A?

4    A    Yes.

5    Q    In full uniform and a marked patrol

6    vehicle working solo.

7              Are those your words, or is that

8    kind of the standard language that the

9    detectives use when you give an interview?

10   A    No, that's my own words pretty much.

11   Q    Only because --

12   A    Most of the PARS reports will start out

13   with that, only because when we go to the

14   criminal justice center, those are the first

15   questions that the district attorneys are

16   going to ask.

17   Q    Sure.

18   A    So in order to save time, we'll respond

19   with almost that verbatim to clear up time,

20   location, whether you were solo, you know,

21   what your assignment was, just so, you know --

22   Q    Gotcha.  It says, at approximately

23   1:02 a.m., I observed a silver Honda Accord,

24   PA tag JGT 6328, pull out of a spot in front

SERGEANT TODD LANDHERR

1    of 2840 North 11th Street.

2              Tell me how you observed the

3    vehicle?  Was it your -- what were the

4    circumstances?

5    A    I was -- I had just turned onto 11th

6    Street, 2800 11th Street, and the Honda was

7    parked in front of 2840 North 11th Street,

8    which is on the left side of the street, the

9    west side.

10   Q    Okay.

11   A    It pulled off from a legal parking space

12   on the left-hand curb, and started to travel

13   northbound.  As it got to the stop sign, it

14   hit its brakes, and I could see the two

15   taillights illuminated brightly, because it's

16   dark out, and at that point, I could see that

17   the center brake light was out.

18   Q    So you hadn't seen who was in the car

19   before you turned that corner?

20   A    No, I did not.

21   Q    You had no idea what that person was

22   doing before you turned the corner?

23   A    I did not.

24   Q    And you didn't see them at all before

SERGEANT TODD LANDHERR

Page 36

1   they pulled out of the spot?

2   A    I did not.

3   Q    You didn't see them get into the car?

4   A    I did not.

5   Q    You didn't know who was in the car?

6   A    I did not.

7   Q    Now, you -- in your statement, you

8   mentioned that you had known -- you had seen

9   Mr. Goldwire a couple days earlier; is that

10  right?

11  A    Yes.

12  Q    You had been part of the group that shut

13  down the location at 2840 North 11th a couple

14  days earlier?

15  A    Yes.

16  Q    Did you see what kind of car Mr. Goldwire

17  was driving on the evening in question, that

18  evening?

19  A    I don't recall it, but I did watch him

20  get in the car after we told him that, you

21  know, this -- the establishment is operating

22  illegally.  You shouldn't be out here with

23  your 235, with your firearm.  He said, say no

24  more, walked down the steps, got into a car

SERGEANT TODD LANDHERR

Page 37

1    that was parked right out in front there, and

2    drove off.  I don't -- honestly I don't

3    remember what type of vehicle, but I remember

4    him getting right in the car and leaving.  He

5    didn't have to be told twice, which is

6    uncommon.

7    Q    He seemed like a good guy?

8    A    At that time, absolutely.  He was totally

9    cooperative.

10   Q    Well, on the 24th, was he totally

11   cooperative also?

12   A    Yes.

13   Q    So every interaction you've had with him

14   has been -- he may not have liked the end

15   result, but it was always a pleasant -- not

16   pleasant -- he was always compliant, he never

17   talked back to you or any of that stuff?

18   A    I agree with that.

19   Q    Okay.  Why -- what was your basis for

20   telling him that he wasn't allowed to be

21   working security because it was an illegal

22   establishment?

23   A    For the reason that you just gave, the

24   business was not to be open at all.  It wasn't

SERGEANT TODD LANDHERR

Page 38

1   licensed to sell alcohol.  It was actually not

2   zoned to be a restaurant, period.  It was

3   supposed to be a single family home.  And it

4   was operating under a false premise.  The

5   building wasn't supposed to be occupied at

6   all.

7          At that point, if the business is

8   illegitimate, the work that you're doing there

9   is illegitimate.

10  Q    What's your basis for saying that?  Like

11  do you have any authority, where did you learn

12  that issue?

13  A    Well, for 235, it has to be a legit place

14  of work.

15  Q    What's the definition -- what's your

16  understanding of a legitimate place of work?

17  A    Legal business, licensed, insured,

18  operating under the law.

19  Q    Where do you get that information?

20  A    Some of it is in the actual 235 where,

21  you know, the definition of what a workplace

22  is I believe is in there.  And the remainder

23  of it, to me, is just commonsense.

24  Q    Okay.  Did you ever call anyone, a

SERGEANT TODD LANDHERR

1   They get credit for it in their monthly

2   activity.

3   Q     Okay.

4   A     So it's not uncommon for me to have an

5   officer come back me up and have them write

6   the citation if one is going to be issued.

7   Q     Is there a way to determine the

8   situations where you make the stop and call

9   someone as backup?  I mean, if I wanted to

10  figure out how many times this has happened,

11  is there a way I could go about doing that?

12  A     As far as me stopping cars for

13  taillights?

14  Q     Well --

15  A     Yes, you could absolutely get all my

16  75-48as.

17  Q     So I could get those.  But what you're

18  saying is there's more than that because a

19  lot -- you said it wouldn't be uncommon -- or

20  it would be common for you to call someone

21  else so that they can get the credit for the

22  stop.  So how can I verify how many times

23  you've done that is my question?

24  A     Well, it would be on the 75-48as that are

SERGEANT TODD LANDHERR

Page 42

1    generated for the stop.  I guess you would

2    just have to go through and review each one to

3    see whether a citation was issued or if it

4    wasn't.

5    Q    Okay.  So the fact of the location of the

6    car, did that have anything to do with your

7    decision to stop it?

8    A    As far as --

9    Q    Meaning that you had seen the car pull

10   out from in front of this place, did that

11   impact your decision to pull it over for the

12   taillight?

13   A    No.

14   Q    Okay.  He came to a stop at the stop sign

15   at 11th and Cambria and I noticed the center

16   brake light on the spoiler was out.  I ran the

17   tag and continued to follow the vehicle until

18   the information came back.

19            How far did you follow the vehicle?

20   A    It was about four blocks till you hit

21   3100 Germantown.

22   Q    You initiated the stop at Germantown

23   Avenue and notified on police radio of your

24   location and the vehicle information.

SERGEANT TODD LANDHERR

Page 43

1             That's accurate?

2    A    Yes.

3    Q    I approached the Honda and came into

4    contact with the defendant who was alone and

5    operating the vehicle.

6             Now, did you recognize him when you

7    saw him?

8    A    At first I didn't.

9    Q    When did you recognize him?

10   A    While he was getting the paperwork

11   together, and then I observed the badge around

12   his neck.  I started to put that together with

13   the previous encounter, I think it was about

14   three days prior.

15   Q    Was he wearing a badge three days prior?

16   A    I don't remember.  I would imagine he was

17   if he was out there armed.  I mean --

18   Q    Do you know?  I mean, if you don't

19   know -- here's my thing.  I'd rather have you

20   tell me -- I want to know what you know.  I

21   don't --

22   A    I don't know.

23   Q    -- want you to guess.

24   A    I don't know.

SERGEANT TODD LANDHERR

Page 44

1    Q    I informed the defendant of the

2    infraction, requested his license and vehicle

3    information.

4           And he was pleasant when you were

5    interacting with him, right?

6    A    The entire time.

7    Q    As he was getting the required

8    information, I noticed he had a badge around

9    his neck.

10          Now, did you look at the badge?

11   A    I did.

12   Q    What did the badge say?

13   A    At the point that I looked at it, I

14   didn't see what it said.  I just saw that it

15   was on a chain with like a black leather

16   pouch.  Similar to what our plain clothes

17   officers wear.

18   Q    Your plain clothes officers, when they

19   have those -- the leather pouches, there's a

20   badge and then identification with it also?

21   A    Yes.

22   Q    That's what Mr. Goldwire had around his

23   neck?

24   A    Yeah, it was very similar to that.  I

SERGEANT TODD LANDHERR

1    don't know if he had the ID cards on the back

2    of it, but he definitely had a badge in that

3    style holster.

4    Q    Did you look at the badge?

5    A    Eventually, I think I did.

6    Q    Did you notice what the badge said?

7    A    I don't remember.

8    Q    I asked him if he had a firearm and he

9    replied, yeah, I have my 235.

10            Do you remember that conversation?

11   A    I do.

12   Q    Do you remember anything else that was

13   discussed at that point in time?  I'm just

14   talking about the initial exchange right now?

15   A    When I asked for his license,

16   registration, and insurance?

17   Q    Yeah.

18   A    No, just like I said.  I noticed he had

19   the badge around his neck.  I asked him if he

20   had a firearm on him.  And he told me yeah,

21   that he had his 235.  And I asked him, you

22   know, where the firearm was.  And I believe he

23   told me it was in the back.

24   Q    Then what happened?

SERGEANT TODD LANDHERR

Page 46

```
 1    A     I asked him to step out of the vehicle.

 2    I conducted a frisk for firearms.  Just

 3    because he says it's in the back doesn't

 4    necessarily mean it's there.

 5    Q     Sure.

 6    A     So I frisked him.

 7    Q     And he complied?

 8    A     Absolutely.  He went to the back of his

 9    vehicle.  He placed his hands on the trunk of

10    the Honda.  And at that point, my backup

11    officers stayed with him.

12    Q     Who are your backup officers?

13    A     Officer Rosa was on location, but also

14    Officer Donyell Thomas, and whoever he was

15    working with that night.  I don't recall who

16    he was working with specifically, but I

17    remember Donyell being there.

18    Q     Donyell Thomas, okay.

19    A     They remained at the back of the Honda

20    with Mr. Goldwire.  I went back to the

21    driver's side rear door, shined my flashlight

22    in.  I saw the rig on the floor in the back.

23    I then went into the vehicle and recovered the

24    rig.
```

1    Q    Okay.  Then tell me about what happened

2    next.

3    A    Since he told me he's 235, you know, just

4    from my general experience, I know 235 meant

5    he had his Act 235 certification, armed

6    security guard.  I asked him, you know, where

7    he was coming from, and he said that he was

8    coming from 11th and Cambria.  I asked him

9    more specifically if he was coming from 2840

10   North 11th Street, and he told me that, yes,

11   he was.

12   Q    Okay.

13   A    At that point I knew that he was coming

14   from the speakeasy, which was shut down by

15   License and Inspection.  I knew that it hadn't

16   been reopened because we still had the cease

17   work order.  The cease work orders are given

18   to the district where the property is located.

19   And when business is resumed, we get a

20   follow-up saying, okay, they can reopen.  We

21   didn't have the follow-up, so I knew that they

22   were still closed.

23           I then ran Mr. Goldwire for a permit

24   to carry a firearm, concealed permit, which he

1    did not have.  At that point, I placed him

2    under arrest.

3    Q    Was there any further conversation?

4    A    With?

5    Q    With Mr. Goldwire.

6    A    I did have further conversation with him

7    when I was asking, you know, biographical

8    information for the 75229.

9    Q    Anything else?

10           Did he mention to you his chemo at

11   all?

12   A    Yes, he did.

13   Q    What did he --

14   A    That was during the biographical

15   information.

16   Q    At the scene?

17   A    I'm not 100 percent sure, but we

18   definitely did have a conversation about the

19   fact that he had to have some type of medical

20   procedure.

21   Q    Okay.

22   A    I think it might be in my interview.

23   Q    Is there anything that you asked him that

24   is not contained in this summary?

SERGEANT TODD LANDHERR

Page 49

1    A    No, I think this is, you know, a pretty

2    accurate description of what took place that

3    night.

4    Q    So there's nothing you want to add?  I

5    just want to be clear.

6    A    As far as what took place between him and

7    I, no.

8    Q    So you didn't ask him where he was going?

9    A    No, I did not.

10   Q    Well, would that be important with

11   respect to Act 235?

12   A    It would be.

13   Q    Did you ask him what he was doing at 2840

14   North 11th Street?

15   A    He said he was coming from work.

16   Q    Did you ask him what he was doing at --

17   like other than him saying he was coming from

18   work, did you ask him what he was doing there?

19   A    No.

20   Q    Is that important?

21   A    If it were another location, it would

22   have been.

23   Q    Why --

24   A    If he would have given me any other

SERGEANT TODD LANDHERR

Page 50

1    address in the city and county of

2    Philadelphia, yes, it would have been

3    important.

4    Q     But because it was that address?

5    A     Correct.  It was not.

6    Q     Why not?

7    A     As I previously stated, the 2840 North

8    11th Street was not to be opened as a

9    business.

10   Q     Right.  But you didn't ask him what he

11   was doing there?

12   A     It's not really relevant at that point,

13   if the business isn't even supposed to be

14   open.

15   Q     Let me ask you something.  If he is

16   just --

17   A     Armed security.

18   Q     If he's armed security -- if I hire him

19   to be my bodyguard, is that considered valid

20   employment, my personal bodyguard, my personal

21   security?

22   A     I don't know.

23   Q     If he is working as a fugitive recovery

24   agent and he is staking out the bar because he

SERGEANT TODD LANDHERR

Page 51

1    heard someone might be there, is that

2    important to know?

3    A     Fugitive recovery agent staking out the

4    bar?  Yeah, that would be important I guess.

5    Q     Did you ask him what he was doing at the

6    bar?

7    A     I did not.

8    Q     So do you believe that you did a complete

9    investigation of what he was doing in that

10   area?

11   A     I think I did.

12   Q     And what is the basis of your opinion?

13   A     My interaction with him three days prior

14   when he was working as armed security at the

15   speakeasy.

16   Q     So three days prior he had indicated to

17   you that he understood when you told him he

18   shouldn't work security at the speakeasy

19   anymore, right?

20   A     Correct.

21   Q     He complied when you -- he said, say no

22   more, and he got out of there?

23   A     Absolutely.

24   Q     And at the time, is one of your jobs to

SERGEANT TODD LANDHERR

Page 52

1   evaluate -- form your own opinion as to the

2   credibility of the person you're interacting

3   with?

4   A    Yes.

5   Q    Did you find him to be a credible person

6   the first time you met him three days earlier?

7   A    I didn't want to -- I mean, establishing

8   credibility at that point three days prior

9   wasn't important to me because I couldn't say

10  that night that he was there acting as a

11  security guard for an illegal operation.  I

12  couldn't say that he knew for sure that it was

13  operating illegally.

14          So whether he was telling me the

15  truth or not, it didn't really matter to me.

16  I didn't believe that that night he knew that

17  the club shouldn't have been open.  We were

18  giving him his notification, his pass per se,

19  and he complied and went on his way.

20  Q    Understood.  And you said he was nicer

21  than most people?

22  A    Absolutely.

23  Q    So that's important as a police officer

24  is that consideration you give in evaluating a

SERGEANT TODD LANDHERR

Page 53

1    person?

2    A    Yes.

3    Q    Okay.  And really that's all you had to

4    go on with Mr. Goldwire, right?

5    A    Which night?

6    Q    The -- during any of your interaction

7    with him, all you had to know -- what you can

8    look at is his demeanor, right, the way he's

9    acting, the way he's holding himself, the way

10   he's speaking with you?  Those are all factors

11   that you consider in evaluating his

12   believability as a witness or as a person; is

13   that right?

14   A    I think circumstances, you know, can

15   change.  But first impressions, yeah, I think

16   those are pretty strong indicators as, you

17   know, what kind of person they are.

18   Q    So your first impression is he was a

19   pretty good guy?

20   A    Yeah.  First impression, yeah.  I can't

21   say that -- anything different.

22   Q    And even when you pulled him over,

23   completely compliant, right?

24   A    Yes.

SERGEANT TODD LANDHERR

Page 54

1    Q      No attitude about why did you pull me

2    over, any of that stuff, just did what you

3    told him to do, right?

4    A      Correct.

5    Q      He tells you he's coming from work, and

6    you know that you've already told him you

7    can't work at that bar, at that speakeasy,

8    right?

9    A      Yes.

10   Q      And you remembered that when you were

11   interacting with him; is that right?

12   A      Yes.

13   Q      And given that your impression of him was

14   that he was a compliant good guy up to that

15   point, are you saying that you just assumed

16   that he was, again, working security at the

17   bar?

18   A      Yes.

19   Q      And that's the reason you arrested him?

20   A      Yes.

21   Q      Without doing any investigation as to

22   what he was doing at the bar?

23   A      I'm sorry, can you repeat that?

24   Q      Sure.  You arrested him based on an

SERGEANT TODD LANDHERR

Page 55

1    assumption, not based upon any evidence,

2    right?

3    A      No, he gave me the location of where he

4    said he was working.

5    Q      I understand that.  But you didn't know

6    what he was --

7    A      So that was my evidence, that --

8    Q      Go ahead.

9    A      That was the evidence I based it on.

10   Q      Right.  But you didn't ask him what kind

11   of work he was doing there.

12   A      I did not.

13   Q      He could have been doing work that was

14   proper at that location, right?

15   A      No.  There was -- no one's supposed to be

16   inside the building.

17   Q      You don't know whether he was inside the

18   building, right?

19   A      Correct.

20   Q      You didn't ask him?

21   A      Correct.

22   Q      You didn't ask him if he was working

23   security at the bar again?

24   A      I did not.

SERGEANT TODD LANDHERR

Page 56

1    Q    So you don't know what he was doing in

2  that area?

3    A    Alls I know is what he told me, he was

4  coming from 2840 North 11th Street.

5    Q    And he had been working.

6    A    Correct.

7    Q    If he was doing proper work, did you have

8  probable cause to arrest him?

9    A    If he was doing proper work, no.

10    Q    What investigation did you do to

11  determine whether he was doing proper work or

12  not?

13    A    I asked him where he was coming from.

14    Q    Other than asking him the location of

15  where he was working, did you do any

16  investigation at all to determine whether he

17  was doing proper work?  And when I say proper

18  work, just so we're on the same page, work

19  that would be allowed -- allow him to carry

20  under Act 235.

21    A    I'm not really following the question, to

22  be honest.

23        MR. CHACKER:  Okay.  Can we read it

24    back?

SERGEANT TODD LANDHERR

Page 61

1   Q    The location was a fact.  You took the

2   fact that he was at a location, and you made

3   an assumption about what he was doing there,

4   right?

5   A    Okay.

6   Q    Is that a yes?

7   A    Yes.

8   Q    You didn't do an investigation to

9   determine what exactly he was doing there?

10  A    Yes.

11  Q    If he was wearing a badge that said

12  fugitive recovery, if his badge, in fact, did

13  say fugitive recovery, should you have asked

14  him about that?

15  A    Yes.

16  Q    I want to show you a document --

17        MR. CHACKER:  75-48a, let's mark

18       this as Landherr-5.

19              - - -

20            (Whereupon, the document was

21   marked, for identification purposes, as

22   Landherr-5.)

23              - - -

24  BY MR. CHACKER:

SERGEANT TODD LANDHERR

Page 62

1  Q    Just let me know once you had a chance to

2  look at it.

3  A    Okay.

4  Q    Now, you were here when I went over some

5  of this with Officer Rosa.  Is any of this in

6  your handwriting?

7  A    Yes.  The general information block,

8  vehicle information section from year down to

9  ZIP Code.

10  Q    Okay.  And the name on the bottom, is

11  that your handwriting where it says Sergeant

12  Landherr --

13  A    No.

14  Q    -- or is that Officer Rosa?

15  A    No, it's Officer Rosa.

16  Q    Did you confer with Officer Rosa before

17  he prepared the paperwork?

18  A    Yes.

19  Q    Is that common?

20  A    Very.

21  Q    You were not involved in the preparation

22  of the property receipt?

23  A    Can I --

24  Q    Let me rephrase that.  You didn't prepare

SERGEANT TODD LANDHERR

Page 66

1    he gave you the -- I'll call it permission,

2    but he recommended the arrest?

3    A    Yes.

4    Q    Do you recall any other conversations at

5    all with Mr. Goldwire that we haven't

6    discussed?

7    A    I've had no other discussions with

8    Mr. Goldwire.

9    Q    And everything that we discussed about

10   the conversation that evening, you've relayed

11   everything that you remember about it?

12   A    Yes.

13   Q    Do you keep notes of any of your

14   conversations?

15   A    I don't.

16   Q    And the directives, you're aware -- are

17   you familiar with the police department

18   directives regarding the obligations of the

19   arresting officer prior to making the arrest?

20   A    As far as what?

21   Q    Just generally.  Do you have an

22   obligation to investigate before making an

23   arrest?

24   A    Yes.

SERGEANT TODD LANDHERR

Page 67

1    Q    An obligation to make sure you have

2    probable cause, sufficient evidence to make an

3    arrest?

4    A    Yes.

5    Q    If he had told you I was working -- if

6    you had asked him about the fugitive recovery

7    and he says, yeah, I'm working on a warrant

8    right now, and I heard the lady was going to

9    be at that location, that's why I was there,

10   would that have changed your decision to

11   arrest him?

12   A    It would have influenced it.  I would

13   have had a series of follow-up questions.

14   Q    Okay.

15   A    For instance, do you have a copy of the

16   warrant, picture of the suspect, how many

17   suspects have you arrested in your history as

18   a fugitive recovery agent.

19   Q    Why does that matter?

20   A    To see if he's, in fact, actually doing

21   the job.

22   Q    Okay.  All right.

23   A    Because in my history, I've never

24   encountered a single bounty hunter make an

SERGEANT TODD LANDHERR

Page 68

1    arrest in Philadelphia in eight years.  So I

2    would be very suspect of it based on that.

3    Q    All right.  And you don't -- you never

4    said to him, look, I told you not to work

5    there the other day and now you're back and

6    now I got to arrest you, you didn't say any of

7    that to him?

8    A    No.

9         MR. CHACKER:  Okay.  I don't think I

10         have anything further.

11         MR. MILLER:  I just have a couple.

12              - - -

13              CROSS-EXAMINATION

14              - - -

15    BY MR. MILLER:

16    Q    You've already testified about all of

17    this I think, but just in case.

18         Prior to March 24, 2014, was 2840

19    North 11th Street functioning as a speakeasy?

20    A    Yes.

21    Q    And early the morning you arrested him,

22    did plaintiff pull out of a parking spot in

23    front of 2840 North 11th Street?

24    A    Yes.

SERGEANT TODD LANDHERR

Page 69

1   Q    And why did you pull him over?

2   A    The reason I stopped the vehicle was a

3   motor vehicle code violation, 4303B, rear

4   taillight, the brake light on the spoiler was

5   out.

6   Q    And what did you think that plaintiff had

7   been doing before you pulled him over?

8   A    Once I stopped the vehicle and, you know,

9   I figured out who was the operator, I made the

10  conclusion that he was operating as security

11  at 2840 North 11th Street, which I shut down

12  on multiple occasions.

13        MR. MILLER:  I don't have any other

14     questions.

15               - - -

16          REDIRECT-EXAMINATION

17               - - -

18  BY MR. CHACKER:

19  Q    And you didn't ask him if he was working

20  security that night?

21  A    I did not.

22  Q    You didn't ask him what he was doing in

23  that area at all that night?

24  A    I did not.

SERGEANT TODD LANDHERR

Page 70

1           MR. CHACKER:  Okay.   Thanks.

2                   - - -

3               (Witness excused.)

4                   - - -

5               (Whereupon, the deposition

6    concluded at approximately 12:42 p.m.)

7                   - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Exhibit C



# FUGITIVE RECOVERY

## CERTIFIED AGENT

### Kelly A. Goldwire

Has successfully completed the prescribed training
course necessary to be Certified Fugitive Recovery
Agent in the Commonwealth of Pennsylvania.
He operates under the authority of the Supreme
Court Ruling. (See Reverse)

Date of Issue 09/23/2012

Chas. S. Sindrow

**PA 0111**

**CERTIFICATION NUMBER**          **AUTHENTICATING OFFICIAL**

# Exhibit D



# First Judicial District of Pennsylvania
## Secure Court Summary

**Goldwire, Kelly**
5843 N Hope St HOUSE
Philadelphia, PA 19120
Aliases:
KELLY A. GOLDWIRE

DOB: 08/28/1969
SID: 382-37-83-7
PID: 1149349
License: PA 27181416

Sex: Male
Eyes: Brown
Hair: Black
Race: Black

**Closed**
**Philadelphia**
**CP-51-CR-0004189-2014**   Proc Status: Completed          DC No: 1425021383          OTN:N9068124
Arrest Dt: 03/24/2014   Disp Date: 12/30/2014   Disp Judge: Melchiorre, Vincent N.
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 6106 §§ A1 | F3 | Firearms Not To Be Carried W/O License | Not Guilty |
| 2 | 18 § 6108 | M1 | Carry Firearms Public In Phila | Not Guilty |

**MC-51-CR-0009317-2014**   Proc Status: Completed          DC No: 1425021383          OTN:N9068124
Arrest Dt: 03/24/2014   Disp Date: 04/08/2014   Disp Judge: Pew, Wendy L.
Def Atty: Defender Association of Philadelphia - (PD)

| Seq No | Statute | Grade | Description | Disposition |
|--------|---------|-------|-------------|-------------|
| 1 | 18 § 6106 §§ A1 | F3 | Firearms Not To Be Carried W/O License | Held for Court |
| 2 | 18 § 6108 | M1 | Carry Firearms Public In Phila | Held for Court |

Recent entries made in the court filing offices may not be immediately reflected on the court summary report. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Court Summary Report information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

Please note that if the offense disposition information is blank, this only means that there is not a "final disposition" recorded in the Common Pleas Criminal Court Case Management System for this offense. In such an instance, you must view the public web docket sheet of the case wherein the offense is charged in order to determine what the most up-to-date disposition information is for the offense.

Exhibit E

POLICE OFFICER RICARDO ROSA

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| KELLY GOLDWIRE, | : | CIVIL ACTION NO.: |
| Plaintiff | : | 2:15-cv-02856-JPH |
| vs. | | |
| | : | |
| CITY OF PHILADELPHIA and | : | |
| CITY OF PHILADELHPIA POLICE OFFICER TODD LANDHERR (BADGE #8753) Individually and as a Police Officer for the City of Philadelphia and | : | |
| CITY OF PHILADELPHIA POLICE OFFICER RICARDO ROSA (BADGE #3945) Individually and as a Police Officer for the City of Philadelphia and | : | |
| CITY OF PHILADLEPHIA POLICE OFFICER DANIEL MURAWASKI (BADGE #8144) Individually and as a Police Officer for the City of Philadelphia and | : | |
| JOHN DOE CITY OF PHILA. POLICE OFFICERS I-III Individually and as Police Officers for the City of Philadelphia, | : | |
| Defendants. | : | |

----------------------

POLICE OFFICER RICARDO ROSA

```
 1                    - - -

 2            Oral deposition of POLICE OFFICER

 3    RICARDO ROSA, taken at the CITY OF

 4    PHILADELPHIA LAW DEPARTMENT, One Parkway

 5    Building, 1515 Arch Street, 14th Floor,

 6    Philadelphia, Pennsylvania 19102 on Thursday,

 7    February 18, 2016, commencing at approximately

 8    10:19 a.m., before Kori DiMattia, Professional

 9    Court Reporter - Notary Public, there being

10    present:

11

12

13

14

15

16

17

18

19

20

21                    - - -
              ACE REPORTERS, INC.
22            The Bourse, Suite 1030
          Philadelphia, Pennsylvania 19106
23                    - - -
          89 North Haddon Avenue, Suite D
24        Haddonfield, New Jersey 08033
```

POLICE OFFICER RICARDO ROSA

Page 3

```
 1     A P P E A R A N C E S:

 2

 3

 4     GAY CHACKER & MITTIN, P.C.
       BY:   BRIAN S. CHACKER, ESQUIRE
 5     1731 Spring Garden Street
       Philadelphia, Pennsylvania 19130
 6     Counsel for the Plaintiff
       bchacker@gaychackermittin.net
 7     (215) 567-7955

 8

 9

10     CITY OF PHILADELPHIA LAW DEPARTMENT
       BY:   MICHAEL R. MILLER, ESQUIRE
11     Civil Rights Unit
       One Parkway Building
12     14th Floor
       Philadelphia, Pennsylvania 19102
13     Counsel for the Defendants
       michael.r.miller@phila.gov
14     (215) 683-5433

15

16

17

18

19

20

21

22

23

24
```

POLICE OFFICER RICARDO ROSA

Page 14

1    A      No.   Never received 18s, which is when

2    they call for disciplinary --

3    Q      No reprimands, no suspensions?

4    A      No suspensions, no.

5    Q      No reprimands either?

6    A      Just counseling memos, but that's it.

7    Q      What would an example of a reason be for

8    a counseling memo?

9    A      Lateness for court.

10   Q      Okay.   Nothing involving use of force or

11   any of that stuff?

12   A      No.

13   Q      Nothing involving false arrests or

14   anything like that?

15   A      No.

16   Q      You take updates, every year you receive

17   your yearly updates as part of your training

18   on the police force?

19   A      Yes.

20   Q      Did you receive your -- I know it's

21   early, but did you receive your 2016 updates

22   yet?

23   A      I don't believe we did, no.

24   Q      When did you do them in 2015, if you

POLICE OFFICER RICARDO ROSA

Page 15

1    remember?

2    A    I don't remember when we received them.

3    Q    Can you give me an approximation, like

4    winter, spring, summer, fall?

5    A    I'd say somewhere around spring.

6    Q    Did any of your updates involve Act 235?

7    A    I don't remember.

8    Q    When's the last time, if ever -- well,

9    let me ask you this.  Have you ever received

10   any training regarding Act 235?

11   A    When I was in the police academy.

12   Q    Since you've been out of the police

13   academy, do you remember ever receiving any

14   training regarding Act 235?

15   A    I don't remember.

16   Q    So you don't remember ever receiving any

17   training; is that correct?

18   A    Since the academy?

19   Q    Yes.

20   A    Since it's been in the updates, I don't

21   remember.

22   Q    Okay.  Presently, so take me through --

23   you've been a police officer the entire time

24   you're been on the force?

POLICE OFFICER RICARDO ROSA

Page 16

1    A    Yes.

2    Q    Are you police officer one, police

3    officer two or --

4    A    Just police officer.

5    Q    Okay.  I thought I saw somewhere where

6    there are different levels, like one, two.

7             Okay.  What district do you work in?

8    A    25th.

9    Q    How long have you been in the 25th?

10   A    My entire career.

11   Q    What shift do you work presently?

12   A    The midnight shift, which starts at

13   10:30 p.m., and I finish at 6:45 a.m.

14   Q    How long have you worked that midnight

15   shift?

16   A    For the past I want to say two,

17   two-and-a-half years.

18   Q    Before that, what shift were you working?

19   A    Before that, I worked in five squad,

20   which was for narcotics and tactical.

21   Q    How long were you in five squad?

22   A    I'd say roughly ten years.

23   Q    Why did you leave?

24   A    I was asked to leave.

Exhibit F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**KELLY GOLDWIRE**    :
            :
**v.**           :
            :  **JURY TRIAL DEMANDED**
**CITY OF PHILADELPHIA**  :
  **and**        :
**CITY OF PHILADELPHIA**  :  **No. 2:15-cv-2856**
**POLICE OFFICER  TODD**  :
**LANDHERR (BADGE # 8753)** :
**Individually and as a Police Officer**
**for the City of Philadelphia**
  **and**        :
**CITY OF PHILADELPHIA**  :
**POLICE OFFICER ROSA RICARDO** :
**(BADGE # 3945)**    :
**Individually and as a Police Officer**
**for the City of Philadelphia** :
  **and**        :
**CITY OF PHILADELPHIA**  :
**POLICE OFFICER**    :
**DANIEL MURAWASKI**  :
**(BADGE # 8144)**    :
**Individually and as a Police Officer** :
**for the City of Philadelphia** :
  **and**        :
**JOHN DOE CITY OF PHILADELPHIA** :
**POLICE OFFICERS I-III**  :
**Individually and as Police Officers** :
**for the City of Philadelphia** :

## AMENDED COMPLAINT

Plaintiff, Kelly Goldwire ("Mr. Goldwire"), by and through his attorneys, Gay Chacker &

Mittin, P.C., hereby asserts the following Amended Complaint against defendants, Police Officer

Todd Landherr ("defendant Landherr"), Police Officer Rosa Ricardo ("defendant Ricardo"),

Police Officer Daniel Murawski ("defendant Murawski"), the City of Philadelphia ("City"), and

John Doe City of Philadelphia Police Officers I-III ("defendant John Doe officers")(collectively

"defendants").

**Parties**

1.      Plaintiff, Kelly Goldwire is and was at all material times a resident of Philadelphia, Pennsylvania.

2.      Defendant City of Philadelphia is a Municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the City of Philadelphia Police Department, which employed the defendant police officers.

3.      Defendant Landherr was at all times relevant to this action an officer of the City of Philadelphia Police Department.  He is being sued in his individual capacity as a police officer for the City of Philadelphia.

4.      Defendant Ricardo was at all times relevant to this action an officer of the City of Philadelphia Police Department.  She is being sued in her individual capacity as a police officer for the City of Philadelphia.

5.      Defendant Murawski was at all times relevant to this action an officer of the City of Philadelphia Police Department.  He is being sued in his individual capacity as a police officer for the City of Philadelphia

6.      Defendant John Doe officers I-III were at all times relevant to this action, officers of the City of Philadelphia Police Department.  They are being sued in their individual capacities as police officers for the City of Philadelphia.

**Jurisdiction**

7.      This action is brought pursuant to 42 United States Code Section 1983. Jurisdiction is based upon 28 United States Code 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction under 28 United States Code Section 1376(a) to hear and decide claims under state law.

2

## Facts

8.      Mr. Goldwire is a self-employed, certified Fugitive Recovery Agent (Certification No. PA 0111).

9.      As such an agent, Mr. Goldwire pursues individuals with open bench warrants and is licensed to carry a firearm.

10.     On or about March 24, 2014 at or about 1:30 A.M., Mr. Goldwire was in his vehicle driving in the area of 11th and Cambria Streets, Philadelphia, Pennsylvania while investigating the whereabouts of a fugitive he was pursuing.

11.     As Mr. Goldwire was driving in/or around Indiana Street, Philadelphia, Pennsylvania, he noticed a police vehicle start to follow him.

12.     Mr. Goldwire was travelling on Glenwood Avenue when he turned on Germantown Avenue.

13.     After Mr. Goldwire turned onto Germantown Avenue, the police vehicle driven by defendant Landherr engaged its emergency lights indicating to Mr. Goldwire to pull over.

14.     Mr. Goldwire complied with the traffic stop.

15.     After Mr. Goldwire pulled over, defendant Ricardo, defendant Murawski, and defendant John Doe officers arrived as back-up for the stop.

16.     The defendants, led by defendant Ledbetter, all approached Mr. Goldwire's vehicle.

17.     Defendant Landherr then informed Mr. Goldwire that one of his taillights was out.

18.     While requesting Mr. Goldwire's driver's license and insurance information, defendant Landherr, who knew Mr. Goldwire and knew his vehicle, asked whether Mr. Goldwire was armed and where his firearm was located.

3

19.     Mr. Goldwire informed defendant Landherr that his firearm was behind him on the floor of his vehicle.

20.     After Mr. Goldwire told the defendant Landherr the location of his firearm, defendant Landherr instructed Mr. Goldwire to get out of the car and immediately and, without basis in law, arrested him.

21.     Mr. Goldwire reminded defendant police officers that he was licensed to carry a firearm.

22.     Mr. Goldwire also offered to produce his all of his licensing paperwork, which was in his wallet and included his Act 235 license.

23.     None of the defendant police officers would look at or review Mr. Goldwire's Act 235 license.

24.     Despite knowing that Mr. Goldwire was properly licensed to carry a firearm, defendant police officers proceeded to detain and arrest Mr. Goldwire without any legal basis to do so.

25.     Despite having an opportunity to intervene and prevent Mr. Goldwire's unlawful arrest and detainment, none of the other defendant police officers made any effort to prevent what they knew to be an improper arrest.

26.     Subsequent to the unlawful detention and arrest of Mr. Goldwire, defendant police officers prepared and caused to be prepared police paperwork intentionally misrepresenting the events that led to the arrest of Mr. Goldwire. These misrepresentations were intentional, malicious, in bad faith, deliberately indifferent and recklessly indifferent to Mr. Goldwire's rights.

4

27.     At no time during the incident described in this complaint did Mr. Goldwire violate the laws of Pennsylvania or any other jurisdiction as described in the bogus paperwork prepared by defendant Landherr.

28.     Subsequent to the unlawful arrest, Mr. Goldwire unlawfully was charged with, Firearms Not To Be Carried Without License and Carry Firearms Public In Philadelphia.

29.     Mr. Goldwire was unable to afford bail initially despite his false arrest, imprisonment and malicious prosecution.

30.     As a result, he remained incarcerated for a period of at least five (5) days until he was able to gather sufficient bail funds.

31.     At the time that the defendant police officers improperly arrested and charged Mr. Goldwire, he advised defendants that he was receiving chemotherapy and could not afford to miss his medical treatment appointment, which was scheduled for later that morning.

32.     As a result of his incarceration, Mr. Goldwire missed one of his chemotherapy appointments.

33.     On December 30, 2014, Mr. Goldwire was found not guilty on all charges.

34.     Mr. Goldwire continues to suffer from, *inter alia,* anxiety, fear, and mental harm.

35.     Mr. Goldwire was without his license to carry a firearm for approximately five (5) months as a result of the defendant police officers' improper and illegal actions.

36.     To date, Mr. Goldwire still does not have possession of his firearm.

37.     As a result of the defendant police officers' actions, Mr. Goldwire has been unable to work as a Fugitive Recovery Agent.

38.     As a direct and proximate result of the defendants' actions, Mr. Goldwire was deprived of rights, privileges and immunities under the Fourth and Fourteenth Amendments to the United States Constitution and in particular the right to be free from malicious prosecution, the right to be free from false arrest and false imprisonment, and the right to due process of law.

39.     The actions and/or inactions of the defendants violated the clearly established federal constitutional rights of Mr. Goldwire to freedom from malicious prosecution, the right to be free from false arrest and false imprisonment and the right to due process of law.

40.     Moreover, there have been numerous media reports and cases similar to the instant matter demonstrating that the violation of Mr. Goldwire's federal constitutional rights was attributable to the policies and/or customs of the City of Philadelphia. See August 31, 2010 Philly.com Article; March 19, 2012 Pennsylvania Record Article; May 17, 2011 Blog Post by Jonathon Turley, true and correct copies of which are attached hereto as Exhibits "A" through "C"; see also, Sharper v. City of Philadelphia et al., 2:14-cv-05299-BMS; Fiorino v. City of Philadelphia et al., 2:12-cv-00769-TON.

41.     In particular, the website Philly.com reported that the City had confiscated the guns of at least nine security guards who possessed valid Act 235 licenses to carry a concealed weapon. See Exhibit "A".

42.     Like Mr. Goldwire, these men were working at the time their weapons were confiscated.  See id.

43.     For example, one man identified by the article simply as "Oliver, 42, of Northeast Philadelphia" was traveling home from his security guard job when he was pulled over by police for allegedly running a stop sign.  Police did not honor any of his valid carry permits, forced him to stand outside in the cold for four (4) hours, held him in custody for eighteen (18) hours, denied

6

him his diabetes medicine throughout the ordeal, and thereafter booked him on firearm charges.
Id.

       44.     The case was withdrawn by the District Attorney's office within a month.  Id.

       45.     At the time of publication, the City confirmed that it was handling eight such
cases.  Id.

       46.     Thus, with respect to Mr. Goldwire, the actions and/or inactions of the City of
Philadelphia were part of a policy and/or custom of inadequately training police officers,
including defendant officers, with respect to Act 235 and similar concealed and open carry gun
laws in effect at the time of the alleged incident.

       47.     Furthermore, the actions and/or inactions of the City of Philadelphia were part of
a policy and/or custom of engaging in a widespread assault on citizens' Second Amendment
rights, specifically by unlawfully arresting people who are legally carrying firearms with a valid
Act 235 license.

       48.     The actions and/or inactions of the City of Philadelphia were part of a policy
and/or custom of the City of inadequately training its officers regarding Act 235 and how to
investigate whether a citizen with an Act 235 certificate may properly carry a firearm.  In
addition, the City of Philadelphia failed to supervise its officers with respect to the enforcement of
Act 235.

       49.     The actions and/or inactions of the City of Philadelphia were part of a policy
and/or custom of circumventing the gun laws of the Commonwealth of Pennsylvania and
covering-up and avoiding detection of acts of police abuse or improper use of authority by
charging victims of police abuse with criminal offenses thereby attempting to prevent the
victim's access to the courts and to due process.

50.     The actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of inadequately supervising and training their police officers, including the defendant officers, thereby failing to adequately discourage further constitutional violations on the part of their police officers.  The City of Philadelphia did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct.

51.     The actions and/or inactions of the City of Philadelphia were part of a policy and/or custom of inadequately supervising and training their police officers, including the defendant officers, against a code of silence or "blue code" of officers refusing to intervene against or provide truthful information against constitutional violations and misconduct committed by their fellow officers.

52.     It is believed and therefore averred that the City of Philadelphia and their Police Departments have adopted and maintained for many years a recognized policy, custom and practice, which allows for falsely arresting, falsely imprisoning and maliciously prosecuting suspects by Police Officers, the same type of treatment to which Mr. Goldwire was subjected, and which violates the Fourth and Fourteenth Amendments of the Constitution of the United States, the laws of the United States and is in violation of 42 U.S.C. Section 1983.

53.     It is believed and therefore averred that further evidence of these policies and/or customs is within the control of the City of Philadelphia.

**COUNT ONE**
**42 U.S.C. § 1983 Against Individual Defendant**
**City of Philadelphia Police Officer Landherr**

54.     Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 53, inclusive, of his Complaint as if the same were set forth at length herein.

8

55.    Plaintiff claims damages for the injuries set forth above under 42 U.S.C. Section 1983 against defendant Landherr for violation of Mr. Goldwire's constitutional rights under color of law.

56.    As aforesaid, defendant Landherr, individually and acting within the course and scope of the City of Philadelphia employment, under color of state law, and pursuant to the customs, policies and practices of the City of Philadelphia Police Department intentionally and maliciously deprived Mr. Goldwire of his rights, privileges and immunities under the Constitution of the United States and the laws of the United States; in particular, the right to be free from false arrest, false imprisonment and malicious prosecution; which violated Mr. Goldwire's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, the laws of the United States, and were in violation of 42 U.S.C. Section 1983.

57.    The defendant Landherr has been deliberately indifferent to the rights of citizens of the Commonwealth of Pennsylvania and, in particular, City of Philadelphia to be free from false arrest, false imprisonment and malicious prosecution, which deliberate indifference violated Mr. Goldwire's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, the laws of the United States, and were in violation of 42 U.S.C. Section 1983.

58.    The defendant Landherr invaded the privacy and/or cast Mr. Goldwire in a false light by making it appear to others that Mr. Goldwire had violated or was violating the laws of the Commonwealth of Pennsylvania or of another jurisdiction.

59.    As a result of the above actions, Mr. Goldwire suffered the damages as aforesaid.

WHEREFORE, plaintiff, Kelly Goldwire, demands judgment in his favor and against defendant Landherr for compensatory damages, reasonable attorney fees and costs, interest; and such other and further relief as appears reasonable and just.

9

**COUNT TWO**
**Bystander Liability**
**42 U.S.C. § 1983 Against Individual Defendant Ricardo, Defendant Murawski, and Defendant John Doe Police Officers I through III**

60.    Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 59, inclusive, of his Complaint as if the same were set forth at length herein.

61.    Plaintiff believes and therefore avers that defendant police officers encouraged and stood idly by while Mr. Goldwire was subjected to malicious prosecution, false arrest and false imprisonment, despite the fact that Mr. Goldwire had done nothing wrong and had offered proof that he licensed to carry a firearm.

62.    Defendant police officers failed to fulfill their obligation to intervene when they had an independent and affirmative duty to prevent the malicious prosecution, false arrest and false imprisonment of Mr. Goldwire.

63.    By encouraging and failing to intervene, the defendant police officers effectively assisted each other in depriving Mr. Goldwire of his Constitutional rights and privileges under the Fourth and Fourteenth Amendments to the Constitution of the United States.

64.    As a result of the above actions, Mr. Goldwire suffered the damages as aforesaid.

65.    The defendant police officers made statements among themselves and others in order to conceal their unlawful and unconstitutional conduct and in an attempt to deny plaintiff's access to the courts and to due process and to cover-up the malicious prosecution, false arrest and false imprisonment of Mr. Goldwire.

WHEREFORE, plaintiff, Kelly Goldwire, demands judgment in his favor and against Defendant Ricardo, Defendant Murawski, and Defendant John Doe Police Officers I-III for compensatory damages, reasonable attorney fees and costs, interest; and such other and further relief as appears reasonable and just.

10

**COUNT THREE**
**42 U.S.C. Section 1983 Against City of Philadelphia**

66.     Plaintiff hereby incorporates the allegations contained in paragraphs 1 through 65, inclusive, of his Complaint as if the same were set forth at length herein.

67.     Prior to March 24, 2014, the City of Philadelphia developed and maintained policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons, which caused the violation of Mr. Goldwire's rights.

68.     In particular, and as evidenced by numerous media reports and similar lawsuits, it was the policy and/or custom of the City of Philadelphia to inadequately train their police officers, including defendant officers, with respect to Act 235 and similar concealed and open carry gun laws in effect at the time of the alleged incident. See Exhibits "A" through "C"; see also, Sharper v. City of Philadelphia et al., 2:14-cv-05299-BMS; Fiorino v. City of Philadelphia et al., 2:12-cv-00769-TON.

69.     It was the policy and/or custom of the City of Philadelphia to engage in a widespread assault on citizens' Second Amendment rights, specifically by unlawfully arresting people who are legally carrying firearms using gun licenses from reciprocal states and those in possession of a valid Act 235 license.

70.     It was the policy and/or custom of the City of Philadelphia to inadequately train its officers regarding Act 235 and how to investigate whether a citizen with an Act 235 certificate may properly carry a firearm. In addition, the City of Philadelphia failed to supervise its officers with respect to the enforcement of Act 235.

71.     It was the policy and/or custom of the City of Philadelphia to circumvent the gun laws of the Commonwealth of Pennsylvania and to cover-up and avoid detection of acts of police abuse or improper use of authority by charging victims of police abuse with criminal offenses

thereby attempting to prevent the victim's access to the courts and to due process.

72.     It was the policy and/or custom of the City of Philadelphia to inadequately supervise and train their police officers, including the defendant officers, thereby failing to adequately discourage further constitutional violations on the part of their police officers. The City of Philadelphia did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct.

73.     It was the policy and/or custom of the City of Philadelphia to inadequately supervise and train their police officers, including the defendant officers, against a code of silence or "blue code" of officers refusing to intervene against or provide truthful information against constitutional violations and misconduct committed by their fellow officers.

74.     It is believed and therefore averred that the City of Philadelphia and their Police Departments have adopted and maintained for many years a recognized policy, custom and practice, which allows for falsely arresting, falsely imprisoning and maliciously prosecuting suspects by Police Officers, the same type of treatment to which Mr. Goldwire was subjected, and which violates the Fourth and Fourteenth Amendments of the Constitution of the United States, the laws of the United States and is in violation of 42 U.S.C. Section 1983.

75.     It is believed and therefore averred that at the time that Mr. Goldwire was falsely arrested, falsely imprisoned and maliciously prosecuted, the City of Philadelphia knew or should have known of the previously described policy, custom and practice of their Police Departments, and it deliberately, knowingly, and negligently failed to take measures to stop or limit the policy, custom and practice, *inter alia*, providing proper training, supervision, and control of the officers, agents, and/or employees of the City of Philadelphia.

76.     As a result of the above described policies and customs, police officers of the City of Philadelphia and the City of Philadelphia, including the defendant police officers, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but would be tolerated and condoned.

77.     As a result of the above actions, Mr. Goldwire suffered the damages as aforesaid.

78.     The actions of the City of Philadelphia were so malicious, intentional and reckless, and displayed such a reckless indifference to Mr. Goldwire's rights and well-being that the imposition of punitive damages is warranted.

WHEREFORE, plaintiff, Kelly Goldwire, demands judgment in his favor and against defendant, City of Philadelphia for compensatory damages, reasonable attorney fees and costs, interest; and such other and further relief as appears reasonable and just.


/BSC5184
BRIAN S. CHACKER, ESQUIRE
GAY CHACKER & MITTIN, P.C.
1731 Spring Garden Street
Philadelphia, PA 19130
bchacker@gaychackermittin.net
Tel: (215) 567-7955
Fax: (215) 567-6809
**Attorneys for Plaintiff**
Dated: September 18, 2015          **Kelly Goldwire**

13

Exhibit G

# philly●com



🏠 | News | Sports | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

BREAKING  NEWS VIDEO  BLOGS  PHILADELPHIA  NEW JERSEY  POLITICS  EDUCATION  OPINION  OBITUARIES  NATION/WORLD  WEATHER  TRAFFIC  LOTTERY

Collections

## Guns of Contention: If Philly says no, Florida can say yes

| 10 | 1 | 0 | @ |
|---|---|---|---|
| Like | Tweet | G+1 | |



From left, Kenneth Sharper, John Solomon, Richard Oliver and Jamell Gaines. All had guns taken by police and have not gotten them back. (Sarah J. Glover/Staff) (Lissa Atkins)

By Stephanie Farr, farrs@phillynews.com 215-854-4225
POSTED: August 31, 2010

In the last two years, Philadelphia police have confiscated guns from at least nine men - including four security guards - who were carrying them legally, and only one of the guns has been returned, according to interviews with the men.

Eight of the men said that they were detained by police - two for 18 hours each. Two were hospitalized for diabetic issues while in custody, one of whom was handcuffed to a bed. Charges were filed against three of the men, only to be withdrawn by the District Attorney's Office.

The civil-rights unit of the City Solicitor's Office confirmed that it is handling eight such cases. Two of the men interviewed by the *Daily News* said that they rejected settlement offers from the city ranging from $3,500 to $7,500. One accepted a $5,000 offer.

Most of the cases hinge on what local authorities call the "Florida loophole," under which a Pennsylvania resident can obtain a nonresident permit to carry a concealed weapon through the mail from another state, even without a permit in Pennsylvania.

The "loophole" is unpopular with Philadelphia cops, who say that it allows those denied a permit here or whose permits were revoked to circumvent Philadelphia authorities and obtain it elsewhere.

But proponents say that it's necessary because Philadelphia has unusually strict criteria for obtaining a concealed-carry permit. Philadelphia, according to police and gun owners, relies heavily on a clause that allows denial of a permit based on "character and reputation" alone.

The men interviewed by the *Daily News* had varying reasons for seeking nonresident permits from Florida or other states, including having been denied a Philadelphia permit because of unpaid parking tickets. Some said that they carry a Florida permit because it is recognized by more states than a Pennsylvania one.

Two of the security guards said that they were on the job when their guns were taken, and that they were holding licenses issued by the state police to security officers under Pennsylvania Act 235, the Lethal Weapons Training Act.



We specialize in answers.

See why ▶

🔵 Rowan University  #AskRowanU

*We Recommend*

City Howl Help Desk: IN NEED OF A COP? MAYBE YOU COULD RENT ONE
*December 7, 2011*



We specialize in answers.

See why ▶

🔵 Rowan University  #AskRowanU

EXHIBIT

Despite following the law, all of the men said that they were treated like criminals by city cops who either ignored their rights or didn't know the laws.

Lt. Fran Healy, special adviser to the police commissioner, acknowledged that some city cops apparently are unfamiliar with some concealed-carry permits. But he said that it's better for cops to "err on the side of caution."

"Officers' safety comes first, and not infringing on people's rights comes second," Healy said.

Both Healy and Craig Straw, chief deputy city solicitor with the civil-rights unit, said that they could not speak to individual cases because of pending litigation, but said that the main issue with Florida permits is that officers on the street are not able to check the validity of a permit 24 hours a day.

"There's a lot of bad guys out there," Healy said. "I want to use my time on them and not waste it on this nonsense."

**9 SEPARATE INCIDENTS**

The nine men learned about each other because one of them, Richard Oliver, teaches safety courses required for nonresident permits from other states but not required by Pennsylvania.

In interviews with the *Daily News*, each said that Philadelphia police had confiscated guns that they had been legally carrying.

-- Oliver, 42, of Northeast Philadelphia: Last year, Oliver, who had nonresident permits from three states and an Act 235 license, was driving to his job as a security guard when police pulled over his car for allegedly running a stop sign in West Philadelphia. He said that police did not honor any of his permits and held him in custody for 18 hours, forcing him to stand outside for four hours in winter and denying him his diabetes medication.

His ordeal eventually landed him in Mercy Philadelphia Hospital, at 54th Street and Larchwood Avenue, in West Philadelphia, before he was booked on firearms charges and held on $15,000 bail, according to court records. In less than a month, his case was withdrawn by the District Attorney's Office, and a week later his gun was returned on a judge's order

Later, Oliver obtained a Philadelphia permit to carry. As owner of the Parapet Group, a protection-and-security company, Oliver continues to teach the safety courses.

Although the charges were withdrawn, they're still visible on Oliver's online court record. He said that the city offered him a $7,500 settlement, which he rejected.

"If ignorance of the law is not an excuse for a citizen," said Oliver, "it cannot be an excuse for law enforcement who are sworn to enforce the law."

-- Randy Huggins, 39, of West Philadelphia: On Election Day in November 2008, Huggins, who had just finished clerking at the polls at 64th and Callowhill streets, went to his mother's house to get his gun after the polls closed. He was stopped with the gun and questioned by police who overheard him on his phone trying to quell a family member's fears that he'd been the victim of a murder, he said.

Huggins said that police did not honor either of his nonresident permits and that he subsequently spent 14 hours in custody. Huggins, a diabetic, said that he was handcuffed to a bed at Thomas Jefferson University Hospital, in Center City, after his blood pressure skyrocketed. He said that he then was interrogated by homicide detectives for hours before he was released without being charged with a crime. Despite numerous attempts, Huggins said, he was unable to retrieve either his gun or his permits.

He said that the city offered him a $3,500 settlement, which he rejected.

-- Jameel Gaines, 32, of Oxford Circle: In April, Gaines, who has a permit to carry a concealed weapon in Philadelphia, and is an Act 235 agent, was working security at the Comfort Zone Lounge, in West Philadelphia, when cops raided the bar.

Gaines, who was in uniform, said that police took his handgun from his holster and took a shotgun he'd hidden behind the bar. After the raid, Gaines said, cops returned his handgun but told him that they were keeping his shotgun. He was never arrested or charged with a gun crime. He still has both his Philadelphia permit and his Act 235 license, but the shotgun has not been returned.

"This is the first time I had negative issues with the Philadelphia Police Department," said Gaines, adding that as a security guard he has turned over numerous illegal weapons to police.

-- Samuel Tiru, 28, of North Philadelphia: During a car stop in 2008 in North Philadelphia, Tiru said, an officer referred to his Florida gun permit as "baloney." He said that he subsequently was taken into custody, held for 18 hours and booked on firearms charges.

The case later was withdrawn by the District Attorney's Office, according to court records, but Tiru said that he has been unable to get his gun back and that police told him that they couldn't find his property receipt.

"It's not fun to sit in jail for something you didn't do wrong," Tiru said. "It wasn't a good experience knowing that you got booked for having a gun permit."

-- John Solomon, 24, of Germantown: Solomon, who has both a Florida gun permit and an Act 235 license, said that cops did not honor either document during a car stop in 2008. He said that he was taken into custody for six hours but was never charged with a crime. Solomon said that he was unable to get his gun back and was not given a property receipt.

-- Frank Walker, 37, of West Philadelphia: Walker said that police did not honor his Virginia nonresident gun permit when they stopped his car in July in West Philadelphia. He said that he was held in custody for four hours, then was let go without being charged with a crime. Walker said that although a supervisor apologized to him, he was told that his weapon wouldn't be returned because the police "already went through the paperwork of writing it up."

"I feel as though I've been robbed, because if I go out there and I take something from somebody, I'm going to jail," he said. "But I want to know why they can just take my gun for no reason."

-- Ron Frierson, 57, of Wynnefield: In 2009, Frierson, who was carrying a concealed weapon using a Florida permit, was pulled over for driving under the influence in West Philadelphia. He later was charged and opted into a first-time-offenders program for possession of marijuana and DUI, according to court records. He was not charged with a gun crime.

Frierson said that he was not able to get his weapon back or get a property receipt. He said that he signed off on a $5,000 settlement from the city, but has not received the money.

-- Ras-Tesfa Ferguson, 27, of Wyncote, Montgomery County: Ferguson, who has a Montgomery County gun permit and permits from Florida and New Hampshire, said that in 2008 he was outside a house in the Lawncrest section of Northeast

Philadelphia when police descended on the block. He said that cops did not honor any of his permits and charged him with possessing firearms not to be carried without a license and related gun crimes. Online court records show that Ferguson also was charged with burglary and simple assault in the case, but that all charges later were withdrawn.

Ferguson said that his gun and permits were confiscated. He said that he never got his gun back, although he was able to get his Montgomery County permit renewed. "Montgomery County is used to gun permits," he said. "Philadelphia acts like you broke the law."

-- Kenneth Sharper, 29, of North Philadelphia: Sharper, who has an Act 235 license and a Philadelphia gun permit, said that he was working security in 2008 at the Players Club, in Northeast Philadelphia, when he and a police officer "had words, like two grown men."

After closing time, Sharper said, police arrested him for disorderly conduct and public intoxication and took him into custody. Sharper said that he never drinks at work and that cops refused to give him a sobriety or blood test. He said that he was held for eight hours and that police took his gun and his Philadelphia permit and have not returned them.

He now carries a Florida nonresident permit and still has a valid Act 235 license.

'THESE GUYS AREN'T THUGS'

Many of the men whose guns were taken said that they were told to write a letter to the police commissioner to seek the return of their firearm. Two of the men wrote letters but said that they received no response.

Guy Sciolla, a defense lawyer whose firm is handling at least 10 such civil suits, said that the men should not have been "separated from their legally possessed firearms."

Sciolla said that even though some officers may not like the "loophole," their disdain for the law should not allow them to circumvent it.

"These guys aren't thugs, they're going about their business, going to work, and they've complied with the law," he said of the men whose guns were confiscated.

"If the bottom line is the police are upset because they are going around them, it's OK if they want to take it personally, but you can't use arrest powers because you're upset on a personal level."

Mary Catherine Roper, a staff attorney at the American Civil Liberties Union of Pennsylvania's Philadelphia office, said that the cases seem "pretty outrageous."

"This idea of taking people's guns who are carrying them legally and arresting them is absurd," she said. "The police don't get to decide what is a crime - they only get to enforce what is a crime."

"They are simply acting as vigilantes here and deciding they know better than the law."

Straw, of the City Solicitor's Office civil-rights unit, said that his department is handling about eight such cases of "constitutional claims that civil rights were violated by us taking their property and by them being falsely arrested."

Healy, the special adviser to the police commissioner, said that he is working on uniform guidelines for officers on the street on how to handle nonresident gun permits.

Meanwhile, Roper said that citizens should remain wary of police who arrest people complying with the law and take their property, even if it is a gun.

"The public may be saying, 'You're getting guns off the street,'" Roper said.

"But there's got to come a point where you want your police, of all people, to respect the law."

"This isn't technical, it's fundamental."

You May Like                                                                 Sponsored Links by Taboola

An Accepted Method To Pay Off A Credit Card
NextAdvisor

This Hoodie Is So Insanely Popular You Have To Wait Months To Get It
American Giant Hoodie

Why Aren't Homeowners Taking Advantage of HARP?
LowerMyBills

Warren Buffett Just Gave Americans a Big Warning
The Motley Fool

2 New Recipes that Turbocharge Weight Loss!
RandomHouse | Zero Belly Cookbook

3 Reasons to Say Goodbye to Spreadsheets in Accounting
Intacct

**More From The Web**

· **The method used to pay down credit card debt at a furious pace** (NextAdvisor)

· **This Hoodie Is So Insanely Popular You Have To Wait Months To Get It** (American Giant Hoodie)

· **Why Aren't Homeowners Taking Advantage of HARP?** (LowerMyBills)

· **Warren Buffett Just Gave Americans a Big Warning** (The Motley Fool)

· **2 New Recipes that Turbocharge Weight Loss!** (RandomHouse | Zero Belly Cookbook)

· **Boy, 2, Dies; Police Suspect Abuse, Hold Father For Assault Head Injuries Killed Shaeer Bailey. Wesley Wise, His Father, May Face Murder Charges. Dhs Has A Case File.**

· **Sources: Philly cops probing sergeant over surrendered guns**

· **Cops: Intruder takes girl from house, beats her**

· **North Philly Horror story**

· **Haverford School's Kevin Carter, Wood's Anthony Russo players of week**

**More From Philly.com**

Promoted Links by Taboola

Comments for this thread are now closed.                    ✕

0 Comments        Philly.com                              ● Login

♥ Recommend    ⤺ Share                              Sort by Best ▾

This thread is now closed.

▾ SPONSORED



· I.                                          Your Cable Company Doesn't Want You To Know This 2 months ago fool.com The Motley Fool Fool.com (sponsored)



comments powered by Disqus

Commenting policy | Comments FAQ

# FLIR® Infrared Cameras

flir.com/Thermal-Simulator

Take An IR Camera For A Virtual Test Drive. See What You're Missing

## FEATURED ARTICLES







City: New road closings, fencing for pope visit; help for businesses

D.A. to probe prison death of 'Fat Mike'

They'll never forget: Attacks changed their lives forever

### More:

In Bulk Trucking, Chemical Leaman Is Rolling Toward The Top

Frank Nofer, 71, famed graphic artist

George Mattson, 88, Olympian, Crew Coach

De Mazia Art Brings $2.38 Million

Leader Of Jbm Sentenced To Life Aaron Jones Was Convicted Of Conspiring To Distribute $100 Million In Cocaine. He Plans To Appeal.

Jbm 8 Believed Founders

Index by Keyword | Index by Date | About Philly.com | Contact Us | Terms of Use & Privacy Statement | Copyright 2015

# Exhibit H

PennRecord.com

# Lawsuit claims harassment of lawful gun owners is turning Phila. into a 'police state'

Pennsylvania Record Report Mar. 19, 2012, 6:59am



A federal civil rights lawsuit filed by a Philadelphia man on March 15 alleges that the City of Philadelphia and its police department have been engaging in a widespread assault on citizens' Second Amendment rights, specifically by unlawfully arresting people who are legally carrying firearms using gun licenses from reciprocal states.

In a 43-page lawsuit filed at the U.S. District Court for the Eastern District of Pennsylvania by Philadelphia attorney James E. Lee, of the firm Brooker, Richardson, Dickerson, Lee & Associates, on behalf of city resident Jeff Lavalliere slams the City of Philadelphia, the Philadelphia Police Department and various law enforcement higher-ups for a slew of constitutional rights violations, asserting that the city's constant and longstanding assault on the Second Amendment is turning Philadelphia into a "police state."

Despite the fact that Philadelphia cannot legally enact its own gun laws due to the state's preemption



statute, the city "has a long and unsuccessful history of attempting to regulate lawful gun ownership," the lawsuit claims.

The suit goes on to label Mayor Michael Nutter as a "malicious and vocal advocate of abolishing the Second Amendment rights of citizens like Mr. Lavalliere."

"Highly prone to rhetorical hyperbole, Mayor Nutter often misstates facts and claims that lawful gun owners are violating the civil rights of other citizens," the lawsuit states. "Mayor Nutter wrongfully and maliciously claims that the formal reciprocity agreements with other states ... is a 'loophole' that allows firearms to be unlawfully possessed in the City of Philadelphia."

The lawsuit outlines three separate incidents in which Lavalliere was unlawfully detained, accosted by police and had his firearm and Florida gun license seized without provocation.

(Florida and Pennsylvania have a reciprocity agreement by which each state recognizes the others' gun licenses. Philadelphia, however, passed an ordinance banning the practice. The local law is believed by many to be illegal).

Lavalliere makes his living as an armed security agent, and his lawsuit alleges that the constant police harassment, and the fact that officers seized, and have yet to return, his property, has made it so he has been unable to make a living in his chosen field.

The lawsuit states that following a third incident in May 2011, during which he was arrested and charged with three felonies – he was later found not guilty of all criminal charges – Lavalliere lost his job as an armed security agent and he has been unable to find work since.

"Even though Mr. Lavalliere was completely exonerated by a state court judge, [the defendants]

have refused to return Mr. Lavalliere's firearm, ammunition, concealed weapons license and Act 235 Permit," the lawsuit states.

Act 235 relates to armed guard certification in Pennsylvania.

The lawsuit claims that the defendants' actions unlawfully interfere with Lavalliere's right to bear arms, his rights to contract for lawful employment, and his rights to lawful travel.

The complaint also alleges that because the City of Philadelphia and its police department allow city officers to work as armed security agents while off-duty, the defendants can personally benefit from denying Lavalliere his ability to carry firearms, which he does for his job.

The lawsuit contains numerous allegations of constitutional violations. It also lodges a claim of failure to supervise against Police Commissioner Charles Ramsey and Deputy Police Commissioner Stephen Johnson, as well as claims of failure to intervene and stop a violation of civil rights against the two department higher-ups.

The suit also contains counts of denial of due process, retaliation, taking property rights, invasion of privacy – false light, assault and battery, false arrest and false imprisonment, malicious prosecution and abuse of process, intentional infliction of emotional distress and conspiracy under the color of state law.

Lavalliere demands punitive damages in the amount of $150,000 on all claims for relief, as well as attorney's fees and other litigation costs. He is also demanding a jury trial.

Additional defendants named in the lawsuit are Lisa King, the lieutenant in charge of the police department's Gun Permits Unit, Detective Vincent Guarna, and Officers Velez, Cartagena, Johnson,

# Exhibit I

# JONATHAN TURLEY

## Res ipsa loquitur ("The thing itself speaks")

## Menu

Skip to content

- Home
- Bio
- Civility Rule
- Columns
- Corrections
- Weekend Bloggers

HomePhiladelphia Police Wrongly Accuse Man of Gun Violation in Abuse Confrontation And Then Charge Him Instead With Disorderly Conduct

# Philadelphia Police Wrongly Accuse Man of Gun Violation in Abuse Confrontation And Then Charge Him Instead With Disorderly Conduct

1, May 17, 2011 jonathanturley Bizarre, Criminal law, Politics, Society

There is an interesting audio recording (below) from

a man, Mark Fiorino, 25, who was confronted by a Philadelphia police officer about carrying a



gun in public. Fiorino is allowed to open carry in the city, but the officers appeared completely ignorant of their own directives and became increasingly hostile to Fiorino's effort to show them that he was lawfully carrying the weapon. After concluding that he was right, he was released . . . only to be charged later with disorderly conduct based on his effort to show the officers that they were wrong about the law.

Fiorino carries a .40-caliber Glock on his hip in plain view. Sgt. Michael Dougherty spotted the gun and pulled his own weapon — shouting "Yo, Junior, what are you doing?"

What follows is an audio tape of the confrontation. The officers become increasingly profane and insulting — particularly after learning that they have been taped. Dougherty asked, incorrectly, "Do you know you can't openly carry here in Philadelphia?: Fiorino responds by saying, correctly, "Yes, you can, if you have a license to carry firearms. It's Directive 137. It's your own internal directive." He is right. You can carry if you have a concealed weapons permit (a slightly higher standard than the rest of the state).

I will not hide my unease about open carry laws and I am sympathetic with the difficulty that it poses for officers who have to determine if someone is a danger to themselves and others. However, the conduct of these officers in this case should be a matter of internal discipline. Instead, as is often the case with taped police encounters, the prosecutors are now seeking to convict Fiorino on a different charge after confirming that he was right. He is now being charged despite the fact that he never raises his voice and remains calm throughout the encounter.

Here is the directive that Fiorino referenced:

Police directive sent to all districts regarding open carry in Philadelphia, PA Sept 22, 2010

GENERAL: 1272 09/22/10 12:53:20

TO : ALL COMMANDING OFFICERS / DEPARTMENT HEADS
SUBJECT : FIREARM OPEN CARRY LAW IN PHILADELPHIA

1. DIRECTIVE 137, ENTITLED "FIREARMS" IS BEING UPDATED CONCERNING THE PENNSYLVANIA OPEN CARRY LAWS REGARDING THE CITY OF PHILADELPHIA. THIS TELETYPE REFLECTS THE NEW POLICY AS IT WILL APPEAR IN THE DIRECTIVE.

2. ALL OFFICERS SHOULD BE AWARE THAT PENNSYLVANIA IS CONSIDERED AN "OPEN CARRY STATE" WITH THE EXCEPTION OF PHILADELPHIA. IT IS IMPORTANT TO DEFINE A FEW TERMS USED, WHICH ARE AS FOLLOWS:

"OPEN CARRY" REFERS TO THE ACT OF OPENLY AND VISIBLY CARRYING A FIREARM ON ONE'S PERSON.

"OPEN CARRY STATE" REFERS TO A STATE THAT ALLOWS PEOPLE TO OPENLY AND VISIBLY CARRY A FIREARM ON ONE'S PERSON WITHOUT A SPECIAL LICENSE OR PERMIT.

"CONCEALED CARRY FIREARMS LICENSE" REFERS TO A SPECIFIC LICENSE ISSUED TO AN INDIVIDUAL AUTHORIZING THE PERSON TO CARRY A FIREARM CONCEALED ON HIS OR HER PERSON OR VEHICLE.

3. IN PHILADELPHIA, UNLIKE ANY OTHER PART OF THE STATE, FOR ANY PERSON TO LAWFULLY, OPENLY AND VISIBLY CARRY A FIREARM, THAT PERSON MUST HAVE A CONCEALED CARRY FIREARMS LICENSE. SO, IN PHILADELPHIA, IF A PERSON HAS A VALID CONCEALED CARRY FIREARMS LICENSE, HE OR SHE CAN LEGALLY CARRY A FIREARM EITHER OPEN AND VISIBLE OR CONCEALED.

4. AN OFFICER ENCOUNTERING A PERSON CARRYING A FIREARM
OPENLY IN PHILADELPHIA SHOULD FOR THE SAFTEY OF PUBLIC
INVESTIGATE AS A POSSIBLE VUFA VIOLATION.

A. SINCE A SEPARATE LICENSE IS REQUIRED IN PHILADELPHIA
AND IT IS IMPOSSIBLE FOR ANY OFFICER TO KNOW WHO DOES
AND DOES NOT HAVE A VALID CONCEALED CARRY LICENSE, IT
IS ENTIRELY REASONALBE FOR OFFICERS TO TEMPORARILY
DETAIN AND INVESTIGATE ANY INDIVIDUAL CARRYING A
FIREARM EXPOSED TO DETERMINE IF THE PERSON IS
OPERATING WITH THE LAW.

B. IMMEDIATLEY SEIZE ANY FIREARMS FOR OFFICER SAFETY
DURING THE STOP AND UNLOAD THE FIREARMS IF POSSIBLE,
BUT ONLY IF IT CAN BE DONE SAFELY.

C. A 75-48A MUST BE COMPLETED AND THE BASIS FOR THE STOP
WOULD BE A "POSSIBLE VUFA VIOLATION"

D. ONCE THE OFFICER RECEIVES CONFIRMATION THAT THE
CONCEALED CARRY LICENSE IS VALID, AND THERE ARE NO
OTHER OFFENSE OR VIOLATIONS BEING INVESTIGATED,
OFFICERS SHOULD RETURN THE FIREARM AND AMMUNITION
BACK TO THE INDIVIDUAL AT THE END OF THE STOP.

E. HOWEVER, IF THE INDIVIDUAL CANNOT PRODUCE A VALID
CONCEALED CARRY LICENSE OR THE LICENSE IS NOT VALID
(I.E. EXPIRED OR REVOKED), PROBABLE CAUSE THEN EXISTS
TO ARREST THE INDIVIDUAL FOR THE VUFA VIOLATION AND
TRANSPORT THE INDIVIDUAL TO THE DIVISIONAL DETECTIVES
FOR PROCESSING. THE FIREARM AND AMMUNITION SHOULD
BE PLACED ON A PROPERTY RECEIPT (75-3) AND MARKED AS

" EVIDENCE". A 75-48A FOR THE INITIAL STOP MUST BE
PREPARD ALONG WITH A 75-48 FOR THE VUFA ARREST.

The District Attorney's Office is pressing charges with reckless endangerment and disorderly
conduct. I believe those charges are wildly excessive and retaliatory.

While he should have followed the directions of the officers in dropping to his knees, it is hardly
the conduct to support a criminal charge. For gun owners, the prospect of being constantly told to
drop to their knees while staring down a gun barrel may seem like retaliation by the police
department, which is clearly hostile to the right created by law. There are ample reasons to
oppose open carry laws, but the government has affirmed this right for citizens like Fiorino.
There is an obvious need for better training of officers on the existence of the right. Moreover,
regardless of the legitimate need to investigate, these officers were plainly unprofessional in their
language and treatment of Fiorino.

Source: Philly

Jonathan Turley

**Share this:**

- Twitter6
- Reddit
- Facebook32

# Exhibit J

SC0807152 ROBERT MCCARTHY

1

```
1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3                      - - -
4    KENNETH SHARPER            :
5                  Plaintiff, :
6         v.                    :
7    CITY OF PHILADELPHIA, ET AL.:
8                  Defendant. :   NO. 14-5299
9                      - - -
10          Oral deposition of POLICE OFFICER ROBERT MCCARTHY,
11   taken at CITY OF PHILADELPHIA LAW DEPARTMENT, Civil Rights
12   Unit, One Parkway Building, 1515 Arch Street, 14th Floor,
13   Philadelphia, Pennsylvania, on Friday, August 7th, 2015,
14   at 11:51 a.m., before Stephanie Marie Calter, a Shorthand
15   Reporter and Notary Public.
16                      - - -
17              ACE REPORTERS, INC.
18            The Bourse, Suite 1030
19         111 South Independence Mall East
20         Philadelphia, Pennsylvania 19106
21         (215)627-6701   (866)ACE-7003
22                      - - -
23          89 North Haddon Avenue, Suite D
24          Haddonfield, New Jersey 08033
```

ACE REPORTERS, INC. (215)627-6701

♀

2

SC0807152 ROBERT MCCARTHY

1    APPEARANCES:

2

3           GAY, CHACKER & MITTIN, P.C.
            BY:   BRIAN S. CHACKER, ESQUIRE
4           1731 Spring Garden Street
            Philadelphia, Pennsylvania 19130
5           bchacker@gaychackermittin.net
            Attorney for the Plaintiffs
6           (215)567-6809

7

8           CITY OF PHILADELPHIA
            LAW DEPARTMENT
9           BY:   NIYA L. BLACKWELL, ESQUIRE
            Civil Rights Unit
10          One Parkway Building
            1515 Arch Street
11          14th Floor
            Philadelphia, Pennsylvania 19102
12          NIYA.BLACKWELL@PHILA.GOV
            Attorney for the Defendants
13          (215) 683-5445

14

15   Also Present:  Steven A. Medina, Esquire

16                  and Kenneth Sharper

17

18

19

20

21

22

23

24

ACE REPORTERS, INC. (215)627-6701

3

SC0807152 ROBERT MCCARTHY

1                        I N D E X

2     WITNESS                 EXAMINATION BY            PAGE

3     POLICE OFFICER ROBERT MCCARTHY

4     EXAMINATION

5

          Mr. Chacker                         5

6

7         Ms. Blackwell                      34

8

9

10

11                   E X H I B I T S

12

13    EXHIBIT NUMBER           DESCRIPTION              PAGE

14                        (NONE PRESENTED.)

15

16

17

18

19

20

21

22

23

24


            ACE REPORTERS, INC. (215)627-6701

    ⚲                                                   4

SC0807152 ROBERT MCCARTHY

17    A        Yes.   I remember the Pennsylvania driver's

18    license.  The Florida license permit to carry.   The

19    Virginia one, and the Philadelphia permit to carry.

20    Q        Do you remember seeing an Act 235 license?

21    A        I don't.

22    Q        Do you know whether you can check to see

23    if an Act 235 license is valid?

24    A        I don't think you can on the MDT.   And,

ACE REPORTERS, INC. (215)627-6701

20

1     you know, you don't -- as a patrol officer I don't

2     think -- I think maybe one other time I came across

3     someone with an Act 235, but that was a long time

4     ago.  I don't remember.

5              But it's very rare you come across

6     it.

7     Q        Had you received at any point in time any

8     training on how to deal with someone who hands you

9     an Act 235 license?

10    A        I don't remember training on it.  You

11    know, you have conversations with, you know, other

12    officers that, you know, know what the Act 235

13    means.  That is, you know, they are allowed to

14    carry, to go to and from work, and basically, like,

15    security club, like the guys out front, you know,

16    with -- all the swat officers, like them guys are

17    Act 235.

Page 19

SC0807152 ROBERT MCCARTHY

18  Q       Right.  But my question is a little
19  different.
20  A       Okay.
21  Q       Did you receive any training that you can
22  recall from the Philadelphia Police Department at
23  the Academy or through your updates regarding how to
24  deal with someone who presents an Act 235 license to

ACE REPORTERS, INC. (215)627-6701

21

1  you?
2  A       I don't recall.
3  Q       You don't recall ever receiving any?
4  A       I don't recall.  No.
5  Q       Have you had your updates yet for this
6  year?
7  A       Yes.
8  Q       Those updates, were you presented with any
9  training on how to deal with someone who presents
10  and Act 235 license?
11  A       No.
12  Q       Do you remember your training in the
13  past -- let's say in the past three years for your
14  updates, do you remember ever receiving any training
15  relating to Act 235?
16  A       I don't.
17  Q       Okay.  Or those who present the license to
18  you?

Page 20

SC0807152 ROBERT MCCARTHY

19    A         I don't.

20    Q         Do you agree with me there must be some

21    way to verify an Act 235 license if it's presented

22    to you; otherwise, you know, what would you do,

23    right?

24    A         Yes.  Right.  Which is why we called up

ACE REPORTERS, INC. (215)627-6701

22

1     the detectives, because when I was running, you

2     know, the IDs in the computer, I was not sure about

3     Florida, being able to carry in Philadelphia.

4     That's why I called the detectives, because I wasn't

5     sure if he was allowed to do that or not.

6                That's why I called the detectives,

7     because, you know, just as far as our training goes,

8     sometimes you don't -- when you're out on the

9     street, you forget.  If you're trained on a certain

10    thing, sometimes you forget and you call up the

11    detectives and they refresh your memory, so...

12    Q         You said something I'm want to clarify,

13    because I thought your partner had said -- Officer

14    Busa said that he called detectives, but you said

15    you called the detectives.

16                Did you --

17    A         I believe he called and talked to -- he

18    talked to a detective and I believe I called again

19    and talked to a Detective Speck.  Speck was like,

Page 21

# Exhibit K



# BASIC RECRUIT CURRICULUM

A

# Section IV
# Laws and Procedures

| | |
|---|---|
| A | Authority and Jurisdiction |
| B | Constitutional Law |
| C | Criminal Law |
| D | Criminal Procedures and Laws of Arrest |
| E | Search and Seizure |
| F | Admissions and Confessions |
| G | Civil Laws |
| H | Liquor Laws |
| I | Controlled Substances |
| J | Cell Phone Laws |
| K | Lethal Weapons Law |
| L | Electronic Surveillance Act |
| M | Environmental Crimes |

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

|  | c. | *Felony of Second Degree* |

c.     *Felony of Second Degree*

d.     *Felony of Third Degree*

e.     *Misdemeanor of First Degree*

f.     *Misdemeanor of Second Degree*

g.     *Misdemeanor of Third Degree*

h.     *Summary Offense*

B.     **Classes relevant to arrest powers.**

    1.     An officer need not know the exact degree of each and every criminal offense.

    2.     An officer must know and be able to differentiate between Felony, Misdemeanor, and Summary Offenses.

       a.     An officer's power to arrest is directly related to the class of crime, he/she wishes to arrest for.

**3 Hours**

**Performance Objective #3**

Define the significance of probable cause, its application, characteristics and its relationship to constitutional rights.

V.     **PROBABLE CAUSE TO ARREST**

A.     **All arrests made by a police officer, either with or without an arrest warrant, must be based upon Probable Cause.**

    1.     Probable Cause to believe that a crime:

       a.     has taken place, OR

       b.     Is taking place, OR

       c.     Is about to take place, AND

    2.     Probable Cause to believe that the person the officer wishes to arrest:

       a.     did commit the crime, OR

       b.     is committing the crime, OR

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

c.   is about to commit the crime.

**Overhead #7**

B.   **Probable Cause defined:**

*Facts and circumstances which support a reasonable belief that a crime has been committed and that the person to be arrested committed the crime.*

1.   When the term "**Reasonable Belief**" is used in reference to Laws of Arrest, the officer should equate it to the term "**Probable Cause**"

2.   Probable Cause:

a.   Is more than mere suspicion

b.   Is less than actual proof.

c.   Is knowledge of facts & circumstances, which lead to prudent inferences or conclusions.

3.   Mere suspicion can not be the basis for a valid arrest in Pa.

a.   In Pa. there is no criminal charge of, **Arrest on Suspicion of...**

b.   All arrests must be for a specific crime(s) & must be based upon Probable Cause.

C.   **Indications of Probable Cause**

1.   **Probable Cause has no technical elements.**

2.   **Probable Cause involves an examination of all the facts & circumstances known to the officer at the time of an event.**

a.   Actions such as fleeing from police are not in themselves sufficient to establish Probable Cause to arrest.

**Performance Objective #4**

Identify the factors an officer may consider in establishing probable cause for an arrest

10

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

      b.     Flight along with additional specific and articulable facts may establish Probable Cause for arrest.

           i.     Flight coupled with proper physical description may create Probable Cause.

**Overhead #8**

      c.     Mere police observation of an exchange of an unidentified item for cash on a public street, coupled with flight of the actor, does not establish Probable Cause to arrest.

           i.     *Comm. v. Banks*, 658 A.2D. 752 (Pa. 1995)

   **3.**    **When considering whether Probable Cause for arrest exists, the officer can consider every fact that is known to him through his senses, including hearsay from others.**

      a.     Hearsay alone will not suffice, and must be corroborated by investigation and or the officers personal observations.

      b.     Hearsay, which may not be admissible as evidence to convict, can still be considered when establishing Probable Cause to arrest.

   **4.**    **Facts & Circumstances at one crime scene may give rise to Probable Cause to arrest more than one person, if the officer is unsure of the perpetrator.**

      a.     *Commonwealth v. Bunch*, 329 Pa.Super A.2d. 1372, 1379 (1984) supports the concept of multiple arrests contingent upon the following conditions:

           i.     There is some degree of certainty that the perpetrator is in the group arrested.

           ii.     The size of the group is limited.

           iii.     The offense is a serious one.

           iv.     The circumstances dictate that the officer act immediately or allow the actor(s) to escape.

| Performance Objectives<br>and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

|  | v.    A high potential for quick post arrest identification of the perpetrator exists. |
|  | b.    An example might involve two males who are arrested by police after wrecking and fleeing from a stolen car. |
|  | i.    Both actors might be arrested until a witness can make a positive ID of the driver involved. |
|  | c.    This ruling does not mean that officers may engage in "Drag Net" type arrests. |
| **Performance Objective #5**<br><br>Identify probable cause facts and the criteria these facts must meet to satisfy the courts | 5.    **There are three broad sources of facts & circumstances which can be used to establish Probable Cause for an arrest:** |
|  | a.    Observations made through the officer's senses. |
|  | i.    The officer may consider what he heard, saw, smelled, tasted or touched. |
| Overhead #9 | b.    Reliable information that the officer receives from others. |
|  | i.    Statements from victims, witnesses or other officers. |
| Review handout "Elements of Probable Cause." | ii.    The officer should document why he believed these sources to be credible. |
|  | c.    Information that the officer receives through investigation. |
|  | i.    Physical, scientific or other such evidence. |
|  | 6.    **Probable Cause is always subject to judicial review.** |
|  | a.    The trial courts will, upon defense motion, determine whether there was Probable Cause to arrest in a particular case. |

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

b.  An officer must be able to point to and describe specific & articulable facts; aided by rational inferences, which lead him/her, to believe there was probable cause for arrest.

c.  The courts determine the legality of an arrest by utilizing "The Totality of the Circumstances Test".

   i.  The courts will view the facts & circumstances "as viewed through the officer's eyes at the time of arrest".

      1)  What the officer could reasonably conclude given the situation.

d.  "The Totality of the Circumstances Test" was adopted by U.S. Supreme Court in:

   i.  *Illinois v. Gates*, 462 U.S. 213. 103 S. Ct. 2317 (1983)

e.  "The Totality of the Circumstances Test" was adopted by Pa. Supreme Court in:

   i.  *Commonwealth v. Gray*, 509 Pa. 476 (1985)

**Performance Objective #6**

Define why it is necessary to avoid making an arrest prior to obtaining sufficient facts that support probable cause

7.  **Arrests lacking sufficient Probable Cause will:**

a.  Be declared illegal by the court.

b.  Jeopardize all evidence seized as a result of the illegal arrest.

   i.  This is known as the Exclusionary Rule.

8.  **An unlawful arrest, lacking Probable Cause may subject an officer to:**

a.  Disciplinary action.

b.  Civil liability.

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

c.     Criminal prosecution if the violation is intentional.

**D.**    **Utilizing Probable Cause as the basis for an arrest made with arrest warrant.**

1.    Probable Cause is the legal basis upon which a District Magistrate may issue an Arrest Warrant.

2.    Probable Cause must exist at the time that an Arrest Warrant is obtained.

a.    Probable Cause must be presented on an affidavit, sworn to by the affiant, before the issuing authority. **(Pa. R. Crim. P. #119a)**

*Review handout "Affidavit of Probable Cause"*

b.    **Four Corners Rule** – When determining the sufficiency of Probable Cause, a Magistrate may only consider those facts described in writing, and placed on the *Affidavit of Probable Cause*. **(Pa. R. Crim. P. #119b)**

i.    The issuing authority may not consider oral statements presented by the officer.

*Instructor should review current case law in which the court examined sufficiency of Probable Cause.*

3.    A Criminal Complaint must be filed with the District Magistrate along with a supporting Affidavit of Probable Cause. **(Pa. R. Crim. P. #101)**

a.    A Criminal Complaint must charge a specific violation of Pa. Law.

b.    Probable Cause summarized in an Affidavit of Probable Cause must support the charges alleged in the Criminal Complaint.

i.    One Affidavit of Probable Cause may support several related criminal charges, arising from related circumstances.

*Overhead #10*

4.    Types of Arrest Warrants:

14

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

a. **Body Warrant** – an arrest warrant for a person, where-in a law enforcement officer is directed to seize a particular person and bring them before the **Issuing Authority** for disposition.

b. **Warrant for fine & costs** – an arrest warrant which becomes invalid if the actor pays the server, upon demand, the cash sum specified in the warrant.

c. **Duplicate Warrant** – A duplicate of an original arrest warrant.

d. **Alias Warrant** – an arrest warrant issued when the original warrant was served but its purpose was not achieved.

    i. Original served, actor released on bond, actor does not appear for Preliminary Hearing.

e. **John Doe Warrant** – an arrest warrant issued in the name of John Doe, where the actors name is unknown.

    i. Warrant issued based upon nick name, physical description.

*Review handout "Sample Bench Warrant"*

f. **Bench Warrant** – an arrest warrant issued by a Judge in a court of record, usually a judge in the Court of Common Pleas.

    i. A Bench Warrant is a special type of body warrant usually issued for actors who fail to appear in court when subpoenaed or who violate probation.

E. **Utilizing Probable Cause as the basis for an arrest made without an arrest warrant.**

1. When an arrest is made without an arrest warrant for a Felony or Misdemeanor offense, the actor must be taken without unnecessary delay before an Issuing Authority. (Pa. R. Crim. P. #~~102~~) *5/3*

15

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

      a.    An Affidavit of Probable Cause and Criminal Complaint must be filed.

      b.    The actor must be afforded a Preliminary Arraignment without unnecessary delay.

2.    When the arresting officer deems it appropriate, the officer may promptly release from custody a defendant who has been arrested without a warrant, rather than taking the defendant before the issuing authority, when the following conditions have been met: (**Pa. R. Crim. P. #102**)

      a.    The most serious offense charged is a Misdemeanor of the second degree.

      b.    The defendant is a resident of the Commonwealth.

      c.    The defendant poses no threat of immediate physical harm to any other person or to himself or herself.

      d.    The arresting officer has reasonable grounds to believe that the defendant will appear as required.

      e.    The defendant does not demand to be taken before an issuing authority.

3.    The release authorized under Pa. Rule #102 applies to:

      a.    A DUI arrest.

      b.    Any other warrantless arrest for a Misdemeanor 2 or Misdemeanor 3 except:

            i.    Arrest pursuant to a violation of a Protection From Abuse Order. (**35 P.S. Section 019.0**)

                1)    Preliminary Arraignment required.

            ii.    Arrests for assaults and other domestic related violence. (**18 Pa. CS 2711**)

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

> 1)     Preliminary Arraignment required.

    4.     When a defendant is released, a complaint shall be filed against the defendant within 5 days of the defendant's release. Thereafter, a summons, not a warrant of arrest, shall be issued and the case shall proceed as provided in Rule 110.

**3 ¼ Hours**

**VI.**     **AUTHORITY TO ARREST IN COURT CASES**

    A.     **Court cases defined** – A case in which one or more of the offenses charged is a misdemeanor, felony or murder.

    B.     **General Rule** – Where possible, an officer who wishes to make an arrest for a Felony or a Misdemeanor offense, should first file a Criminal Complaint and obtain an Arrest Warrant.

       1.     The general rule requiring that officers obtain Arrest Warrants where possible is to allow a neutral and detached Magistrate or Judge to make the determination about the sufficiency of the officers Probable Cause to arrest.

**Performance Objective #7**

Define the term "Exigent Circumstances" and be able to determine when these circumstances exist

          a.     This review process insures that the citizen's detention is not an unreasonable seizure described in the U.S. and Pa. Constitution.

       2.     Under certain emergency circumstances an officer is authorized to make certain arrests, for Felony or Misdemeanor offenses.

          a.     These arrest are authorized when immediate police action is required to prevent or terminate a crime or for other public safety purposes.

          b.     We refer to these events as **Exigent Circumstances.**

          c.     Exigent Circumstance which require immediate police response have been defined in numerous court rulings and in Pa. Statutory Law.

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

d.   We will discuss those exigent circumstances that permit an officer to make an arrest without an Arrest Warrant for Felony and certain Misdemeanor offenses.

C.   **Warrantless Arrest for Felony Offenses.**

Overhead # 11

*Warrantless Arrest Authorized for:*

*Felony Committed in Officers View*

*On Probable Cause for Felony Not Committed in Officers View*

*Exceptions – Actors home*

*Another persons dwelling where actor may be found.*

1.   **An officer may arrest, without an Arrest Warrant, for any Felony Offense:**

Performance Objective #8

Identify when an arrest can be made without an arrest warrant

a.   **Committed in his/her view.**

i.   The term in view means detectable by the senses.

1)   An officer who hears glass breaking and sees the suspect fleeing from the window has viewed the offense.

2)   An officer who arrives at a fresh crime scene and finds the actor in the process of flight has viewed the offense.

ii.   Immediate fresh pursuit into buildings is permitted.

iii.   An officer may arrest for any Felony Offense committed within any location or building where he is legally present and where he observes the offense.

18

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

b. Not viewed by the officer, but for which the officer has established Probable Cause to believe:

    i. A Felony has been committed, AND

    ii. The person to be arrested committed the Felony.

       1) *Commonwealth v. Gelber*, 406 Pa.Super. 382, 594 A.2d. 672 (1991)

**Performance Objective #9**

Identify when it is necessary to have a warrant to make a lawful arrest

Overhead #12

2. Exceptions to the general rule which authorizes Warrantless Felony Arrests:

a. <u>Actor's home</u> – warrantless felony arrests involving a nonconsensual or forced entry into the actor's home is not authorized.

    i. An Arrest Warrant is required unless Exigent Circumstances are present.

    <u>*Exigent Circumstances*</u>

    *Officers in hot pursuit.*

    *Armed & dangerous person in a building.*

    *Violent crime in progress.*

    *Persons in need of immediate police/medical assistance.*

    1) An officer in hot pursuit of a Felony suspect who flees into his home may pursue and force entry, if necessary, to complete the arrest.

       a) *U.S. v. Santana*, 427 U.S. 38, 96 S.Ct. 2406 (1976)

19

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

        b)    *Commonwealth v. Johnsonna* 420 Pa.Super, 434, 616 A.2d. 1376 (1992)

2)    An armed & dangerous person in the home or other building, creates circumstance which permits forced entry, if necessary, to complete the arrest or terminate a danger to any person.

        a)    *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371 (1980)

        b)    *Commonwealth v. Ehrsam*, 355 Pa.Super, 40, 512 A.2d. 1199 (1986)

3)    An officer who reasonably believes that a violent crime is in progress inside the home, may force entry, if necessary, to complete the arrest or terminate a danger to any person.

        a)    *Payton* & *Ehrsam* quoted above.

4)    An officer who reasonably believes that any person in the home is in immediate need of police or medical assistance may force entry for purposes of rendering immediate aid to any person.

        a)    *Payton* & *Ehrsam* quoted above.

5)    The above quoted cases are based on danger to some party and/or the need for immediate police action.

| Performance Objectives and Instructional Cues | OUTLINE AND PRESENTATION |
|---|---|

        a)    These same cases prohibit warrantless entries to make a "routine" felony arrest.

  ii.    Officers already <u>legally</u> in an actors home may make warrantless arrest, as if actor were outside home.

     1)    An officer is legally in the home if:

        a)    The officer has been invited into the home by at least one owner/occupant.

        b)    The officer is in the home serving a search warrant or other legal service.

        c)    The officer entered the home to aid a party in need of medical or police assistance.

     2)    An officer who enters a home to put out a fire or assist medical personnel is "legally in the residence".

  **b.**    **When the actor which an officer wishes to arrest is in another persons dwelling, a <u>Search Warrant</u> is required unless:**

    **i.**    **Exigent circumstances are present.**

     1)    Rule applies even if officer has arrest warrant for the actor.

        a)    *Minnesota v. Olson*, 110 S.Ct. 1684 (1990)

        b)    Same exigent circumstances as described above in i.